IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF NEW JERSEY

NEWARK DIVISION

| | |
|---|---|
| GREG MANNING; CLAES ARNRUP; POSILJONEN AB; POSILJONEN AS; SVEABORG HANDEL AS; FLYGEXPO AB; AND LONDRINA HOLDING, LTD., | Case No.: _____ |
| Plaintiffs, | |
| v. | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; KNIGHT CAPITAL AMERICAS, L.P., formerly known as KNIGHT EQUITY MARKETS L.P.; UBS SECURITIES, L.L.C.; E*TRADE CAPITAL MARKETS L.L.C.; NATIONAL FINANCIAL SERVICES, L.L.C.; CITADEL DERIVATIVES GROUP, L.L.C.; JOHN DOES 1–10 (names being fictitious); and ABC COMPANIES 1–10 (names being fictitious), jointly, severally or in the alternative, individually, | **NOTICE OF REMOVAL** |
| Defendants. | |

Under 28 U.S.C. §§ 1331, 1337, 1441, and 1446 and 15 U.S.C. § 78aa,

Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"),

by and through its undersigned counsel, hereby provides notice of the removal of

the above-captioned case from the Superior Court of New Jersey Law Division,

Morris County, to the United States District Court for the District of New Jersey, Newark Division as follows:

1.    Plaintiffs commenced this action by filing a complaint on May 8, 2012, in the Superior Court of New Jersey Law Division, Morris County, Docket No. MRS L-1173-12 (the "State Court Action"). Plaintiffs filed an amended complaint (the "Complaint") on June 7, 2012. Merrill Lynch was served with the Complaint on June 18, 2012.

2.    Under 28 U.S.C. § 1446(a) and Local Civil Rule 5.2, a copy of all process, pleadings, and orders served upon Merrill Lynch and/or filed in the State Court Action is attached as Exhibit A. Under Local Civil Rule 5.1, a completed civil cover sheet is also submitted herewith. Merrill Lynch has filed no pleadings or papers in the State Court Action, and the time for Merrill Lynch to answer, move to dismiss, or otherwise respond to the Complaint has not yet expired. Merrill Lynch expressly reserves its rights under Rule 81 to hereafter answer or present other defenses or objections in accordance with the Federal Rules of Civil Procedure.

3.    Under 28 U.S.C. § 1446(b), this Notice of Removal must be filed within 30 days of service of the Complaint. Because Merrill Lynch was served on June 18, 2012, this Notice of Removal is timely. In addition, the docket in the

State Court Action reflects that Knight Capital Markets, L.P., and E*Trade Capital Markets L.L.C. also have been served. Those defendants' consent to this Notice are attached as Exhibit B.

4.      Concurrent with the filing of this Notice, Merrill Lynch is serving this Notice on Plaintiffs' counsel and filing a copy of the Notice with the Clerk of the Superior Court of New Jersey Law Division, Morris County.

5.      The United States District Court for the District of New Jersey, Newark Division, embraces the county in which the State Court Action is now pending. Venue is therefore proper for this Notice of Removal under 28 U.S.C. §§ 110 and 1446(a).

6.      While Plaintiffs purport to assert New Jersey state law claims, all of their causes of action arise under the federal securities laws and are removable under 28 U.S.C. §§ 1311, 1337, and 1441 and 15 U.S.C. § 78aa. The Complaint amounts to a nationwide attack on "short selling" and how prime brokers handle these transactions for their clients. Consequently, Plaintiffs' claims are necessarily federal, and a determination of Plaintiffs' right to relief requires resolution of substantial, disputed federal questions. Original federal jurisdiction over this proceeding exists under 28 U.S.C. § 1331, because Plaintiffs' claims arise under the laws of the United States, and under 28 U.S.C. § 1337, because the claims arise

3

under the Securities Exchange Act of 1934 (the "Exchange Act"), an Act of Congress regulating commerce. Under 15 U.S.C. § 78aa, this Court also has exclusive jurisdiction over Plaintiffs' claims, as they are based on alleged violations of duties existing and created under the Exchange Act.

**This Court Has Original Jurisdiction Under Section 28 U.S.C. § 1331 Because The State Court Action Is Based on Violations of Federal Law**

7. Federal-question jurisdiction will lie over state-law claims that implicate significant federal issues. *Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005); *D'Allessio v. N.Y. Stock Exchange, Inc.*, 258 F.3d 93, 103–04 (2d Cir. 2001). Plaintiffs here are seeking relief premised on the violation of a comprehensive scheme of federal statutes and regulations governing short-selling and the settling and clearing of short-sale transactions. Specifically, it would be impossible to adjudicate any of Plaintiffs' claims without considering whether the National Clearance and Settlement System (including the Continuous Net Settlement system ("CNS") of the Depository Trust and Clearing Corporation ("DTCC")) creates "counterfeit," "fictitious," or "phantom" shares that harm stockholders, as Plaintiffs allege. (*See, e.g.*, Am. Compl. ¶¶ 1, 4.) Yet Congress created the National Clearance and Settlement System in 1975 in order to create "uniform standards and procedures for clearance and settlement," 15 U.S.C. § 78q-1(a)(1)(D), and specifically directed the United States Securities and

Exchange Commission (the "SEC") to "regulate[] . . . every facet of the securities handling process . . . clearing agencies, depositories, corporate issuers, and transfer agents." *See* 15 U.S.C. §§ 78q-1; S. Rep. No. 94-75, 1975 U.S.C.C.A.N. 179, 233. The Complaint is also replete with allegations that Defendants violated duties imposed by SEC Regulation SHO, 17 C.F.R § 242.203 ("Regulation SHO"), allegations that Congress has committed exclusively to the federal courts. Accordingly, the crux of Plaintiffs' claims, and the alleged unlawful act underlying all of Plaintiffs' asserted causes of action, is that Defendants violated the federal regulatory scheme concerning short selling and the settling and clearing of short-sale transactions. Plaintiffs' challenge to that federal system therefore presents a substantial federal question, which will turn on the interpretation of the federal securities rules and regulations.

8.      Other courts have already recognized the principle that an allegation that the Congressionally-mandated National Clearance and Settlement System creates counterfeit shares implicates a substantial federal interest. *See, e.g.*, *Capece v. DTCC*, 2005 U.S. Dist. LEXIS 42039, at *25–26 (S.D. Fla. Oct. 11, 2005) (denying remand of state-law claims because "resolution of Plaintiffs' claim is dependent upon scope and requirement of federal law" and "requires examination of the technicalities of the [DTCC's stock borrow program]"). As in

*Capece*, Plaintiffs' claims here also require an examination of the technicalities of the National Clearance and Settlement System, including the DTCC's stock borrow program. (*See, e.g.*, Am. Compl. ¶ 33 (describing DTCC stock borrow program and alleging Defendants violated their obligations to DTCC).) The Court cannot resolve Plaintiffs' claims without addressing Plaintiffs' assertion that CNS and the DTCC stock borrow program permit the creation of counterfeit shares, and that question—which lies at the heart of Plaintiffs' case—turns on an interpretation of the federal regulatory scheme governing CNS and the federally regulated stock borrow program.

**Plaintiffs Cannot Destroy Federal Question Jurisdiction By Artfully Pleading Around Their Federal Securities Claims.**

9. Federal jurisdiction exists despite Plaintiffs' efforts to plead otherwise. As the Supreme Court has explained, "a plaintiff may not defeat removal by omitting to plead necessary federal questions. If a court concludes that a plaintiff has artfully pleaded claims in this fashion, it may uphold removal even though no federal question appears on the face of the plaintiff's complaint." *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 475 (1998) (citations and internal quotation marks omitted); *see also Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 519 n.7 (11th Cir. 2000) ("Removal will be held proper when the plaintiff has concealed a legitimate ground of removal by . . . artful pleading."). In assessing

federal jurisdiction, the court "looks to the substance of the complaint, not the labels in it." *In re Ben Carter*, 618 F.2d 1093, 1101 (5th Cir. 1980). Here, the "substance" of Plaintiffs' allegations is that Defendants harmed Plaintiffs by failing to comply with the federal regulations governing short selling, which necessarily makes this a federal case. *See Hawkins v. NASD Inc.*, 149 F.3d 330, 332 (5th Cir. 1998) (finding jurisdiction despite plaintiff having "carefully articulated in terms of state law" his claims, since they were claims "to enforce liabilities or duties created by federal securities laws"). While Plaintiffs attempt to state their claims as violations of New Jersey law, the alleged wrongdoing is undeniably federal in nature. *See Merrill, Lynch, Pierce, Fenner & Smith, Incorporated v. Dabit*, 547 U.S. 71, 78 (2006) ("The magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated.").

10.     Moreover, when a plaintiff sues in state court "based on the same nucleus of facts" as a related federal action, "the court may look more skeptically at a plaintiff's characterization of the law where the plaintiff may be seeking to avoid the federal forum to which a defendant is entitled." *Kahn v. Solomon Bros. Inc.*, 813 F. Supp. 191, 194 (E.D.N.Y. 1993). Here, the Complaint is "based on the same nucleus of facts" as *Cohen v. Stevanovich*, 722 F. Supp. 2d 416 (S.D.N.Y.

2010). There Plaintiffs sued two of the same broker-dealers alleging the same claims Plaintiffs here attempt to plead as violations of New Jersey law—*i.e.*, that defendants created "phantom" shares by failing to deliver securities to the DTCC in accordance with federal regulations. The only difference between *Cohen* and this action is that Plaintiffs here have described the duties created by federal securities law as predicate acts under New Jersey's RICO statute rather than asserting them directly. This was clearly intended to avoid the federal forum (and the dismissal granted to the defendants in *Cohen*) to which Defendants are entitled.

**This Court Has Exclusive Jurisdiction Because
The State Court Action Alleges Exchange Act Violations.**

11.     Section 27 of the Exchange Act provides that "[t]he district courts of the United States . . . shall have exclusive jurisdiction of violations of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder." 15 U.S.C. § 78aa(a). Based on this statutory language, this Court has exclusive jurisdiction over this action because Plaintiffs seek to "enforce [a] duty created by" Regulation SHO and other federal regulations promulgated expressly pursuant to and under the authority conferred by the Exchange Act. *See* 15 U.S.C. § 78aa(a); *see also Hawkins*, 149 F.3d at 332 (affirming federal jurisdiction because plaintiff's claims, "though carefully

articulated in terms of state law, are actions at law seeking to enforce liabilities or

duties created by federal securities laws which are governed exclusively by federal

courts pursuant to 15 U.S.C. § 78aa"); *Whitehall Wellington Invs., Inc. v. NASD*,

2000 U.S. Dist. LEXIS 18607, at *12–13 (S.D. Fla. Dec. 7, 2000) (finding

exclusive federal jurisdiction over state law claims based on NASD rules, which

are promulgated under Exchange Act). Specifically, Plaintiffs allege that

Defendants did not properly locate, borrow, and deliver securities when executing

short sales. (*See, e.g.*, Compl. ¶ 24 ("[S]ecurities laws and regulations require a

Short Seller to borrow the stock it sold and deliver that borrowed stock within

three days . . . .).) As Plaintiffs concede (*see* Compl. ¶ 28), all of those activities

are governed by Regulation SHO or its predecessor rules. *See* 17 C.F.R. § 242.203

(imposing locate and delivery requirements); *Sullivan & Long v. Scattered Corp.*,

47 F.3d 857, 863 (7th Cir. 1995) (explaining that before Regulation SHO,

"plaintiffs do not point us to, and we have not been able on our own to find, a law

that requires . . . short sellers to borrow the stock that they are selling short"). The

Court therefore has exclusive jurisdiction over Plaintiffs' claims under Section 27

of the Exchange Act.

## CONCLUSION AND PRAYER

WHEREFORE, all of the requirements and/or prerequisites of 28 U.S.C. §§ 1331, 1337, 1441(a), and 1446 have been satisfied, and Notice is hereby given that this action is removed from the Superior Court of New Jersey Law Division, Morris County, to the United States District Court for the District of New Jersey, Newark Division.

Dated:  July 17, 2012            Respectfully submitted,

                                    s/ Andrew J. Frackman
                                    Andrew J. Frackman
                                    Jeffrey A. N. Kopczynski

                                    O'Melveny & Myers LLP
                                    7 Times Square
                                    New York, New York  10036
                                    Phone:  (212) 326-2000
                                    Fax:  (212) 326-2061
                                    E-mail:  afrackman@omm.com
                                                      jkopczynski@omm.com

                                    *Attorneys for Defendant*
                                    MERRILL LYNCH, PIERCE, FENNER
                                    & SMITH INCORPORATED

# Exhibit A

**NEAL H. FLASTER L.L.C.**
30 Columbia Turnpike
P.O. Box 21
Florham Park, New Jersey 07932
Tel. No.: 973-822-7900
Attorney for Plaintiff
Greg Manning. et al

C:\Users\rls\2011\Desktop\New Briefcase\Manning\complaint3820121Pv4.wpd

ENTERED ON ACMS
RECEIVED & FILED
SUPERIOR COURT

2012 MAY -8 P 3: 48

CIVIL DIVISION

| | |
|---|---|
| GREG MANNING; CLAES ARNRUP; POSILJONEN AB; POSILJONEN AS; SVEABORG HANDEL AS; FLYGEXPO AB; and LONDRINA HOLDING, LTD.<br><br>                     Plaintiffs,<br><br><br>     *vs.*<br><br>MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; KNIGHT CAPITAL AMERICAS, LP, formerly known as KNIGHT EQUITY MARKETS L.P.; UBS SECURITIES, L.L.C.;, E* TRADE CAPITAL MARKETS L.L.C.; NATIONAL FINANCIAL SERVICES, L.L.C.; CITADEL DERIVATIVES GROUP, L.L.C.; JOHN DOES 1-10 (names being fictitious); and ABC COMPANIES 1-10 (names being fictitious), jointly, severally or in the alternative, individually<br><br>                    Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MORRIS COUNTY<br><br><br>DOCKET NO.: $MRS$ $L-1173-12$<br><br><br>*Civil Action*<br><br><br><br><br>COMPLAINT AND JURY DEMAND |

Plaintiffs Greg Manning ("Manning"), residing at 4 Whitfield Court, Boonton Township,

New Jersey 07932; Claes Arnup, residing at Hans Michelsensgatan 9, 11th floor, Malmo, Sweden;

Posiljonen AB ("Posiljonen"), with its principal place of business located at Box 537, S-201 25

Malmo, Sweden; Posiljonen AS ("Posiljonen AS"), with its principal place of business located at

Koebmagergade 2, DK-1050 Copenhagen, Denmark; Flygexpo AB ("Flygexpo"), with its principal

place of business located at Box 321, S-72107 Vaesteraas, Sweden; Sveaborg Handel AS

("Sveaborg"), with its principal place of business located at Postboks 5098, Majorstua, –0301 Oslo, Norway; and Londrina Holding Ltd. ("Londrina"), with its principal place of business located at Boit Postal 260, L-2012 Luxemburg by way of complaint say:

## NATURE OF ACTION

1.      This is an action to recover damages incurred as a result of the Defendants' massive manipulation of the market for the price of the common stock of Escala Group, Inc. ("Escala")[1] beginning May 9, 2006 ("Relevant Period I") through May 12, 2006 and again from December 1, 2006 through January 9, 2007 ("Relevant Period II"). As described in detail below, Defendants substantially injured Plaintiffs while at the same time reaping enormous profits by knowingly and intentionally, creating, loaning and selling unauthorized, fictitious and counterfeit shares of Escala stock, through various unlawful schemes and devices and by engaging in the unlawful practice of naked short sales.

2.      Defendants' unlawful conduct occurred within the context of their pervasive and long-standing pattern of naked short selling, which is an unlawful form of market manipulation that violates, inter alia, the New Jersey Racketeering Statute, N.J.S.A. 2C:41-1 et seq., the New Jersey Uniform Securities Act, N.J.S.A. 49:3-49 et seq., and various other New Jersey statutes and common law causes of action, including but not limited to claims based inter alia, on unjust enrichment, breach of fiduciary duty, tortious interference with prospective economic advantage, breach of the covenant of good faith and fair dealing and breach of contract.

3.      In 2005, in response to such pervasive manipulative conduct, the Securities and Exchange Commission ("SEC") adopted Regulation SHO ("Reg SHO"), 17 C.F.R. § 242.204. The

---

[1]Escala is now known as Spectrum Group International, Inc.

general purpose of Reg SHO is to establish uniform "Locate" and "Close-Out" requirements and prevent unlawful naked short selling, in which market participants, like Defendants, seek to obtain illicit profits by selling or loaning stock, at artificially depressed prices, that they did not own, never intended to borrow or Locate for delivery to buyers and Close-Out by settling their trades.

4.    To perpetrate this massive manipulation of the market price of the Escala shares, Defendants engaged in a pattern of racketeering activity by inter alia, designing schemes and employing devices across their equities trading business. During the Relevant Periods in May and December 2006, Defendants entered millions of proprietary and customer short sale transactions without having reasonable grounds to believe that the securities could be borrowed and be available for delivery.

5.    As part of their pattern of illegal naked short selling activities, Defendants increased the pool of tradable shares of Escala by: a) electronically manufacturing fictitious and unauthorized phantom shares; and b) using non-registered Escala shares to dilute the fixed percentage of stock owned by the Plaintiffs to cause their shares of Escala to decline in value. Thereafter, certain Defendants sold and/or loaned these shares, reaping significant monies in unlawful profits and fees. After unlawfully creating, trading and/or loaning these unauthorized and fictitious shares, Defendants implemented a sophisticated scheme to conceal and cover-up their illegal conduct.

6.    There are certain Defendants who have been fined millions of dollars by the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA") for their intentional and persistent violation of the rules and regulations governing their unlawful short selling activities.  These fines and sanctions, however, have not deterred these Defendants, which view them merely as "pocket change" and the "cost of doing business".  See

3

Exhibit A, annexed hereto.

## PARTIES

7.      At all times herein, Plaintiff Manning was a resident of Morris County and State of New Jersey and currently resides at 4 Whitfield Court, Boonton Township, County of Morris and State of New Jersey and the owner of approximately 2.1 million shares in the Escala Group, Inc. ("Escala") during the Relevant Periods.

8.      At all times herein, Plaintiff Arnup was an individual, residing at Hans Michelsensgatan 9, 11th floor, Malmoe, Sweden and the owner of approximately 10,000 shares of stock in Escala during Relevant Period I.

9.      At all times herein, Plaintiff Posiljonen AB ("Posiljonen") is a company whose principal place of business is located at Box 537, S-201 25 Malmoe, Sweden and the owner of approximately 60,000 shares of stock in Escala during the Relevant Period(s).

10.     At all times herein, Plaintiff Posiljonen AS ("Posiljonen") is a company whose principal place of business is located at Koebmagergade 2, DK-1050 Copenhagen, Denmark and the owner of approximately 13,100 shares of stock in Escala during the Relevant Period(s).

11.     At all times herein, Flygexpo AB ("Flygexpo") is a company whose principal place of business is located at Box 321, S-72107 Vaesteraas, Sweden and the owner of approximately 30,000 shares of stock in Escala during the Relevant Period(s).

12.     At all times herein, Sveaborg Handel AS ("Sveaborg") is a company whose principal place of business is located at Postboks 5098, Majorstua, –0301 Oslo, Norway and the owner of approximately 55,000 shares of stock in Escala during the Relevant Period(s).

13.     At all times herein, Londrina Holding Ltd. ("Londrina") is a company whose principal

4

place of business is located at Boit Postal 260, L-2012 Luxemburg and the owner of approximately 110,000 shares of stock in Escala during the Relevant Period(s).

14.     At all times herein, Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), its subsidiaries, affiliates, successors or assigns, is a business corporation organized under the laws of Delaware aud authorized to do business in New Jersey, with offices located at 1300 Merrill Lynch Drive, Pennington, New Jersey and conducts business in or that affects New Jersey.

15.     At all times herein, Defendant Knight Capital Group, Inc., ("Knight"), its subsidiaries, affiliates, successors or assigns, including but not limited to Knight Capital Americas, LP, formerly known as Knight Equity Markets, LP ("Knight Equity"), is a Delaware Corporation authorized to do business in New Jersey, with its principal place of business located at 545 Washington Blvd., Jersey City, New Jersey and conducts business in or that affects New Jersey.

16.     At all times herein, Defendant UBS Securities, LLC ("UBS"), its subsidiaries, affiliates, successors or assigns, has offices located at 480 Washington Blvd., Jersey City, New Jersey and conducts business in or that affects New Jersey.

17.     At all times herein, Defendant E*Trade Capital Markets, LLC ("E*Trade"), its subsidiaries, affiliates, successors or assigns, is a subsidiary of E*Trade Financial Corporation, which has its principal place of business located at Harborside Financial Center, 501 Plaza 2, 34 Exchange Place, Jersey City, New Jersey and conducts business in or that affects New Jersey.

18.     At all times herein, Defendant National Financial Services, LLC ("National Financial"), subsidiaries, affiliates, successors or assigns, has offices located at 1000 Plaza, Jersey City, New Jersey and conducts business in or that affects New Jersey.

19.     At all times herein, Defendant Citadel Derivatives Group, L.L.C., its subsidiaries,

5

affiliates, successors or assigns has offices located at 131 South Dearborn Street, #3100, Chicago, Illinois and conducts business in or that effects New Jersey.

20.    At all times herein, Defendants John Does 1-10 (names being fictitious) are such persons whose identities are unknown who acted individually or collectively with one or all of the other Defendants to inflict damages to the Plaintiffs.

21.    At all times herein, Defendants ABC Companies 1-10 (names being fictitious) are such companies or entities whose identities are unknown who acted individually or collectively with one or all of the other Defendants to inflict damages to the Plaintiffs.

### SHORT SELLING AS A LAWFUL TRADING STRATEGY

22.    In a typical legal short selling transaction, a party known as a "Short Seller" speculates that the price of a stock will decline, and seeks to profit from that expected decline. To accomplish this, the Short Seller locates and then borrows shares of the subject company's stock from another shareholder in a transaction typically arranged by the broker dealer, and sells those borrowed shares on the open market at the existing price. The Short Seller completes the transaction, i.e., covers its short position, by replacing the shares it borrowed by purchasing the subject company's stock at a later date, and returning the borrowed shares back to the lender. If the Short Seller's speculation that the stock price will decline is correct, the Short Seller will earn as profit the difference between the higher price at which it sold the borrowed shares and the lower price at which it subsequently replaced them. As an illustrative example, a Short Seller speculates that Stock X is currently overvalued at $50/share, and expects the share price to decline. The Short Seller (who does not own Stock X) borrows 100 shares of Stock X, and sells those shares on the open market at the existing $50/share price. The borrowed shares are delivered to the purchaser to

6

complete the proper settlement of the short sale. If the stock price later falls to $45/share, and the Short Seller purchases 100 shares of the stock to replace the shares the short seller borrowed at $50 per share, the short seller has earned $5/share, minus any fees, commissions and/or interest it incurred in completing the transaction. If the stock is never borrowed then the profit is significantly greater by avoiding the borrowing fees, commissions and interest. If the subject company files for bankruptcy the short seller will never replace the shares that were sold.

23.     When conducted in accordance with securities and other laws and regulations, short selling is a legal and accepted trading strategy. However, a critical requirement of a *lawful* short sale is that the Short Seller first makes an affirmative or reasonable determination that the shorted shares are available and the broker actually borrows or otherwise obtains the stock it sells. Indeed, securities laws and regulations require a Short Seller to borrow the stock it sold and deliver that borrowed stock within three days of the short sale (the "Settlement Date"). This settlement cycle is known as "T+3". T+3 means that when a trade occurs, the participants to the trade deliver and pay for the security at the clearing agency three settlement days after the trade is executed so the brokerage firm can exchange those funds for the securities on that third settlement day.

## NAKED SHORT SELLING AS AN *UNLAWFUL* TRADING STRATEGY USED TO MANIPULATE THE MARKET IN WHICH SECURITIES ARE TRADED

24.     In a "naked" short sale, the seller does not own, and does not borrow or arrange to borrow the securities in time to make delivery to the buyer within that standard T+3 Settlement Date. As a result, the seller fails to deliver the securities to the buyer when the delivery is due. If the Short Seller never borrows or otherwise obtains the stock it sold short, the Short Seller cannot convey or deliver authorized and legitimate stock to the purchaser. In those instances in which a Short Seller

7

fails to borrow or otherwise obtain the stock it sold short, the purchaser is not precluded from completing the sale and obtaining the purchased stock.

25.     Today, most settlements of securities trades are conducted electronically through a central depository, known as the Depository Trust and Clearing Corporation and its primary subsidiary, National Securities Clearing Corporation (collectively referred to herein as the "DTCC"), which accounts for the buying and selling of securities through electronic book entries (rather than transfer of physical stock certificates).

26.     In a typical securities transaction, the DTCC's electronic trading records reflect that the buyer "owns" the shares, and that the seller "owes" the purchased shares, which the seller is required to deliver by the Settlement Date. In a short sale, the DTCC still electronically transfers to the buyer the stock it purchased *even if the seller fails to deliver the shares it "owes" to the DTCC* ("Fail"). If the Short Seller Fails to deliver the stock it owes to the DTCC, the Short Seller has, in effect, electronically created and conveyed an unauthorized, fictitious and/or phantom share of stock to the buyer because the DTCC credits the buyer with owning shares that did not previously exist. The newly created shares are counterfeit shares because they were not authorized or issued by the company or registered for sale by the company with either the SEC or the market exchange on which the shares trade. These unauthorized, counterfeit shares, are created electronically by the Short Seller through an illegal short sale of a stock that the Short Seller did not own, deliver and/or intend on possessing in order to complete the settlement of the short sale.

27.     The SEC has articulated the pernicious effects of naked short selling on the securities markets as follows:

> …we are concerned that large and persistent fails to deliver may have a

8

negative effect on the market in these securities. For example, large and persistent fails to deliver may deprive shareholders of the benefits of ownership, such as voting and lending. In addition, where a seller of securities fails to deliver securities on trade settlement date, in effect the seller unilaterally converts a securities contract (which should settle within the standard 3-day settlement period) into an undated futures-type contract, to which the buyer may not have agreed, or that may have been priced differently. Moreover, sellers that fail to deliver securities on trade settlement date may enjoy fewer restrictions than if they were required to deliver the securities within a reasonable period of time, and such sellers may attempt to use this additional freedom to engage in trading activities that deliberately and improperly depress the price of a security.

In addition, many issuers and investors continue to express concern about extended fails to deliver in connection with "naked" short selling. To the extent that large and persistent fails to deliver might be indicative of manipulative "naked" short selling, which could be used as a tool to drive down a company's stock price, fails to deliver may undermine the confidence of investors. These investors, in turn, may be reluctant to commit capital to an issuer they believe to be subject to such manipulative conduct. In addition, issuers may believe that they have suffered unwarranted reputational damage due to investors' negative perceptions regarding large and persistent fails to deliver. Any unwarranted reputational damage caused by large and persistent fails to deliver might have an adverse impact on the security's price. ...

28.    In November of 2007, former SEC Chairman Harvey Pitt derided the practice of naked short selling stating: "Phantom shares created by naked shorting are analogous to counterfeit money." Similarly, during a February 14, 2008 Senate Banking Committee Hearing, Senator Robert Bennett commented that through naked short selling it is becoming "increasingly...easier in this electronic world to give you counterfeit shares." The SEC also reaffirmed its ". . . zero tolerance for abusive naked short selling" by strengthening investor protection. Indeed, the SEC, which regulates federal securities laws that are substantially similar to Georgia's Securities Act, has explicitly stated "selling stock short and failing to deliver shares at the time of settlement with the purpose of driving down the security's price" constitutes a "manipulative activity" that "in general, would violate various securities laws." *See www.sec.gov/spotlight/keyregshoissues.htm*; *See also* SEC

9

Release No. 34-.57511, p.3, File No. S7-08-08 (Mar. 17, 2008).

29.     Naked short selling exacerbates volatility in the securities markets and damages bona fide shareholders of a company because it floods the market with, unauthorized, fictitious and/or counterfeit shares or entitlements, thereby diluting the value of each legitimate share of stock, diluting the shareholder's right to a fixed percentage of ownership of the company and diluting the shareholder's voting rights. Naked short selling is intended to deliberately depress the price of a security in order to maximize the profit that is made based on the difference between the price of the stock when it was sold and the price of the stock that is required to be delivered on the Settlement Date.

## VIOLATIONS FOR NAKED SHORT
## SELLING BY DEFENDANTS

30.     Upon information and belief, Defendants have used several illegal methods to engage in and conceal their naked short selling, including, but not limited to: (a) using the DTCC stock borrowing program as a means to conceal naked short sales; (b) failing to make legitimate or reasonable efforts to locate Escala shares prior to short selling them; [c] failing to supervise compliance with the laws regarding short sale and short interest position reporting; (d) concealing their activity through falsely reporting nonexistent assets of Escala on brokerage statements to investors as if these assets were representative of real Escala shares; (e) failing to comply with their responsibilities and duties to investigate and report suspicious transactions to regulatory authorities and (f) falsely representing that they either possessed the borrowed securities or had located them for borrowing and delivery.

31.     Securities regulators have sanctioned certain Defendants numerous times for their role in facilitating, engaging in or permitting naked short sales of securities. The Table of Violations

10

attached as Exhibit "A" lists some of the sanctions assessed against some of the Defendants for their illegal conduct. These sanctions evidence that the Defendants knew their naked short sales were unlawful and therefore, that they intended the consequences of their actions.

32.     By way of example and not limitation, FINRA recently filed an action against Defendant UBS in the matter entitled, "*Financial Industry Regulatory Authority Letter of Acceptance, Waiver and Consent No. 20080144511* (the "Letter") in which Defendant UBS sought to settle an investigation commenced by the FINRA Department of Enforcement ("DOE") based on an alleged long standing pattern of securities law violations for its short selling activities. While not admitting or denying any of the allegations of the DOE, UBS accepted and consented to the entry of findings by FINRA (the "Findings"). The Findings made by FINRA include the following:

> UBS's Reg SHO supervisory and compliance system regarding locates and order marking of short sale orders was significantly flawed and resulted in a systemic supervisory failure that contributed to serious Reg SHO failures across the Firm's equities trading business." Id., at 2. "During the Relevant Period, the Firm's extensive locate violations occurred due to: (1) the misapplication of exceptions to Reg SHO's locate requirement ...; (2) the inclusion of certain threshold and hard-to-borrow securities on the Firm's easy-to-borrow list ...; (3) the Firm permitting certain clients to bypass the locate requirement when entering short sales ...; and (4) the Firm failing to reasonably supervise that locates were obtained and/or documented for short sales entered through the Firm's Order Entry Systems. Id., at 3.

> As a result of these failures, the Firm improperly entered **millions of proprietary and customer short sale orders** at various times during the Relevant Period without having reasonable grounds to believe that the securities could be borrowed and available for delivery. A significant number of these short sale orders were in hard-to-borrow securities. Extrapolating from the quantified violations indicates that during the Relevant Period, **the Firm likely entered tens of millions of proprietary and customer short sale orders** without having reasonable grounds to believe that the securities could be borrowed and available for delivery. The duration, scope and volume of the trading created a potential for harm to the integrity of the market. Id., at 3. (Emphasis added).

> Additionally, the Firm mismarked millions of sale orders in its trading systems at

11

various times during the relevant Period. Extrapolating from the quantified violations indicates the Firm likely mismarked **tens of millions of sale orders** during the Relevant Period. (emphasis added). Many of these mismarked orders were short sales that were mismarked as "long" resulting in additional significant violations of Reg SHO's locate requirement. Id.

Moreover, the Firm also had significant reporting and record keeping violations resulting from the foregoing. UBS's mismarked sale orders flowed through to the Firm's blue sheet submissions, causing it to make inaccurate submissions of trading data to FINRA. ... Id.

Enforcement tested short sales entered through more than a dozen of the Firm's Order Entry Systems (OES's) during the three month period June 1, 2006 to August 31, 2006 (the "Sample Period"). Enforcement's investigation uncovered approximately 700,000 short sales that were effectuated without locates during the Sample Period based upon improper applications of the exceptions to the locate requirement as described above. Given that the Firm improperly applied these exceptions in some cases for several years, extrapolating from the number of violations quantified during the Sample Period indicates that the Firm likely effected more than **ten million short sales in improper reliance** on an exception to Reg SHO's locate requirement. Id., at 5. (Emphasis added).

The Firm incorrectly programmed a trading system so that two proprietary trading strategies treated all short sale orders in Exchange Traded Funds ("ETFs") as if they were exceptions to Reg SHO's locate requirement. ... During the Sample Period, the Firm effected approximately 680,000 proprietary short sale orders in ETF's without locates using these two trading systems. ... [E]xtrapolating from the number of violations quantified during the Sample Period indicates that the Firm likely effected more than 7.4 million short sales in ETFs without valid locates." Id. "During the period beginning January 3, 2005 until approximately April 3, 2008, the Firm also improperly treated certain equity hedge transactions ... as exceptions to Reg SHO's locate requirements. ..." Id., at 6.

[T]he Firm created and distributed ETB (easy-to-borrow) lists that improperly included threshold and HTB (hard-to-borrow) securities to UBS's proprietary traders and clients, resulting in more than 900,000 short sale orders that were released for execution without valid locates." Id. "The Firm's DES platform was normally designed to block short sale orders that did not contain an entry indicating that a located had first been obtained. However, the Firm altered the programming for these 270 DES Clients to bypass this standard DES platform check. As a result, the clients configured to bypass the locate check had the ability to route short sale directly to the market for execution without locates ... Id., at 8.

The Letter resulted in a sanction consented to by UBS of $12,000,000.00.

12

33.     Defendants' illegal short selling activity was not limited to Escala securities, but rather was part of an ongoing pattern of unlawful and improper conduct of illegal naked short selling in the securities of other companies. Because naked short selling was and is enormously lucrative to the Defendants, the relatively minor sanctions and penalties assessed against them (when one consider the magnitude of the money directly connected to naked short selling) have failed to stop or even deter the Defendants' from continuing to engage in such unlawful conduct. Defendants have a long and well documented history of being "recidivist" offenders of fraud and stock manipulation statutes and as one Court recently held, civil penalties and disgorgement even as high as $295 million are considered by the investment community to be merely a "mild and modest cost of doing business."

34.     The DTCC is a corporation formed for the clearance and settlement of securities transactions, which is undertaken through a series of electronic systems. It was created in 1974 for, inter alia, the "prompt and accurate clearance and settlement of securities transactions" as "necessary for the protection of investors." Since 1999, the DTCC has controlled virtually all of the U.S. trade clearance and settlement processing of real stock issued by corporations that is held in brokerage accounts.

35.     In 1981, further efforts were made to increase the speed of the settlement trade process through the advent of the DTCC stock borrow program by the DTCC within its overall system. That program created a massive lending pool of shares from brokers' client margin accounts (*i.e.*, brokerage accounts in which the broker lends the customer cash to purchase securities, which are securitized by both securities and cash), which facilitated securities trading. For example, if a prime broker is unable to deliver stock it sold within the T+3 Settlement Date, the prime broker

13

could obtain shares to provide to the purchaser from the DTCC borrowing pool, allowing the trade to clear. When operated properly, the prime broker who sold the stock will replace the shares it owes to the DTCC. But, as described in detail throughout this Complaint, the Defendants violated the trading rules and regulations requiring that they actually deliver shares they owe to the DTCC to settle short sale transactions.

36.     The Defendants who are owners of the DTCC, have significant involvement and communication with, as well as influence over, the DTCC. For example, Defendants act as "DTCC member clearing firms," meaning that they are informed by the DTCC of the clearing and settling of trades and purportedly they assure that paperwork associated with a securities transaction is accurate. Moreover, Defendants as prime brokers, play an integral role in short sale securities transactions. Among other things, the Defendants are responsible for locating shares of the shorted stock, borrowing the short stock, and delivering the shares by the T + 3 Settlement Date.

## FACTS COMMON TO ALL CLAIMS

37.     Plaintiff Greg Manning founded the Greg Manning Company in 1961 and as Chief Executive Officer eventually established it as one of the largest stamp dealers in the world. In 1993, the company, renamed Greg Manning Auctions, Inc. went public and by 1994, had revenues exceeding Twenty Five Million ($25,000,000) Dollars annually.

38.     In May 2006, Escala had its principal place of business located in the Township of West Caldwell, Passaic Avenue, County of Essex and State of New Jersey.

### The Nature And Scope Of Defendants' Scheme To Manipulate Escala Stock

39.     Defendants' manipulated the price of Escala's common stock through a pattern of naked short selling by:

14

(1) creating and/or using unauthorized counterfeit shares to increase the pool of tradable common stock which operated to dilute the shares owned by Plaintiffs;

(2) selling and/or loaning unauthorized and counterfeit shares, thereby enabling Defendants to reap millions of dollars in unlawful profits and fees while simultaneously injuring plaintiffs; and thereafter;

(3) implementing a sophisticated scheme to conceal and cover up their unlawful conduct.

40.     The share price of Escala stock declined from $32 a share at the close of business on May 8, 2006 to $12.23 at the close of business on May 9, 2006, a 62% drop in value. The price decline was a by-product of large scale selling of unlawful and counterfeit short shares that were neither borrowed nor delivered to complete to complete a legal sale and illegal trades used for the purpose of manipulating Escala's share price. The stock continued to decline in value, until it reached $4.00 a share on May 12, 2012.

### Defendants' Creation Of And/Or Use Of Fictitious And Unauthorized Phantom Shares Of Escala Stock

41.     Defendants traded in their own proprietary accounts and/or loaned Escala stock to their clients and others to complete short sales at times when Defendants neither possessed, nor had any intention of obtaining sufficient authorized stock to cover these transactions. When a customer or prime broker seeks to sell a stock short, the prime broker or customer must first determine whether there are shares available to be borrowed. When the broker does not itself have shares available to borrow, the prime broker must ask other prime brokers whether they have shares available to lend and deliver to complete the short sale. When one prime broker affirmatively states

that it has shares available to lend and deliver, that statement is referred to as giving a "Locate."

42.     Defendants have given and received false "Locates" knowing that they would not likely have to deliver the located shares if requested, thereby artificially increasing the pool of tradable Escala shares. By way of example and not limitation, many of the Defendants improperly provided Locates for Escala securities on the same dates for which they were failing to deliver Escala securities (*i.e.*, Defendants were saying they had Escala securities available to lend to facilitate additional short selling at the same time they did not have sufficient Escala securities to cover past sales).

43.     In addition, Defendants claimed to receive Locates from other Defendants (or non-party banks) on dates when those other Defendants (or non-party banks) did not have sufficient Escala securities to cover the alleged Locates and accepted Locates they knew were unreliable. Giving these false Locates allows the counterparty to the short sale transaction to complete the unauthorized sale and generate commissions without having to actually borrow the stock and incur borrowing costs.

44.     When a Short Seller fails to deliver stock by the Settlement Date, the DTCC system indicates that a "Fail" occurred. Under DTCC rules, only the purchaser (or the Defendant prime broker representing it) has the ability to force the short seller to deliver the shares and clear out the "Fail" positions. Defendants permitted "Fail" transactions to remain unfulfilled indefinitely. This practice facilitates naked short sales by eliminating the need for a Defendant to actually locate Escala shares before loaning or selling Escala shares in conjunction with a short sale. It also deceives the market, the regulators and keeps the stock off of the Reg. SHO list, thus avoiding additional regulatory scrutiny and enforcement.

16

**The Unlawful And/Or Lending Of Unauthorized And Fictitious Shares of Escala**

45.     Each of the Defendants maintain their own proprietary accounts from which they conduct stock transactions on their own behalf.  An analysis of the trading of Escala stock shows patterns of trading that do *not* correlate to the activity recorded in the DTCC's electronic trading records, reflect a material deviation from various stock indices and are strongly indicative of illegal naked short selling.  During the Relevant Periods, there were significant amounts of shares of Escala stock traded by the Defendants; however, because DTCC's records show little if any change in the Defendants' net position, it is clear that the shares traded were not authorized or legitimate but counterfeit, fictitious and unauthorized.

**A.     The Events of May 2006 (Relevant Period I)**

46.     In May 2006, there were 9,037,738 shares of Escala stock on deposit at the DTCC where the actual shares issued by Escala that are in the public float are accounted for.  In practice, the DTCC acts as a "bank" for the shares of publicly traded corporations held in brokerage accounts, with the DTCC accounting for the transfers of shares between firms.  There were at least 1.9 million shares of Escala stock held in cash or non marginable accounts, which could not be lent for short sales and therefore, could not be sold in the market. This reduced the actual  public float at the DTCC down to 7,137,738 million shares and of these shares, there were 5,615,754 million shares already shorted in May 2006, leaving only 1,521,904 million shares available in the public float to settle long and short sales.

47.     Approximate Number of Shares available to settle trades in May 2006.

| *Settlement Date* | *5/5/2006* | *5/12/2006* | *5/19/2006* |
|---|---|---|---|
| Shares on deposit with DTCC | 9,037,738 | 9,037,738 | 9,037,738 |
| Non-Shortable Shares | 1,900,000 | 1,900,000 | 1,900,000 |
| Short Interest | 4,859,221 | 5,615,754 | 5,615,754 |
| **Approx. Shares Available** | **2,278,517** | **1,521,984** | **1,521,984** |

17

*Escala's Trade Volume*

| | | |
|---|---|---|
| Shares Traded Between Periods | 8,349,565 | 66,6997,503 |
| Shares traded on May 9th | 6,944,513 | |

48.     In May of 2006, reported short interest was 5,615,754 shares or approximately 62%

of the 9.1 million shares in the public float. DTCC records show that the public float remained

consistent from May 2006 through January 2007 at less than 9.1 million shares. In essence, when

the 1.9 million shares that were in the known accounts that could not be shorted were taken into

consideration, 79% of the remaining shares on deposit at the DTCC were already shorted. The real

shares issued by Escala that were in the public float, less established short positions and shares in

friendly hands in non-shortable accounts totaled approximately 1.5 million shares.

49.     In May 2006, there was a significant increase in marketplace volume of Escala stock

to over 97 million shares verses April's marketplace volume of 2.7 million shares, an increase of

35.5 times the previous monthly volume. The May marketplace volume of 97 million shares was a

rotation of 10.8 times all of Escala's shares on deposit at the DTCC or averaging a turnover of the

DTCC shares every two days for the month. The majority of this volume, 91,002,350 shares or 93%

of the May 2006 volume, transacted in just 11 days, which equates to the entire number of shares on

deposit turning over, every 1.1 days during this 11 day period. The 9.1 million shares on deposit at

the DTCC were, in theory, turned over ten times in these 11 days. Moreover, shares in the real

available float (shares on deposit at the DTCC less shares on deposit in non shortable accounts less

short interest totaling approximately 1.5 million shares) turned over approximately 60 times in this

11 day period.

50.     The incongruence between the number of Escala shares traded and the number of

shares on deposit with the DTCC available to be traded is strongly indicative of naked short selling.

Based on the movement of real shares at the DTCC, it would be impossible to trade 91 million

18

shares in the 11 days in May as they could not have been short sales because there was no significant amount of shares to short.

### Failure to Deliver Escala Shares for Settlement-May 2006

51.     Escala shares were failing to deliver in small quantities at the National Securities Clearing Corporation ("NSCC") in the months preceding May 2006, indicating that there were few shares available to borrow to complete short sale settlements. Fails as a percentage of short interest were relatively small in 2006 and averaged 1.6% from January to April 2006. By May 10, 2006, the short interest reporting date, fails to deliver increased to 1,464,623 shares from a prior two day fail to deliver level of 52,229 shares. Fails as a percentage of short interest exploded to 26.1% of the reported interest. In the next 5 trading days, fails rose to 3,214,676 or 57% of the May reported short interest. Prior to May 10, 2006, there were few fails to deliver, indicating that the new fails to deliver were a result of newly reported shorted shares. The reported short interest for April 2006 was 4,859,221 and the reported short interest for May 2006 was 5,615,754, or a short interest increase of only 756,533 shares. The fails to deliver at the NSCC increased from the large volume of trading on May 9th and May 10th by 1,412,394 shares.

### Fails to deliver Greater Than Reported Short Interest-May 2006

52.     The May 9th and May 10th trading was reported in the May short interest period and short interest only grew in this period by 756,533 shares. Since fails to deliver increased by 1.4 million shares, it appears that at least 655,861 shares that failed in delivery were not reported as short interest by the clearing firms. These delivery failures represent sales of stock where no borrow could be obtained to complete settlement and shares were sold, but not owned by sellers (transactions which must be marketed short). The clearing firms and market makers misrepresented the number

of shorted shares, which infused false and misleading information to the marketplace. The clearing

firms knew that the Escala stock was failing to deliver, but continued to allow further failures to be

traded, which impacted real supply and demand price discovery.

53.     Reg SHO requires the exchanges to publish threshold lists identifying the stocks for

which the number of shares that have failed to be delivered at DTCC's subsidiary, NSCC for at least

five days exceeds (a) 0.5% of the issuer's outstanding common stock and (b) 10,000 shares. Prior

to May 2006, Escala had been on and off the Reg SHO Threshold list three times, demonstrating

previous failure to deliver because of the tight supply of available shares.

**Phantom or Counterfeit Escala Shares Continued to be Sold- May 2006**

54.     Short Sellers of Escala failed to deliver 3,214,676 shares to the NSCC by May 17,

2006. Thus, short sellers were not borrowing shares for legitimate delivery (naked short selling) and

were front running trades of real owners of Escala shares with shares that did not exist and used these

trades to manipulate the pricing of Escala downward.

**Trading Volume of Shares-May 2006**

55.     The NASDAQ Market Participant Report for May 2006 identified the largest volume

traders by reporting Market Participants in the stock for Escala for May 2006, which comprises 81%

of the total market participant report volume:

| *Market Participant* | *May 26 Reported Volume* | *Percentage of Volume* |
|---|---|---|
| Knight Equity Markets | 31,984,624 | 45.16% |
| USB Securities, LLC | 12,096,879 | 17.08% |
| E*Trade Capital Markets, LLC | 9,034,783 | 12.76% |
| National Fin. Services, LLC | 4,158,568 | 5.87% |
| **Total** | | 80.87% |

56.     The Escala DTCC Inventory for May 2006 for the clearing firms for the traders

identified above do not support the trade volumes by these Defendants. Since the four traders,

20

Defendants Knight Equity Markets, USB Securities, LLC, E*Trade Capital Markets, LLC and National Financial Services, LLC accounted for approximately 81% of the trading reported in market participant reports, it would be expected that these firms were trading significant volume with each other and therefore, one of the firms' inventories would be significantly increasing while another firm would be significantly decreasing. However, this is not reflected in the DTCC tracking movement of shares.

57. For example, Market Participant(s):

a) Knight Equity Markets, L.P./CF Merrill Lynch, Trade Volume in May 2006 was 31,984,624. Clearing Firm Inventory for Week ending May 5, 2006 was 41,857. Clearing Firm Inventory for Week ending May 12, 2006 was $188,846. Clearing Firm Inventory for Week ending May 19, 2006 was 306,546. Clearing firm Inventory for Week ending May 26, 2006 was 272,946.

b) UBS Securities, LLC, Trade Volume in May 2006 was 12,096,879. Clearing Firm Inventory for Week ending May 5, 2006 was 48,830. Clearing Firm Inventory for Week ending May 12, 2006 was 225,139. Clearing Firm Inventory for Week ending May 19, 2006 was 256,900. Clearing Firm Inventory for Week ending May 26, 2009 was 63,294.

c) E*Trade Capital Markets, LLC, Trade Volume in May 2006 was 9,034,783. Clearing Firm Inventory for Week ending May 5, 2006 was 77,777. Clearing Firm Inventory for Week ending May 12, 2006 was 118,940. Clearing Firm Inventory for Week ending May 19, 2006 was 304,504. Clearing Firm Inventory for Week ending May 19, 2006 was 394,000.

d) National Financial Services, LLC, Trade Volume in May 2006 was 4,158,568. Clearing Firm Inventory for Week ending May 5, 2006 was 199,275. Clearing Firm Inventory for Week ending May 12, 2006 was 186,367. Clearing Firm Inventory for Week ending May 5, 2006

21

was 278,515. Clearing Firm Inventory for Week ending May 19, 2006 was 463,410.

58.      There is such a small movement of shares in the inventories of the Defendant clearing firms that it could not support settlements of the 91 million shares executed in the marketplace with the real shares issued by Escala.

## B.      The Events of December 2006

59.      In December 2006, Escala announced substantial changes to its Boards of Directors and Officers and announced that it would restate earnings for previous years beginning in 2003 and that the restatements would be significant and material to its operation. However, the restatements were never put into effect. Despite Escala's designation as a Reg SHO threshold security, which should have constrained large volumes of short sales unless the security was pre-borrowed to complete delivery, the continued tight supply of available shares and the still large short interest, there were substantial stock sales recorded in December 2006. Reported short interest was stated at 5,045,238 shares or 55% of the 9.1 million shares in the public float

60.      Approximate Number of Shares available to settle trades in December 2006.

| _Settlement Date_ | _12/1/2006_ | _12/8/2006_ | _12/15/2006_ | _12/22/2006_ | _12/29/2006_ |
|---|---|---|---|---|---|
| Shares deposited with DTCC | 9,092,4898 | 9,094,405 | 9,094,405 | 9,094,405 | 9,094,405 |
| Non-Shortable Shares | 1,900,000 | 1,900,000 | 1,900,000 | 1,900,000 | 1,900,000 |
| Short Interest | 5,110,988 | 5,110,988 | 5,045,238 | 5,045,238 | 5,045,238 |
| **Approx. Shares Available** | 2,081,501 | 2,083,417 | **2,149,167** | 2,149,167 | 2,149,659 |
| | | | | | |
| _**Escala's Trade Volume**_ | | | | | |
| Shares Traded Between Periods | | 545,794 | 1,424,949 | 19,346,502 | 56,271,665 |

61.      In December 2006, the marketplace volume increased to 84.6 million shares, an increase of 30 times November's marketplace volume of 2.8 million shares. December's marketplace volume was a rotation of 9.3 times all of Escala's shares on deposit at the DTCC, an average turnover of the DTCC shares every 2 days for the month. The majority of this volume, 79,282,758

shares or 94% of the December 2006 volume, transacted in just 6 trading days from December 19, 2006 through December 27, 2006. This equals the entire number of shares on deposit turning over every day during this 6 day period.

62.     The 79 million shares traded in these six days could not have legally settled based on the movement of real shares at the DTCC.  This volume could not have been short sales because there was no significant amount of shares to short. In fact, the short interest, while remaining over 5 million shares, actually decreased from December 2006 to January 2007.

63.     During December 2006, the supply of shares to trade was constrained, short interest stayed above 5 million shares, shares outstanding remained stable, the 1.9 million shares were held in known ownership; however massive volumes were sold without a significant increase in the fails to deliver to the NSCC.

64.     On December 19, 2006, there was almost 19 million shares traded in the marketplace, but there was a decrease in fails to 329,269 shares failed; a decline of 13,224 shares from the previous day. The fails to deliver peaked in December 2006 at less than 1.3 million shares.

65.     In the first 12 days in December 2006, the average closing price was $4.88. On December 19th, the market opened at $5.00 and increased to a closing price of $8.60. The price continued to increase to a peak price on December 20th of $13.30. By January 8, 2007, the stock closed at 47.73 and by January 9th the stock closed at 4.54 a share.

66.     The NASDAQ Market Participant Report identified the largest volume traders by reporting Market Participants in the stock for Escala in December 2006, comprising 83.15% of the total market participant report volume:

23

| Market Participant | 12/2006 Reported Volume | Percentage of Volume |
|---|---|---|
| Knight Equity Markets, L.P. | 16,556,363 | 27.39% |
| USB Securities, LLC | 11,153,215 | 18.45% |
| E*Trade Capital Markets, LLC | 14,476,559 | 23.95% |
| National Fin. Services, LLC | 4,725,698 | 7.82% |
| Citadel Derivatives Group, LLC | 3,349,785 | 5.54% |
| **Total** | | 83.15% |

67.    The Escala DTCC Inventory for December 2006 for the trader's clearing firms identified above do not support the trade volumes by these Defendants. Since the four traders, Defendants Knight Equity Markets, UBS Securities, LLC, E*Trade Capital Markets, LLC and National Financial Services, LLC accounted for 83.15% of the trading reported in market participant reports, it would be expected that these firms were trading significant volume with each other and therefore, one of the firms' inventories would be significantly increasing while another firm would be significantly decreasing. However, this is not reflected in the DTCC tracking movement of shares.

68.    For example, Market Participant(s):

a)    Knight Equity Markets. L.P./CF Merrill Lynch, Trade Volume in December 2006 was 16,556,363. Clearing Firm Inventory for Week ending December 1, 2006 was 222,789. Clearing Firm Inventory for Week ending December 8, 2006 was $230,907. Clearing Firm Inventory for Week ending December 15, 2006 was 234,486. Clearing firm Inventory for Week ending December 22, 2006 was 219,497.

b)    E*Trade Capital Markets, LLC, Trade Volume in December 2006 was $14,476,559. Clearing Firm Inventory for Week ending December 1, 2006 was 391,844. Clearing Firm Inventory for Week ending December 8, 2006 was 319,393. Clearing Firm Inventory for Week ending December 15, 2006 was 370,602. Clearing Firm Inventory for Week ending December 22, 2006 was 334,703. Clearing Firm Inventory for Week ending December 29, 2006 was 511,101.

c)    UBS Securities, LLC, Trade Volume in December 2006 was 11,153,215.  Clearing

24

Firm Inventory for Week ending December 1, 2006 was 133,448. Clearing Firm Inventory for Week ending December 8, 2006 was 127,121. Clearing Firm Inventory for Week ending December 15, 2006 was 94,131. Clearing Firm Inventory for Week ending December 22, 2006 was 77,513. Clearing Firm Inventory for Week ending December 29, 2006 was 69,966.

        c)     <u>National Financial Services LLC</u>, Trade Volume in December 2006 was 4,725,698. Clearing Firm Inventory for Week ending December 1, 2006 was 347,596. Clearing Firm Inventory for Week ending December 8, 2006 was 331,243. Clearing Firm Inventory for week ending December 15, 2006 was 373,754. Clearing Firm Inventory for Week ending December 22, 2006 was 347,078. Clearing firm Inventory for Week ending December 29, 2006 was 499,437.

        d)     <u>Citadel Derivatives Group, LLC</u>, Trade Volume in December 2006 was 3,349,785. Clearing Firm Inventory for Week ending December 1, 2006 was 152,183. Clearing Firm Inventory for week ending December 8, 2006 was 140,348. Clearing Firm Inventory for Week ending December 15, 2006 was 55,672. Clearing Firm Inventory for Week ending December 22, 2006 was 62,705.

        69.     Combined NASDAQ Market Participation Reports for May and December 2006.

| Market Participant | May 2006 Volume | December 2006 Volume | Total |
|---|---|---|---|
| Knight Equity Markets, LP | 31,984,624 | 16,556,363 | 48,540,987 |
| E*Trade Capital Markets | 9,034,783 | 14,476,559 | 23,511,342 |
| UBS Securities LLC | 12,096,879 | 11,153,215 | 23,250,094 |
| National Financial Services | 4,158,568 | 4,725,698 | 8,884,266 |
| Citadel Derivatives, Group | 1,603,235 | 3,349,785 | 4,953,020 |

There was a total of almost 182 million shares of Escala traded in May 2006 and December 2006. Settlement of this number of shares is unlikely based on the accounting of shares issued, shares held in accounts that could not be shortened, inventory movement at the DTCC short sale data, previously shorted shares and shares failing to be delivered at the NSCC.

25

70.     Defendants, as the "gatekeepers to the public markets", had a duty to report the suspicious transactions of unlawful naked short sales of Escala stock that took place in May and December 2006/January 2007 to avoid impairment in or dilution of the shareholders' interests and to ensure that they were not selling counterfeit unregistered securities.  Since the fails to deliver, by their very nature, represented sales of unregistered counterfeit securities that were not issued by Escala nor borrowed to deliver for legal settlement, Defendants violated the duty they owed to Plaintiffs by ignoring the obvious need for further inquiry.

71.     There was such small movement of shares between the clearing firms, that settlements of the 91 million shares executed in the marketplace during the Relevant Period(s) could not be supported.  In the absence of buyers for shares of Escala, the 182 million shares traded in Escala stock by itself is indicia of evidence that the trading was manipulated and not executed by real buyers and sellers. The data indicates that there was an illegal bear raid with massive volumes of non existent counterfeit stock used to manipulate the pricing of the stock. Although Defendants knew or should have known that the stock of Escala was being short sold and in limited supply and that the stock was not being delivered for proper settlement, they continued to allow or participate actively in the trading.

**The Concealment And Cover-Up Of Defendants' Unlawful Conduct**

72.     Upon information and belief, Defendants created false documentation of their trading, loaning and ownership of Escala shares to conceal their unlawful naked short selling.  As set forth above and in Exhibit "A", the Defendants have repeatedly been fined for this kind of misconduct. Defendants have also upon information and belief concealed their unlawful activities by falsely reporting counterfeit or phantom shares on brokerage statements to investors, including the

26

Plaintiffs.

### Defendants Engaged in, Facilitated and Profited from Naked Short Selling

73.     Many of the improper acts and/or omissions are currently specifically known only by the Defendants and are contained in their documents and electronic records which they exclusively possess, control and maintain. However, Plaintiffs are aware of certain specific facts and circumstances that when analyzed within the context of publicly available records, clearly demonstrate a pattern of unlawful conduct.

74.     Defendants Knight Capital Group, Inc., through its subsidiary Knight Capital Americas, LP, formerly known as Knight Equity Markets, LP was the largest trader by reported market participants in the stock of Escala for May and December 2006, with reported trade volumes of 31,984,624 in May 2006 and 16,556,363 in December 2006 for a combined total of 48,540,987 shares traded during these periods.

75.     Defendant Merrill Lynch acted as the clearing firm for the Knight Equity trades in May and December 2006/January 2007.

76.     Defendant UBS Securities, LLC was a significant trader by reported market participants in the stock of Escala for May and December 2006, with reported trade volumes of 12,096,879 trades in May 2006 and 11,153,215 trades in December 2006 for a combined total of 23,250,094 shares trades during these periods. Defendant UBS also acted as the clearing firm for its trades.

77.     Defendant E*Trade Capital Markets, LLC was another significant trader by reported market participants in the stock of Escala for May and December 2006, with reported trade volumes of 9,034,783 trades in May 2006 and 14,476,559 in December 2006 for a combined total of

27

23,511,342 shares traded during these periods. Defendant E*Trade Capital Markets, LLC also acted as the clearing firm for its trades.

78.    Defendant National Financial Services, LLC was another significant trader by reported market participants in the stock of Escala for May and December 2006, with reported trade volumes of 4,158,568 in May 2006 and 4,725,698 in December 2006 for a combined total of 8,884,266 shares traded during these periods. Defendant National Financial Services LLC also acted as the clearing firm for its trades.

79.    Each of the Defendant traders and/or clearing firms engaged in affirmative activity that fostered or facilitated the naked short sales of Escala stock in breach of the duty imposed on them as "gatekeepers" of the market.

80.    Defendants' unlawful conduct, described above, was the proximate cause of injuries suffered by Plaintiffs. Defendants' persistent and unlawful naked short selling resulted in the creation and circulation of millions of unauthorized and/or counterfeit Escala shares, which diluted the value of legitimate, authorized Escala shares and thereby artificially depressed the price of those shares that Plaintiffs bought, sold and held during the Relevant Period(s). Defendants' unlawful conduct during the Relevant Period created uncertainty in the market as to the integrity of Escala and its management, causing further stock price depression. By unlawfully flooding the market with unauthorized, fictitious and/or counterfeit Escala shares, Defendants diluted the number of legitimate shares of Escala stock, including diluting shareholder's right to a fixed percentage ownership of the company and associated voting rights.

## COUNT ONE
## NEW JERSEY RICO STATUTE, N.J.S.A. 2C:41-1 et. seq.

81.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-82

28

of the Complaint, as if incorporated by reference herein.

82.     Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, LP, formerly known as Knight Equity Markets LP., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives, L.L.C., John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) engaged in an enterprise of acquiring or maintaining personal property, including but not limited to money, directly or indirectly, through a pattern of racketeering activity or proceeds derived therefrom violated or conspired or endeavored to violate the New Jersey Racketeering Influenced and Corrupt Organization Act, N.J.S.A. 2C:41-1 et seq. Each of the Defendants committed at least two interrelated predicate acts of racketeering activity within the State of New Jersey with the knowledge and intent that they were in furtherance of that pattern of racketeering activity.

83.     Defendants committed, attempted to commit, aided and abetted, solicited or engaged by way of an enterprise in at least two interrelated predicate incidents or acts of racketeering activity in furtherance of one or more incidents, schemes or transactions that had the same or similar intent, results, accomplices, victim or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents which proximately caused injury to the Plaintiffs.

84.     The incidents of acts of racketeering activity which form the pattern of racketeering activity engaged in by each Defendant occurred within the Relevant Period(s) and include multiple violations of the New Jersey Uniform Securities Law, N.J.S.A. 49:3-47, et seq. the commissions of acts constituting inter alia, theft and related crimes, fraud in the offering, sale or purchase of securities, and other conduct defined as racketeering activity by N.J.S.A. 2C:41.1, et seq.

29

**A.**     **Violations of New Jersey Uniform Securities Law, N.J.S.A. 49:3-49 et seq.**

85.     Defendants' conduct constituting predicate acts of racketeering activity in violation of N.J.S.A. 2C:41-1 et seq include but are not limited to the following:

        a.     Willfully employing a device, scheme, or artifice to defraud in connection with an offer to sell, sale or purchase any security;

        b.     Willfully engaging in an act, practice, or course of business that operates or would operate as a fraud or deceit upon a person;

        c.     Willfully effecting a transaction in a security which involves no change in the beneficial ownership of the security for the purpose of creating a false or misleading appearance of active trading in a security or with respect to the market for a security;

        d.     Willfully misappropriating, converting or improperly withholding funds or other property;

        e.     Willfully selling or offering for sale unregistered, unauthorized, fictitious and/or counterfeit Escala shares; and/or

        f.     Wilfully employing a deceptive or fraudulent device, scheme or to manipulate the market in the security.

86.     As the market for Escala stock was intended to operate in an efficient and honest manner, Plaintiffs relied upon the assumption that the market for Escala stock was free from manipulation.

87.     By knowingly and intentionally engaging in the conduct described herein, (*e.g.*, selling Escala stock short at times when Defendants neither possessed nor intended on obtaining Escala stock to deliver by the Settlement Date and by creating and trading in unauthorized, fictitious,

and/or counterfeit Escala shares) each of the Defendants willfully violated, attempted to violate, aided and abetted, and solicited another to willfully violate the New Jersey Uniform Securities Law, N.J.S.A. 49:3-47 et seq., which prohibits "generally, any course of conduct or business which is calculated or put forward with intent to deceive the public or the purchaser of any security or investment advisory services as to the nature of any transaction or the value of such security". Defendants, by making phantom loans of counterfeit Escala stock to facilitate naked short sale transactions, engaged inter alia, in the employment of an "artifice, agreement, device or scheme to obtain money, profit or property by any of the means herein set forth or otherwise prohibited by this act."

88.    The SEC has expressly noted that naked short selling involves the omission of a material fact. By knowingly and intentionally engaging in the conduct described in this Complaint, (e.g., selling Escala stock short at times when they neither possessed nor intended on obtaining Escala stock to deliver by the Settlement Date and by creating and trading in unauthorized, fictitious, and/or counterfeit Escala shares), Defendants have made untrue statements of a material fact or omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading in violation of the New Jersey Uniform Securities Law, N.J.S.A. 49:3-47 et seq.

89.    Upon information and belief, Defendants, in violation of the New Jersey Uniform Securities Law, N.J.S.A. 49:3-47 et seq.:

    a.    Knowingly and intentionally charging clients, customers, banks or others, fees, commissions and/or interest for "loaning" securities that the Defendant never loaned;

    b.    Knowingly and intentionally permitting a pattern of allowing failure to deliver

31

or receive positions from the same counterparty or for the same customers/clients;

        c.     Knowingly and intentionally failed to conduct or request buy-ins from clients or counterparties;

        d.     Knowingly and intentionally continued to accept, permit or facilitate short sales or other transactions (*e.g.*, flex options, conversions) for a customer or a prime broker that had failed to deliver on numerous occasions;

        e.     Knowingly and intentionally continuing to accept, permit or facilitate short sales of a stock that had repeated net failures to deliver or receive;

        f.     Knowingly and intentionally permitting, facilitating and/or engaging conversion, reverse conversion, flex option or other transactions that they knew were unlawful;

        g.     Knowingly and intentionally permitted, facilitated and/or engaged in transactions with customers/clients that it knew intended on violating or circumventing the law;

        h.     Knowingly and intentionally permitted, facilitated and/or engaged in transactions where they knew that stock would not be borrowed and/or delivered because of a negative rate (i.e., it would cost money to borrow the stock).

        **B.**     **Theft By Taking (N.J.S.A. 2C:20-2 et seq.)**

      90.     Defendants' violations of N.J.S.A. 2C:20-2 et seq., that is the commission of the offense of theft, constitutes a predicate act of racketeering activity pursuant to N.J.S.A. 2C:41-1(n).

      91.     A person commits the offense of theft when he/she unlawfully takes or, being in lawful possession thereof, unlawfully appropriates property of another with the intention of depriving him/her of the property, regardless of the manner in which the property is taken or appropriated.

      92.     Plaintiffs held a property interest in their authorized issued shares of Escala stock and

all rights appertaining thereto. Because at any point in time there is a finite amount of authorized and issued Escala stock, when the Defendants created fictitious and/or counterfeit stock through naked short sales, they diminished and/or diluted from each legitimate owner of authorized and issued Escala stock, an amount proportionate to the amount of fictitious and/or counterfeit Escala shares they created.

93. Each Defendant committed, attempted to commit, aided and abetted, solicited another to commit, or engaged in acts constituting the offense of theft by taking the property of Escala and Escala shareholders, including Plaintiffs. Defendants unlawfully took the property of Plaintiffs, with the intention of depriving them of that property by, inter alia, selling Escala stock short at times when they neither possessed nor intended on obtaining Escala stock to deliver by the Settlement Date and by creating and trading in unauthorized, fictitious, and/or counterfeit Escala shares. Defendants took, in whole or in part, shares of Escala stock, which had not been issued or authorized to be issued, for which Escala was never paid, thereby depriving Escala (and Plaintiffs, as shareholders of the company) of the right of exclusive possession and control over this property and any financial benefit from the introduction of its shares into the marketplace.

94. Defendants also engaged in theft by taking by purporting to loan short sellers Escala stock that the Defendants neither owned nor had any intention of obtaining. Upon information and belief, Defendants then charged short sellers fees for these sham "loans" of stock which the Defendants did not own, did not intend to obtain and never did obtain. The creation of fictitious and/or counterfeit shares of Escala through unlawful naked short sales of counterfeit stock and the fees Defendants charged for sham loans constitutes the unlawful taking of property in violation of N.J.S.A. 2C:20-2.

33

95.    Defendants have engaged in similar unlawful naked short selling of counterfeit securities of other companies for which they earned illicit profits and fees. The illegal naked short selling engaged in by the Defendants were not isolated incidents or part of the same transaction but rather constituted a pattern of racketeering activity that spanned several years, through which the Defendants derived, directly or indirectly, personal property including money.

**C.    Theft By Deception (N.J.S.A. 2C:20-4)**

96.    Defendants' violations of N.J.S.A. 2C:20-4 et seq., that is, the commission of the offense of theft by deception, constitutes a predicate act of racketeering activity pursuant to N.J.S.A. 2C:41-1(n).

97.    A person commits the offense of theft by deception when he/she purposely obtains the property of another by deception, which means that the Defendants unlawfully brought about a transfer or an apparent transfer of a legal interest in the property either to the Defendant or to another person. A person deceives another if he/she purposely 1) creates or reinforces a false impression, including false impressions as to law, value, intention, or other state of mind or 2) prevents another from acquiring information which would affect his/her judgment of a transaction.

98.    Defendants, by inter alia, engaging in the unlawful naked short sale of counterfeit Escala stock based on promises to borrow Escala stock, which it failed to borrow and had no intention of borrowing, committed the crime of theft by deception prohibited by N.J.S.A. 2C:20-4.

99.    For the reasons set forth herein, the actions by Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, LP, formerly known as Knight Equity Markets LP., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives Group, L.L.C., John Does 1-10 (names being fictitious) and ABC Companies

34

1-10 (names being fictitious) in engaging in an enterprise of acquiring or maintaining personal property, including but not limited to money, directly or indirectly, through a pattern of racketeering activity or proceeds derived therefrom, constitute racketeering under the New Jersey Racketeering Influenced and Corrupt Organization Act, N.J.S.A. 2C:41-1 et seq.

100.    The multiple acts of racketeering committed by said Defendants were interrelated, part of a common and continuous pattern of fraudulent acts, and perpetrated for the same or similar purposes, thus constituting, among other things, a pattern of racketeering activity as defined by the New Jersey Racketeering Influenced and Corrupt Organization Act, N.J.S.A. 2C:41-1 et seq.

101.    Defendants willfully, knowingly, and intentionally participated in this scheme to defraud Plaintiffs and engaged in the pattern of racketeering activity described herein with the knowledge and the intention that Plaintiff would be defrauded.

102.    As a direct and proximate result of said Defendants' wrongful racketeering acts, Plaintiffs have been injured and have sustained substantial damages, and Plaintiffs are therefore entitled to treble damages, reasonable attorney's fees and costs pursuant to N.J.S.A. 2C:41-1 et seq.

WHEREFORE, Plaintiffs demand judgment against Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, LP, formerly known as Knight Equity Markets LP., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives, Group L.L.C., John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, statutory treble damages, attorney's fees, interest and costs of suit.

## COUNT TWO
## UNJUST ENRICHMENT

103.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-102

of the Complaint as if incorporated by reference herein.

104.    Defendants, while engaged in naked short selling of counterfeit shares of Escala stock knew or should have known that their artificial manipulation of the company's stock value would directly and negatively impact Plaintiff's financial expectations and contractual rights as a shareholder in Escala, while providing Defendants with significant financial benefits.

105.    Defendants unlawful manipulation of the market for Escala stock unjustly enriched themselves at Plaintiffs expense, such that retention of these benefits would be inequitable.

106.    As a result of Defendants' unlawful conduct, Plaintiffs expectations of financial gain under ordinary market conditions were denied to their substantial detriment.

107.    As a direct and proximate result of Defendants' actions, Plaintiff have suffered damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, LP, formerly known as Knight Equity Markets LP., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel, Group. L.L.C., John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, attorney's fees, interest and costs of suit.

## COUNT THREE
## UNLAWFUL INTERFERENCE WITH PLAINTIFF'S ECONOMIC ADVANTAGE

108.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-107 of the Complaint as if incorporated by reference herein.

109.    Plaintiff's had a reasonable expectation of economic advantage or benefit as a result of their acquisition of Escala shares of stock.

110.    Defendants knew or should have known of Plaintiffs' expectancy of economic

advantage by their ownership of stock in Escala.

111.     Defendants' unlawful short selling of counterfeit Escala Stock and other actions undertaken as set forth herein were wrongfully undertaken without justification, as a result of which Plaintiffs' expectancy of economic advantage or benefit was interfered with, to their substantial detriment.

112.     In the absence of Defendants' wrongful conduct, it is reasonably probable that the Plaintiffs would have realized their economic advantage or benefit.

113.     As a direct and proximate result of Defendants' unlawful interference with Plaintiffs' economic advantage, Plaintiffs suffered damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, LP, formerly known as Knight Equity Markets LP., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives Group, L.L.C., John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, attorney's fees, interest and costs of suit.

### COUNT FOUR
### TORTIOUS INTERFERENCE WITH PLAINTIFF'S CONTRACTUAL RELATIONS

114.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-113 of the Complaint as if incorporated by reference herein.

115.     Plaintiffs purchase or acquisition of shares of stock in Escala was for investment purposes and undertaken pursuant to a contract.

116.     Defendants knew or should have known of the existence of that relationship by virtue of Plaintiffs' status as a shareholder in Escala.

117.     Defendants intentionally and maliciously with motive to harm without justification

37

interfered with the contractual relationship between Plaintiffs and Escala by engaging inter alia, in the unlawful short selling of counterfeit shares of stock by inducing, procuring or causing a breach or termination in that agreement.

118. In the alternative, Defendants, if they did not act out of malice, but rather for profit or to enhance their financial position engaged in conduct that went beyond or transgressed generally accepted standards of morality, that is a violation of standards of socially acceptable conduct.

119. But for Defendants' conduct, Plaintiffs contract would have continued and they would not have suffered losses in the share value of the Escala stock.

120. As a direct and proximate result of Defendants' actions, Plaintiffs suffered damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, LP, formerly known as Knight Equity Markets LP., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives Group, L.L.C. John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, attorney's fees, interest and costs of suit.

## COUNT FIVE
## UNLAWFUL INTERFERENCE WITH CONTRACTUAL RELATIONS

121. Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-120 of the Complaint as if incorporated by reference herein.

122. Plaintiffs had the right to enjoy the fruits and advantages of their enterprise, industry and skill, free from unjustified and wrongful interference by their investment in Escala stock.

123. Defendants' conduct by inter alia, engaging in the unlawful short selling of counterfeit shares of Escala stock constituted an unjustifiable interference with Plaintiffs contract rights and/or reasonable expectations derived therefrom.

38

124.    But for Defendants' unlawful activity as set forth herein, Plaintiffs would have realized their economic advantage or benefit.

125.    As a direct and proximate result of Defendants actions, Plaintiffs suffered damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, LP, formerly known as Knight Equity Markets LP., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives Group, L.L.C., John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, attorney's fees, interest and costs of suit.

## COUNT SIX
## THIRD PARTY BENEFICIARY CLAIMS

126.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-125 of the Complaint as if incorporated by reference herein.

127.    Plaintiffs are intended third party beneficiaries individually and/or as a class of any and all agreements and/or contracts entered into by Defendants in furtherance of their roles as market makes, traders and clearing firms in transacting short sales of Escala stock.

128.    Upon information and belief, Defendants intended that Plaintiffs, individually and as a class were to receive a benefit from these agreements and/or contracts.

129.    As a direct and proximate result of Defendants' failure to abide by their agreements and/or contracts, whether by intention, design or otherwise, Plaintiffs suffered damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, LP, formerly known as Knight Equity Markets LP., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives Group, L.L.C., John Does 1-10 (names being fictitious) and ABC Companies

39

1-10 (names being fictitious) for compensatory damages, attorney's fees, interest and costs of suit

## COUNT SIX
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

130.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-129 of the Complaint as if incorporated by reference herein.

131.    In any and all agreements and/or contracts entered into in which Plaintiffs were intended third party beneficiaries individually or as a class, there is an implied covenant of good faith and fair dealing which requires that all parties to same must act in good faith and deal fairly with the other party in performing or enforcing the terms of the agreement and/or contract.

132.    Defendants in engaging inter alia in the unlawful shortselling of counterfeit shares of Escala stock acted in bad faith, dishonestly or with improper motive to destroy or injure the right of Plaintiffs individually, or in their capacity as shareholders of Escala to receive the benefits or reasonable expectation of their agreement or contract as third party beneficiaries.

133.    Defendants with no legitimate purpose: a) acted with bad motives or intentions or engaged in deception or evasion in the performance of their agreement and/or contract; and b) by such conduct, denied Plaintiffs the benefit of the bargain initially intended by the parties.

134.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, LP, formerly known as Knight Equity Markets LP., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives Group, L.L.C., John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, attorney's fees, interest and costs of suit.

## COUNT SEVEN
## PUNITIVE AND EXEMPLARY DAMAGES

135. Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-134 of the

Complaint as if incorporated by reference herein.

136 Defendants actions were undertaken willfully, wantonly and maliciously.

137. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Merrill Lynch, Pierce, Fenner &

Smith, Inc., Knight Capital Americas, LP, formerly known as Knight Equity Markets LP., UBS Securities,

L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives Group,

L.L.C., John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for

punitive and exemplary damages, attorney's fees, interest and costs of suit.

**NEAL H. FLASTER, LLC**
Attorneys for Plaintiffs
Greg Manning, et al

By: _Neal H. Flaster_
Neal H. Flaster

Dated: May 8, 2012

## JURY DEMAND

Plaintiff demand a trial by jury on all issues so triable.

_Neal H. Flaster_
Neal H. Flaster

Dated: May 8, 2012

41

RECEIVED & FILED
SUPERIOR COURT

## CERTIFICATION PURSUANT TO R. 4:5-1

2012 MAY -8 P 3: 48

CIVIL DIVISION

I hereby certify that the matter in controversy is not the subject of any other action pending in any

Court or of a pending or contemplated arbitration proceeding. Moreover, I am presently unaware of any other

party who should be joined in the within action.

Neal H. Flaster

Dated: May 8, 2012

42



ENTERED ON ACMS

RECEIVED & FILED
SUPERIOR COURT
2012 JUN -7 P 12: 30
CIVIL DIVISION

**NEAL H. FLASTER L.L.C.**
30 Columbia Turnpike
P.O. Box 21
Florham Park, New Jersey 07932
Tel. No.: 973-822-7900
Attorney for Plaintiff
Greg Manning, et al

| | |
|---|---|
| GREG MANNING; CLAES ARNRUP; POSILJONEN AB; POSILJONEN AS; SVEABORG HANDEL AS; FLYGEXPO AB; and LONDRINA HOLDING, LTD. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MORRIS COUNTY |
| Plaintiffs, | DOCKET NO.: L-1173-12 |
| vs. | *Civil Action* |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; KNIGHT CAPITAL AMERICAS, L.P., formerly known as KNIGHT EQUITY MARKETS L.P.; UBS SECURITIES, L.L.C.; E* TRADE CAPITAL MARKETS L.L.C.; NATIONAL FINANCIAL SERVICES, L.L.C.; CITADEL DERIVATIVES GROUP, L.L.C.; JOHN DOES 1-10 (names being fictitious); and ABC COMPANIES 1-10 (names being fictitious), jointly, severally or in the alternative, individually | **AMENDED COMPLAINT AND JURY DEMAND** |
| Defendants. | |

Plaintiffs Greg Manning ("Manning"), residing at 4 Whitfield Court, Boonton Township,

New Jersey 07932; Claes Arnup, residing at Hans Michelsensgatan 9, 11th floor, Malmo, Sweden;

Posiljonen AB ("Posiljonen AB"), with its principal place of business located at Box 537, S-201 25

Malmo, Sweden; Posiljonen AS ("Posiljonen AS"), with its principal place of business located at

Koebmagergade 2, DK-1050 Copenhagen, Denmark; Flygexpo AB ("Flygexpo"), with its principal

place of business located at Box 321, S-721 07 Vaesteraas, Sweden; Sveaborg Handel AS

("Sveaborg"), with its principal place of business located at Postboks 5098, Majorstua, –0301 Oslo, Norway; and Londrina Holding Ltd. ("Londrina"), with its principal place of business located at Boit Postal 260, L-2012 Luxemburg by way of complaint say:

## NATURE OF ACTION

1.      This is an action to recover damages incurred as a result of Defendants' massive manipulation of the market for the price of the common stock of Escala Group, Inc. ("Escala")[1] beginning May 9, 2006 ("Relevant Period I") through May 12, 2006 and again from December 1, 2006 through January 9, 2007 ("Relevant Period II"). As set forth herein, Defendants knowingly and intentionally engaged in the unlawful practice of naked short sales of Escala stock by creating, loaning and selling unauthorized, fictitious and counterfeit shares through various unlawful schemes and devices for the purpose of reaping enormous profits.

2.      Defendants' unlawful conduct, occurring within the context of a pervasive and long-standing pattern of naked short selling of securities, constituted an unlawful form of market manipulation in violation, inter alia, of the New Jersey Racketeering Influenced and Corrupt Organization Act, N.J.S.A. 2C:41-1 et seq., the New Jersey Uniform Securities Act, N.J.S.A. 49:3-49 et seq., and various other New Jersey statutes and common law causes of action, including but not limited to theft by taking, theft by deception, unjust enrichment, unlawful interference with Plaintiff's economic advantage, tortious interference with Plaintiff's prospective economic advantage, breach of contract and breach of the covenant of good faith and fair dealing.

3.      To perpetrate this massive manipulation of the market price of Escala shares of stock, Defendants inter alia, designed their schemes and employed their devices while engaged in a pattern

---

[1]Escala is now known as Spectrum Group International, Inc.

2

of racketeering activity that resulted in their entering millions of proprietary and customer short sale transactions during the Relevant Period(s), while lacking reasonable grounds to believe that the securities could be borrowed and be available for delivery.

4.    By undertaking the unlawful naked short selling of Escala stock, Defendants <u>inter alia</u>, increased the pool of tradable shares by electronically manufacturing fictitious and unauthorized phantom shares and using non-registered Escala shares to dilute the fixed percentage of the Plaintiffs' stock; however, in so doing, this caused the shares to dramatically decline in value with Defendants then selling or loaning these shares, receiving significant profits and fees for their unlawful actions. Thereafter, Defendants implemented a sophisticated scheme to conceal and cover-up their illegal conduct to avoid detection.

5.    Defendants have been fined hundreds of thousands of dollars or more by regulatory agencies for their intentional and persistent violation of rules and regulations governing unlawful naked short sales of securities. However, these fines and sanctions have failed to deter Defendants from continuing to engage in business "as usual", viewing these sanctions as merely "pocket change" and the "cost of doing business". See Exhibit A, annexed hereto.

6.    Plaintiffs seek entry of judgment against each Defendant for statutory treble damages pursuant to the New Jersey Racketeering Influenced and Corrupt Organization Act, N.J.S.A. 2C:41-1 et seq., attorney's fees, compensatory damages, punitive damages, interest and costs of suit.

## PARTIES AND NON PARTY PARTICIPANTS

### A.    Plaintiffs.

7.    Plaintiff Manning, the owner of approximately 2.1 million shares in the Escala Group, Inc. ("Escala") during the Relevant Periods was a resident of Morris County and State of New Jersey

3

at that time and currently resides at 4 Whitfield Court, Boonton Township, County of Morris and State of New Jersey.

8.  Plaintiff Arnup, the owner of approximately 10,000 shares of stock in Escala during Relevant Period I, is an individual residing at Hans Michelsensgatan 9, 11th floor, Malmoe, Sweden.

9.  Plaintiff Posiljonen AB, the owner of approximately 60,000 shares of stock in Escala during the Relevant Period(s), is a company with its principal place of business located at Box 537, S-201 25 Malmoe, Sweden.

10.  Plaintiff Posiljonen AS, the owner of approximately 13,100 shares of stock in Escala during the Relevant Period(s), is a company with its principal place of business located at Koebmagergade 2, DK-1050 Copenhagen, Denmark.

11.  Plaintiff Flygexpo AB, the owner of approximately 30,000 shares of stock in Escala during the Relevant Period(s), is a company with its principal place of business located at Box 321, S-72107 Vaesteraas, Sweden.

12.  Plaintiff Sveaborg Handel AS, the owner of approximately 55,000 shares of stock in Escala during the Relevant Period(s), is a company with its principal place of business located at Postboks 5098, Majorstua,-0301 Oslo, Norway.

13.  Plaintiff Londrina Holding Ltd., the owner of approximately 110,000 shares of stock in Escala during the Relevant Period(s), is a company with its principal place of business located at Boit Postal 260, L-2012 Luxemburg.

**B.  Entity Defendants.**

14.  Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), its

4

subsidiaries, affiliates, successors or assigns, is a business corporation organized under the laws of Delaware that conducts business in or that affects New Jersey, is authorized to do business in New Jersey and has offices located at 1300 Merrill Lynch Drive, Pennington, New Jersey.

15.     Defendant Knight Capital Group, Inc., ("Knight"), its subsidiaries, affiliates, successors or assigns, including but not limited to Knight Capital Americas, L.P., formerly known as Knight Equity Markets, L.P. ("Knight Equity"), is a business corporation organized under the laws of Delaware that conducts business in or that affects New Jersey, is authorized to do business in New Jersey and has its principal place of business located at 545 Washington Blvd., Jersey City, New Jersey.

16.     Defendant UBS Securities, L.L.C. ("UBS"), its subsidiaries, affiliates, successors or assigns, conducts business in or that affects New Jersey and has offices located at 480 Washington Blvd., Jersey City, New Jersey.

17.     Defendant E*Trade Capital Markets, L.L.C. ("E*Trade"), its subsidiaries, affiliates, successors or assigns, is a subsidiary of E*Trade Financial Corporation, which conducts business in or that affects New Jersey and has offices located at Harborside Financial Center, 501 Plaza 2, 34 Exchange Place, Jersey City, New Jersey.

18.     Defendant National Financial Services, L.L.C. ("National Financial"), its subsidiaries, affiliates, successors or assigns, conducts business in or that affects New Jersey and has offices located at 1000 Plaza, Jersey City, New Jersey.

19.     Defendant Citadel Derivatives Group, L.L.C., its subsidiaries, affiliates, successors or assigns conducts business in or that effects New Jersey and has its offices located at 131 South Dearborn Street, #3100, Chicago, Illinois.

5

20.    Defendants ABC Companies 1-10 (names being fictitious) are such companies or entities whose identities are unknown who acted individually or collectively with one or all of the other Defendants: a) to cause Plaintiffs to suffer financial harm; and b) to form, operate or manage an enterprise for the purpose of engaging in unlawful activity affecting trade or commerce in New Jersey , including but not limited to such activity which serves as the basis for relief under the New Jersey Racketeering Influenced and Corrupt Organization Act, N.J.S.A. 2C:41-1 et seq.; and c) to operate or manage an enterprise involved in unlawful activities affecting trade or commerce in New Jersey.

**C.    Non- Entity Individual Defendants.**

21.    Defendants John Does 1-10 (names being fictitious) are such persons whose identities are unknown who acted individually or collectively with one or all of the other Defendants to cause Plaintiffs: a) to suffer financial harm; and b) through a pattern of illegal racketeering activity, operate or manage an enterprise engaged in activities affecting trade or commerce in New Jersey,  including but not limited activities which serves as the basis for relief under the New Jersey Racketeering Influenced and Corrupt Organization Act, N.J.S.A. 2C:41-1 et seq.

**D.    Non-party Participant(s).**

22.    Non-party Participant Escala had its principal place of business located at Passaic Avenue, in the Township of West Caldwell, County of Essex and State of New Jersey during the Relevant Period(s) in issue.

## FACTS COMMON TO ALL CLAIMS

**A.    Background**

**1.    Short Selling as a Lawful Trading Strategy**

23.     In a typical legal short selling transaction, a party known as a "Short Seller" speculates that the price of a stock will decline, and seeks to profit from that expected decline. To accomplish this, the Short Seller locates and then borrows shares of the subject company's stock from another shareholder in a transaction typically arranged by the broker dealer, and sells those borrowed shares on the open market at the existing price. The Short Seller completes the transaction, i.e., covers its short position, by replacing the shares it borrowed by purchasing the subject company's stock at a later date, and returning the borrowed shares back to the lender. If the Short Seller's speculation that the stock price will decline is correct, the Short Seller will earn as profit the difference between the higher price at which it sold the borrowed shares and the lower price at which it subsequently replaced them. As an illustrative example, a Short Seller speculates that Stock X is currently overvalued at $50/share, and expects the share price to decline. The Short Seller (who does not own Stock X) borrows 100 shares of Stock X, and sells those shares on the open market at the existing $50/share price. The borrowed shares are delivered to the purchaser to complete the proper settlement of the short sale. If the stock price later falls to $45/share, and the Short Seller purchases 100 shares of the stock to replace the shares the short seller borrowed at $50 per share, the short seller has earned $5/share, minus any fees, commissions and/or interest it incurred in completing the transaction. If the stock is never borrowed then the profit is significantly greater by avoiding the borrowing fees, commissions and interest. If the subject company files for bankruptcy the short seller will never replace the shares that were sold.

24.     When conducted in accordance with securities and other laws and regulations, short selling is a legal and accepted trading strategy. However, a critical requirement of a *lawful* short sale is that the Short Seller first makes an affirmative or reasonable determination that the shorted shares

7

are available and the broker actually borrows or otherwise obtains the stock it sells. Indeed, securities laws and regulations require a Short Seller to borrow the stock it sold and deliver that borrowed stock within three days of the short sale (the "Settlement Date"). This settlement cycle is known as "T+3". T+3 means that when a trade occurs, the participants to the trade deliver and pay for the security at the clearing agency three settlement days after the trade is executed so the brokerage firm can exchange those funds for the securities on that third settlement day.

### 2. Naked short sales of stock as an unlawful trading strategy used to manipulate the market in which securities are traded

25.     In a "naked" short sale, the seller does not own, and does not borrow or arrange to borrow the securities in time to make delivery to the buyer within that standard T+3 Settlement Date. As a result, the seller fails to deliver the securities to the buyer when the delivery is due. If the Short Seller never borrows or otherwise obtains the stock it sold short, the Short Seller cannot convey or deliver authorized and legitimate stock to the purchaser. In those instances in which a Short Seller fails to borrow or otherwise obtain the stock it sold short, the purchaser is not precluded from completing the sale and obtaining the purchased stock.

26.     Today, most settlements of securities trades are conducted electronically through a central depository, known as the Depository Trust and Clearing Corporation and its primary subsidiary, National Securities Clearing Corporation (collectively referred to herein as the "DTCC"), which accounts for the buying and selling of securities through electronic book entries (rather than transfer of physical stock certificates).

27.     In a typical securities transaction, the DTCC's electronic trading records reflect that the buyer "owns" the shares, and that the seller "owes" the purchased shares, which the seller is

required to deliver by the Settlement Date. In a short sale, the DTCC still electronically transfers to the buyer the stock it purchased *even if the seller fails to deliver the shares it "owes" to the DTCC* ("Fail"). If the Short Seller Fails to deliver the stock it owes to the DTCC, the Short Seller has, in effect, electronically created and conveyed an unauthorized, fictitious and/or phantom share of stock to the buyer because the DTCC credits the buyer with owning shares that did not previously exist. The newly created shares are counterfeit shares because they were not authorized or issued by the company or registered for sale by the company with either the SEC or the market exchange on which the shares trade. These unauthorized, counterfeit shares, are created electronically by the Short Seller through an illegal short sale of a stock that the Short Seller did not own, deliver and/or intend on possessing in order to complete the settlement of the short sale.

28. In 2005, in response to pervasive manipulative conduct in the unlawful naked short sales of securities, the Securities and Exchange Commission ("SEC") adopted Regulation SHO ("Reg SHO"), 17 C.F.R. § 242.204. The general purpose of Reg SHO is to establish uniform "Locate" and "Close-Out" requirements and prevent unlawful naked short selling, in which market participants like the Defendants, sought to obtain illicit profits by selling or loaning stock at artificially depressed prices that they did not own, never intended to borrow or locate for delivery to buyers and close-out by settling their trades.

29. The SEC articulated the pernicious effects of naked short selling on the securities markets, stating that:

> …we are concerned that large and persistent fails to deliver may have a negative effect on the market in these securities. For example, large and persistent fails to deliver may deprive shareholders of the benefits of ownership, such as voting and lending. In addition, where a seller of securities fails to deliver securities on trade settlement date, in effect the seller unilaterally converts a securities contract (which

9

should settle within the standard 3-day settlement period) into an undated futures-type contract, to which the buyer may not have agreed, or that may have been priced differently. Moreover, sellers that fail to deliver securities on trade settlement date may enjoy fewer restrictions than if they were required to deliver the securities within a reasonable period of time, and such sellers may attempt to use this additional freedom to engage in trading activities that deliberately and improperly depress the price of a security.

In addition, many issuers and investors continue to express concern about extended fails to deliver in connection with "naked" short selling. To the extent that large and persistent fails to deliver might be indicative of manipulative "naked" short selling, which could be used as a tool to drive down a company's stock price, fails to deliver may undermine the confidence of investors. These investors, in turn, may be reluctant to commit capital to an issuer they believe to be subject to such manipulative conduct. In addition, issuers may believe that they have suffered unwarranted reputational damage due to investors' negative perceptions regarding large and persistent fails to deliver. Any unwarranted reputational damage caused by large and persistent fails to deliver might have an adverse impact on the security's price...

30.     In November of 2007, former SEC Chairman Harvey Pitt derided the practice of

naked short selling stating: "Phantom shares created by naked shorting are analogous to counterfeit

money." Similarly, during a February 14, 2008 Senate Banking Committee Hearing, Senator Robert

Bennett commented that through naked short selling it is becoming "increasingly...easier in this

electronic world to give you counterfeit shares." The SEC also reaffirmed its ". . . zero tolerance

for abusive naked short selling" by strengthening investor protection. Indeed, the SEC, which

regulates federal securities laws that are substantially similar to New Jersey's Securities Act, has

explicitly stated that selling stock short and failing to deliver shares at the time of settlement with

the purpose of driving down the security's price" constitutes a "manipulative activity" that "in

general, would violate various securities laws." *See www.sec.gov/spotlight/keyregshoissues.htm* ; *See*

*also* SEC Release No. 34-.57511, p.3, File No. S7-08-08 (Mar. 17, 2008).

31.     Naked short selling exacerbates volatility in the securities markets and damages bona

10

fide shareholders of a company because it floods the market with, unauthorized, fictitious and/or counterfeit shares or entitlements, thereby diluting the value of each legitimate share of stock, diluting the shareholder's right to a fixed percentage of ownership of the company and diluting the shareholder's voting rights. Naked short selling is intended to deliberately depress the price of a security in order to maximize the profit that is made based on the difference between the price of the stock when it was sold and the price of the stock that is required to be delivered on the Settlement Date.

32.     The DTCC is a corporation formed for the clearance and settlement of securities transactions, which is undertaken through a series of electronic systems. It was created in 1974 for, inter alia, the "prompt and accurate clearance and settlement of securities transactions" as "necessary for the protection of investors." Since 1999, the DTCC has controlled virtually all of the U.S. trade clearance and settlement processing of real stock issued by corporations that is held in brokerage accounts and did so during the relevant periods at issue in the within Complaint.

33.     In 1981, further efforts were made to increase the speed of the settlement trade process through the advent of the DTCC stock borrow program by the DTCC within its overall system. That program created a massive lending pool of shares from brokers' client margin accounts (i.e., brokerage accounts in which the broker lends the customer cash to purchase securities, which are securitized by both securities and cash), which facilitated securities trading. For example, if a prime broker is unable to deliver stock it sold within the T+3 Settlement Date, the prime broker could obtain shares to provide to the purchaser from the DTCC borrowing pool, allowing the trade to clear. When operated properly, the prime broker who sold the stock will replace the shares it owes to the DTCC. But, as set forth in detail herein, the Defendants violated the trading rules and

11

regulations requiring that they actually deliver shares they owe to the DTCC to settle short sale transactions.

34.     The Defendants, who are owners of the DTCC, have significant involvement and communication with, as well as influence over, the DTCC. For example, Defendants act as "DTCC member clearing firms," meaning that they are informed by the DTCC of the clearing and settling of trades and purportedly they assure that paperwork associated with a securities transaction is accurate. Moreover, Defendants, as prime brokers, play an integral role in short sale securities transactions; among other things, Defendants are responsible for locating shares of the shorted stock, borrowing the short stock, and delivering the shares by the T + 3 Settlement Date.

35.     Defendants' illegal short selling activity has not been limited to Escala shares of stock, but is part of an ongoing pattern of unlawful naked short selling of securities of other companies. Because naked short selling was and is enormously lucrative to the Defendants, the relatively minor sanctions and penalties assessed against them (when one considers the magnitude of the money directly connected to naked short selling) have failed to stop or even deter Defendants' from continuing to engage in such unlawful conduct. Defendants have a long and well documented history of being "recidivist" offenders of fraud and stock manipulation statutes and as one Court recently held, civil penalties and disgorgement even as high as $295 million are considered by the investment community to be merely, a "mild and modest cost of doing business."

**B.     The nature and scope of Defendants' unlawful scheme to manipulate Escala stock**

36.     Many of the Defendants unlawful acts and/or omissions are currently known only by them and are contained in documents and electronic records which they exclusively possess, control and maintain. However, Plaintiffs are aware of certain specific facts and circumstances that when

12

analyzed within the context of publicly available records, clearly demonstrate a pattern of unlawful conduct.

37.  Upon information and belief, during the Relevant Period(s), Defendants manipulated the price of Escala's common stock through a pattern of naked short selling by:

a)  creating and/or using unauthorized counterfeit shares to increase the pool of tradable common stock which operated to dilute the shares owned by Plaintiffs;

b)  selling and/or loaning unauthorized and counterfeit shares, thereby enabling Defendants to reap millions of dollars in unlawful profits and fees while simultaneously injuring plaintiffs; and thereafter;

c)  implementing a sophisticated scheme to conceal and cover up their unlawful conduct.

38.  On the close of business on May 8, 2006, the share price of Escala stock was $32 a share. Its share value declined to $12.23 at the close of business on May 9, 2006, a 62% drop in value as the result of large scale selling of unlawful and counterfeit short shares which were neither borrowed nor delivered by Defendants to complete a legal sale and illegal trades used for the purpose of manipulating Escala's share price. The share value of the Escala stock continued to decline until it reached $4.00 a share on May 12, 2012.

**1.  Defendants' creation and/or use of fictitious and unauthorized phantom shares of Escala stock**

39.  Upon information and belief, Defendants traded in their own proprietary accounts and/or loaned Escala stock to their clients and others to complete short sales at times when Defendants neither possessed, nor had any intention of obtaining sufficient authorized stock to cover these transactions.

40.  When a customer or prime broker seeks to sell a stock short, the prime broker or customer must first determine whether there are shares available to be borrowed. When the broker

13

does not itself have shares available to borrow, the prime broker must ask other prime brokers whether they have shares available to lend and deliver to complete the short sale. When one prime broker affirmatively states that it has shares available to lend and deliver, that statement is referred to as giving a "Locate."

41. Upon information and belief, Defendants gave and received false "Locates", knowing that they would not likely have to deliver the located shares if requested, thereby artificially increasing the pool of tradable Escala shares. Many of these same Defendants improperly provided Locates for Escala securities on the same dates for which they were failing to deliver Escala securities (i.e., Defendants were saying they had Escala securities available to lend to facilitate additional short selling at the same time they did not have sufficient Escala securities to cover past sales).

42. Upon information and belief, Defendants claimed to receive Locates from other Defendants (or non-party banks) on dates when those other Defendants (or non-party banks) did not have sufficient Escala securities to cover the alleged Locates and accepted Locates they knew were unreliable. Giving these false Locates allows the counter-party to the short sale transaction to complete the unauthorized sale and generate commissions without having to actually borrow the stock and incur borrowing costs.

43. When a Short Seller fails to deliver stock by the Settlement Date, the DTCC system indicates that a "Fail" occurred. Under DTCC rules, only the purchaser (or the Defendant prime broker representing it) has the ability to force the short seller to deliver the shares and clear out the "Fail" positions. Defendants, however, by implicitly agreeing not to require each other to clear out "Fails" and instead, permitted "Fail" transactions to remain unfulfilled indefinitely, facilitated naked

14

short sales by eliminating the need for a Defendant to actually locate Escala shares before loaning or selling Escala shares in conjunction with a short sale. It also deceives the market, the regulators and keeps the stock off of the Reg. SHO list, thus avoiding additional regulatory scrutiny and enforcement.

### 2. Defendants' unlawful and/or lending of unauthorized and fictitious shares of Escala stock

44. Each of the Defendants maintain their own proprietary accounts from which they conduct stock transactions on their own behalf. Analysis of the trading of Escala stock demonstrates patterns of trading that do *not* correlate to the activity recorded in the DTCC's electronic trading records and therefore, reflect a material deviation from various stock indices indicative of illegal naked short selling. Although there were significant amounts of Escala stock traded by the Defendants during the Relevant Periods, since the DTCC's records show little if any change in the Defendants' net position, the shares traded were not authorized or legitimate but were rather, counterfeit, fictitious and unauthorized.

### 3. The Events of May 2006 (Relevant Period I)

45. In May 2006, there were 9,037,738 shares of Escala stock on deposit at the DTCC where the actual shares issued by Escala in the public float are accounted for. In practice, the DTCC acts as a "bank" for the shares of publicly traded corporations held in brokerage accounts, with the DTCC accounting for the transfers of shares between firms. There were at least 1.9 million shares of Escala stock held in cash or non marginable accounts, which could not be loaned out for short sales and therefore, could not be sold in the market. This reduced the actual public float at the DTCC to 7,137,738 million shares and of these shares, there were 5,615,754 million shares already shorted in May 2006, leaving only 1,521,904 million shares available in the public float to settle long and

15

short sales.

46.     Approximate Number of Escala shares available to settle trades in May 2006.

| Settlement Date | 5/5/2006 | 5/12/2006 | 5/19/2006 |
|---|---|---|---|
| Shares on deposit with DTCC | 9,037,738 | 9,037,738 | 9,037,738 |
| Non-Shortable Shares | 1,900,000 | 1,900,000 | 1,900,000 |
| Short Interest | 4,859,221 | 5,615,754 | 5,615,754 |
| **Approx. Shares Available** | **2,278,517** | **1,521,984** | **1,521,984** |

| Escala's Trade Volume | | | |
|---|---|---|---|
| Shares Traded Between Periods | | 8,349,565 | 66,697,503 |
| Shares traded on May 9th | | 6,944,513 | |

47.     In May 2006, reported short interest was 5,615,754 shares or approximately 62% of the 9.1 million shares in the public float. DTCC records show that the public float remained consistent from May 2006 through January 2007 at less than 9.1 million shares. In essence, when the 1.9 million shares that were in the known accounts that could not be shorted were taken into consideration, 79% of the remaining shares on deposit at the DTCC were already shorted. The real shares issued by Escala that were in the public float, less established short positions and shares in friendly hands in non-shortable accounts totaled approximately 1.5 million shares.

48.     In May 2006, there was a significant increase in marketplace volume of Escala stock to over 97 million shares verses April's marketplace volume of 2.7 million shares, an increase of 35.5 times the previous monthly volume. The May marketplace volume of 97 million shares was a rotation of 10.8 times all of Escala's shares on deposit at the DTCC or averaging a turnover of the DTCC shares every two days for the month. The majority of this volume, 91,002,350 shares or 93% of the May 2006 volume, transacted in just 11 days, which equates to the entire number of shares on deposit turning over, every 1.1 days during this 11 day period. The 9.1 million shares on deposit at the DTCC were, in theory, turned over ten times in these 11 days. Moreover, shares in the real

16

available float (shares on deposit at the DTCC less shares on deposit in non shortable accounts less short interest totaling approximately 1.5 million shares) turned over approximately 60 times in this 11 day period.

49.    The incongruence between the number of Escala shares traded and the number of shares on deposit with the DTCC available to be traded is indicative of Defendants' unlawful naked short selling of Escala stock. Based on the movement of real shares at the DTCC, it would be impossible to trade 91 million shares in the 11 days in May 2006, as these transactions could not have been short sales because there were not significant numbers of shares to short.

50.    In the months preceding May 2006, Escala shares of stock were failing to deliver in small quantities at the National Securities Clearing Corporation ("NSCC"), which indicated that there were few shares available to borrow to complete short sale settlements. Fails as a percentage of short interest were relatively small in 2006 and averaged 1.6% from January to April 2006. By May 10, 2006, the short interest reporting date, fails to deliver increased to 1,464,623 shares from a prior two day fail to deliver level of 52,229 shares. Fails as a percentage of short interest exploded to 26.1% of the reported interest. In the next 5 trading days, fails rose to 3,214,676 or 57% of the May reported short interest. Prior to May 10, 2006, there were few fails to deliver, indicating that the new fails to deliver were a result of newly reported shorted shares. The reported short interest for April 2006 was 4,859,221 and the reported short interest for May 2006 was 5,615,754, or a short interest increase of only 756,533 shares. The fails to deliver at the NSCC increased from the large volume of trading on May 9th and May 10th by 1,412,394 shares.

51.    The May 9th and May 10th trading was reported in the May short interest period, with short interest growing by 756,533 shares. Since fails to deliver increased by 1.4 million shares, it

appears that at least 655,861 shares that failed in delivery were not reported as short interest by Defendant clearing firms. These delivery failures represent sales of stock where no borrow could be obtained to complete settlement and shares were sold, but not owned by sellers (transactions which must be marketed short). Defendant clearing firms and market makers misrepresented the number of shorted shares, which infused false and misleading information to the marketplace, at a time when they knew that Escala stock was failing to deliver; nonetheless, they continued to allow further failures to be traded, which impacted real supply and demand price discovery.

52.     Reg SHO requires the exchanges to publish threshold lists identifying the stocks for which the number of shares that have failed to be delivered at DTCC's subsidiary, NSCC for at least five days exceeds (a) 0.5% of the issuer's outstanding common stock and (b) 10,000 shares. Prior to May 2006, Escala had been on and off the Reg SHO Threshold list three times, demonstrating previous failure to deliver because of the tight supply of available shares.

53.     Short sellers of Escala stock failed to deliver 3,214,676 shares to the NSCC by May 17, 2006. Thus, short sellers were not borrowing shares for legitimate delivery (i.e., naked short selling) and were front running trades of real owners of Escala shares with shares that did not exist, using these trades to manipulate the pricing of Escala downward.

54.     For May 2006, the NASDAQ issued a report identifying the largest volume traders by reporting Market Participants in Escala stock for the month, comprising 81% of the total market participant report volume:

| *Market Participant* | *May 26 Reported Volume* | *Percentage of Volume* |
|---|---|---|
| Knight Equity Markets | 31,984,624 | 45.16% |
| USB Securities, L.L.C. | 12,096,879 | 17.08% |
| E*Trade Capital Markets, L.L.C. | 9,034,783 | 12.76% |
| National Fin. Services, L.L.C. | 4,158,568 | 5.87% |
| **Total** | | 80.87% |

18

55.     The Escala DTCC Inventory for May 2006 for the clearing firms for the traders identified above do not support the trade volumes by these Defendants. Since the four traders, Defendants Knight Equity Markets, L.P., USB Securities, L.L.C., E*Trade Capital Markets, L.L.C. and National Financial Services, L.L.C. accounted collectively for approximately 81% of the trading reported in market participant reports, it would be expected that these firms were trading significant volumes with each other and therefore, one of the firms' inventories would be significantly increasing while another firm would be significantly decreasing. However, this is not reflected in the DTCC tracking movement of shares, as set forth below.

56.     Specifically, Market Participant(s):

a)     <u>Knight Equity Markets, L.P./CF Merrill Lynch,</u> Trade Volume in May 2006 was 31,984,624 shares. The Clearing Firm inventory, calculated on a weekly basis was:

        1)     May 5, 2006--41,857 shares;
        2)     May 12, 2006--188,846 shares;
        3)     May 19, 2006--306,546 shares; and
        4)     May 26, 2006--272,946 shares.

b)     <u>UBS Securities, L.L.C.,</u> Trade Volume in May 2006 was 12,096,879 shares. The Clearing Firm inventory, calculated on a weekly basis was:

        1)     May 5, 2006 -- 48,830 shares;
        2)     May 12, 2006--225,139 shares;
        3)     May 19, 2006--256,900 shares; and
        4)     May 26, 2009--63,294 shares.

c)     <u>E*Trade Capital Markets, L.L.C.,</u> Trade Volume in May 2006 was 9,034,783 shares. The Clearing Firm inventory, calculated on a weekly basis was:

        1)     May 5, 2006--77,777 shares;
        2)     May 12, 2006--118,940 shares;
        3)     May 19, 2006--304,504 shares; and

19

4)  May 19, 2006 was 394,000 shares.

d)  <u>National Financial Services, L.L.C.,</u> Trade Volume in May 2006 was 4,158,568 shares. The Clearing Firm inventory, calculated on a weekly basis was:

1)  May 5, 2006 was 199,275 shares;
2)  May 12, 2006 was 186,367 shares;
3)  May 5, 2006 was 278,515 shares; and
4)  May 19, 2006 was 463,410 shares.

57.  The small movements of shares in the inventories of the Defendant clearing firms do not support settlements of 91 million shares executed in the marketplace during Relevant Period I with the real shares issued by Escala.

**4.  The Events of December 2006 (Relevant Period II)**

58.  In December 2006, Escala announced substantial changes to its Boards of Directors and Officers, stating that it would restate earnings for previous years beginning in 2003 and that the restatements would be significant and material to its operation. However, the restatements were never put into effect.

59.  There were substantial sales of Escala stock recorded in December 2006, despite:

a)  its designation as SHO threshold security, which would have constrained large volumes of short sales unless the security was pre-borrowed to complete delivery;

b)  the continued tight supply of available Escala shares; and

c)  the still large short interest of 5,045,238 shares or 55% of the 9.1 million shares in the public float.

60.  Approximate Number of Shares available to settle trades in December 2006.

20

| Settlement Date | 12/1/2006 | 12/8/2006 | 12/15/2006 | 12/22/2006 | 12/29/2006 |
|---|---|---|---|---|---|
| Shares deposited with DTCC | 9,092,4898 | 9,094,405 | 9,094,405 | 9,094,405 | 9,094,405 |
| Non-Shortable Shares | 1,900,000 | 1,900,000 | 1,900,000 | 1,900,000 | 1,900,000 |
| Short Interest | 5,110,988 | 5,110,988 | 5,045,238 | 5,045,238 | 5,045,238 |
| **Approx. Shares Available** | 2,081,501 | 2,083,417 | **2,149,167** | 2,149,167 | 2,149,659 |
| ***Escala's Trade Volume*** | | | | | |
| Shares Traded Between Periods | | 545,794 | 1,424,949 | 19,346,502 | 56,271,665 |

61.     In December 2006, the marketplace volume in Escala stock increased to 84.6 million shares, an increase of 30 times November's marketplace volume of 2.8 million shares. December's marketplace volume was a rotation of 9.3 times of all of Escala's shares on deposit at the DTCC, an average turnover of the DTCC shares every 2 days for the month. The majority of this volume, 79,282,758 shares or 94% of the December 2006 volume, transacted in just 6 trading days from December 19, 2006 through December 27, 2006, which equals the entire number of shares on deposit turning over every day during this period.

62.     The 79 million shares traded in these six days could not have legally settled based on the movement of real shares at the DTCC. This volume could not have been short sales because there was no significant amount of shares to short. In fact, the short interest, while remaining over 5 million shares, actually decreased from December 2006 to January 2007.

63.     Although the supply of Escala shares to trade was constrained in December 2006:

a)      short interest stayed above 5 million shares;

b)      shares outstanding remained stable;

c)      1.9 million shares were held in known ownership; and d) massive share volumes were sold without a significant increase in the fails to deliver to the NSCC.

64.     Although there were almost 19 million shares of Escala stock traded on December 19, 2006, there was a decrease in fails to 329,269 shares, a decline of 13,224 shares from the

previous day. The fails to deliver peaked in December 2006 at slightly less than 1.3 million shares.

65.    In the first 12 days in December 2006, the average closing price for a share of Escala stock was $4.88. On December 19th, the market opened at $5.00 and increased to a closing price of $8.60. The price continued to increase to a peak price on December 20th of $13.30. By January 8, 2007, the stock closed at $4.73 per share and by January 9th it closed at $4.54 a share.

66.    For December 2006, the NASDAQ issued a report identifying the largest volume traders by reporting Market Participants in Escala shares, comprising 83.15% of the total market participant report volume:

| Market Participant | 12/2006 Reported Volume | Percentage of Volume |
|---|---|---|
| Knight Equity Markets, L.P. | 16,556,363 | 27.39% |
| USB Securities, L.L.C. | 11,153,215 | 18.45% |
| E*Trade Capital Markets, L.L.C. | 14,476,559 | 23.95% |
| National Fin. Services, L.L.C. | 4,725,698 | 7.82% |
| Citadel Derivatives Group, L.L.C. | 3,349,785 | 5.54% |
| **Total** | | 83.15% |

67.    The Escala DTCC Inventory for December 2006 for the trader's clearing firms identified above do not support the trade volumes by these Defendants. Since the four traders, Defendants Knight Equity Markets, L.P., UBS Securities, L.L.C., E*Trade Capital Markets, L.L.C. and National Financial Services, L.L.C. accounted for 83.15% of the trading reported in Market Participant reports for this period, the data would ordinarily reflect that these firms were trading significant volume with each other and therefore, one of the firms' inventories would be significantly increasing while another firm would be significantly decreasing. However, the DTCC tracking movement of shares does not support such conclusion.

68.    For example, Market Participant(s):

a)    Knight Equity Markets, L.P./CF Merrill Lynch, Trade Volume in December 2006 was 16,556,363 shares. The Clearing Firm inventory, calculated on a weekly basis was:

22

   a)    December 1, 2006--222,789 shares;
   b)    December 8, 2006--230,907 shares;
   c)    December 15, 2006--234,486 shares; and
   d)    December 22, 2006--219,497 shares.

 b)    E*Trade Capital Markets, L.L.C., Trade Volume in December 2006 was 14,476,559

shares. The Clearing Firm inventory, calculated on a weekly basis was:

   a)    December 1, 2006--391,844 shares;
   b)    December 8, 2006--319,393 shares;
   c)    December 15, 2006--370,602 shares;
   d)    December 22, 2006--334,703 shares; and
   e)    December 29, 2006 --511,101 shares.

 c)    UBS Securities, L.L.C., Trade Volume in December 2006 was 11,153,215 shares.

The Clearing Firm inventory, calculated on a weekly basis was:

   a)    December 1, 2006--133,448 shares;
   b)    December 8, 2006--127,121 shares;
   c)    December 15, 2006--94,131 shares;
   d)    December 22, 2006--77,513 shares; and
   e)    December 29, 2006--69,966 shares.

 c)    National Financial Services L.L.C., Trade Volume in December 2006 was 4,725,698

shares. The Clearing Firm inventory, calculated on a weekly basis was:

   a)    December 1, 2006--347,596 shares;
   b)    December 8, 2006--331,243 shares;
   c)    December 15, 2006--373,754 shares;
   d)    December 22, 2006--347,078 shares; and
   e)    December 29, 2006--499,437 shares.

 d)    Citadel Derivatives Group, L.L.C., Trade Volume in December 2006 was 3,349,785

shares. The Clearing Firm inventory, calculated on a weekly basis was:

   a)    December 1, 2006--152,183 shares;
   b)    December 8, 2006--140,348 shares;
   c)    December 15, 2006--55,672 shares; and
   d)    December 22, 2006--62,705 shares.

23

69.     Combined NASDAQ Market Participation Reports for May and December 2006.

| Market Participant | May 2006 Volume | December 2006 Volume | Total |
|---|---|---|---|
| Knight Equity Markets, L.P. | 31,984,624 | 16,556,363 | 48,540,987 |
| E*Trade Capital Markets | 9,034,783 | 14,476,559 | 23,511,342 |
| UBS Securities L.L.C. | 12,096,879 | 11,153,215 | 23,250,094 |
| National Financial Services | 4,158,568 | 4,725,698 | 8,884,266 |
| Citadel Derivatives, Group | 1,603,235 | 3,349,785 | 4,953,020 |

70.     Although there was almost 182 million shares of Escala stock traded in May 2006 and December 2006, settlement of this volume was unlikely given the accounting of the shares issued, the number of shares held in accounts that could not be shortened, inventory movement at the DTCC short sale data, the amount of previously shorted shares, and the number of shares failing to be delivered at the NSCC.

71.     Defendants Knight Capital Group, Inc., through its subsidiary Knight Capital Americas, L.P., formerly known as Knight Equity Markets, L.P., was the largest trader by reported market participants in the stock of Escala for May and December 2006, with reported trade volumes of 31,984,624 shares in May 2006 and 16,556,363 shares in December 2006 for a combined total of 48,540,987 shares traded during these periods. Defendant Merrill Lynch acted as the clearing firm for the Knight Equity trades in May and December 2006.

72.     Defendant UBS Securities, L.L.C. was a significant trader by reported market participants in the stock of Escala for May and December 2006, with reported trade volumes of 12,096,879 shares in May 2006 and 11,153,215 shares in December 2006 for a combined total of 23,250,094 shares traded during these periods.  Defendant UBS acted as the clearing firm for its trades.

73.     Defendant E*Trade Capital Markets, L.L.C. was also a significant trader by reported market participants in the stock of Escala for May and December 2006, with trade volumes of

24

9,034,783 shares in May 2006 and 14,476,559 shares in December 2006 for a combined total of 23,511,342 shares traded during these periods. Defendant E*Trade Capital Markets, L.L.C. acted as the clearing firm for its trades.

74.     Defendant National Financial Services, L.L.C. was another significant trader by reported market participants in the stock of Escala for May and December 2006, with trade volumes of 4,158,568 shares in May 2006 and 4,725,698 shares in December 2006 for a combined total of 8,884,266 shares traded during these periods.  Defendant National Financial Services L.L.C. acted as the clearing firm for its trades.

### 5.     Washed and Matched Trading

75.     The massive trading volume in May and December 2006 were netted out as a pre-arranged washed and matched trading (e.g., washed is trading between related affiliates of a dealer; matched trades are between conspiring non related traders). High trade volumes without substantial inventories, lack of clearing firm inventory movements, no additional reported short interest and no significant increase in "fails to deliver" were strong indications that the transactions in issue were intended solely for the purpose of adding artificial volume and thereby create an appearance of buying or selling by actual investors in a company, which is an unlawful practice.

76.     The Defendant traders and/or clearing firms that engaged in conduct fostering or facilitating the naked short selling of Escala stock did so in breach of their duty as "gatekeepers" of the market to report suspicious transactions of unlawful naked short sales of stock to authorities. Since by their very nature, the fails to deliver represented sales of unregistered counterfeit securities that were not issued by Escala nor borrowed to deliver for legal settlement, by ignoring the obvious need for further inquiry, Defendants allowed Plaintiff's interests as shareholders of Escala to be

diluted and thus, impaired.

77.    There was so little movement of shares between the clearing firms, that settlements of the 91 million shares executed in the marketplace during the Relevant Period(s) were unsupportable.

78.    The 182 million shares of Escala stock traded during the Relevant Period(s) is indicative by itself that the trading was manipulated by Defendants and not executed by real buyers and sellers, in the absence of buyers for Escala stock. The data reflects that there was an illegal bear raid on Escala securities, with massive volumes of non existent counterfeit stock used to manipulate pricing and front run trades ahead of the actual shareholders of Escala, including the Plaintiffs, with short sales being mis-reported to the marketplace. Although Defendants, as market makers, traders and/or clearing firms, knew or in the alternative, should have known that Escala's stock was being short sold and in limited supply and therefore, that the shares were not being delivered for proper settlement, they actively participated in the trading of these securities, or alternatively, allowed it to occur.

79.    Upon information and belief, to conceal their unlawful naked short selling of Escala stock, Defendants:

        a.    created false documentation of their trading, loaning and ownership in Escala shares;

        b.    failed to complete an order ticket for their securities transactions involving Escala shares that would ordinarily have permitted securities regulators to determine the amount of short sales that Defendants, acting as a prime broker, transacted and the identity of the parties involved in the short sale; and

        c.    knowingly and intentionally mis-marked order tickets to make transactions appear as "long" sales when in fact, they were short sales and concealed these unlawful activities by falsely reporting counterfeit or phantom shares on brokerage statements to investors, including the Plaintiffs in order to mislead

them.

80.     Upon information and belief, Defendants unlawfully used Rule 144 Restricted Stock in their possession to cover their own naked short sales or help other Defendants and/or third parties to cover their own naked short sales of Escala stock and used stock designated as "Do Not Lend" to conceal and cover-up their own Fails to deliver resulting from their unlawful activity.

**6.     Pattern of unlawful short sales of securities by Defendants**

81.     Defendants have been engaged unlawfully for years in a pattern of repeated naked short selling of securities involving victims similarly situated as those of the Plaintiffs, utilizing the same or similar schemes as they employed in sales of Escala stock during the Relevant Period(s).

82.     There have been numerous claims made and/or lawsuits filed against some or all of the Defendants by aggrieved shareholders, with sanctions imposed by regulators. For example, the Financial Industry Regulatory Authority ("FINRA") and other regulatory agencies filed complaints against Defendant Merrill Lynch, dating back to at least 2007, charging it with, inter alia:

a)     effectuating short sale transactions in certain securities and failing to make an affirmative determination prior to affecting such transaction. Resolution date: August 20, 2004. Sanction Amount: $9,000.00.

b)     effectuating short sale transactions in securities, failing to make an affirmative determination prior to affecting such transaction, executing short sale transactions and failing to report these transactions as required by law with a short sale modifier: Resolution Date: October 27, 2004. Sanction amount:  $97,000.00;

c)     failing to report the correct symbol indicating whether transactions in eligible securities were a buy, sell, sell short, short Exempt or Cross for Transaction in reportable securities. Resolution Date: March 23, 2006. Sanction Amount: $45,000.00;

d)     failing to report the correct symbol indicating whether transactions were buy, sell, sell short, sell short Exempt or Cross for Transaction in reportable securities. Resolution Date: September 24, 2008. Sanction amount:

27

$242,500.00;

e)    having a fail to deliver position in a threshold security for 13 consecutive settlement days and failing to timely allocate and close out its fail to deliver position. Subsidiary or affiliated company: Merrill Lynch Professional Clearing Corp. Resolution Date: June 26, 2007. Sanction amount: $1,250,000;

f)    submitting inaccurate short interest position reports in NASDQ Securities to NASD, submitting inaccurate short interest position reports in securities listed on the NYSE to the NYSE, thereby impairing ability of the OATS system to link execution reports to related trade report. Subsidiary or affiliated company: Merrill Lynch Professional Clearing Corp. Resolution Date: May 27, 2010. Sanction amount: $47,500. See Exhibit A, annexed hereto.

83.    FINRA and other regulatory agencies also filed complaints against Defendant UBS dating back to at least 2008, charging it with inter alia:

a)    accepting customer short sale orders in certain securities and for, each order failed to make an affirmative determination that the firm would receive delivery of the security on behalf of the customer or that the firm could borrow the security on behalf of the customer for delivery by the settlement date, affecting short sale orders in certain securities and for itself, for each order failing to make an affirmative determination that the firm would receive delivery of the security or could borrow the security by the settlement date. Resolution Date: June 26, 2008. Sanction amount: $116,000.00.

b)    submitted reports to OATS that contained inaccurate, incomplete or improperly formatted data and erroneously submitted Execution Reports routed away for handling and/or execution to OATS. Resolution Date: March 2007. Sanction amount: $65,000.00. See Exhibit A, annexed hereto.

84.    On October 24, 2011, FINRA issued a Letter of Acceptance to Defendant UBS,

28

*"Financial Industry Regulatory Authority Letter of Acceptance, Waiver and Consent No.*
*20080144511* ("Letter"). In the Letter, FINRA set forth its basis for settlement of an investigation

commenced by its Department of Enforcement ("DOE") against UBS with regard to its long standing

pattern of securities law violations for short selling activities.

      85.     While not admitting or denying the allegations made against it, UBS accepted and

consented to entry of findings by FINRA (the "Findings"), which included the following:

> UBS's Reg SHO supervisory and compliance system regarding locates and order
> marking of short sale orders was significantly flawed and resulted in a systemic
> supervisory failure that contributed to serious Reg SHO failures across the Firm's
> equities trading business." Id., at 2. "During the Relevant Period, the Firm's
> extensive locate violations occurred due to: (1) the misapplication of exceptions to
> Reg SHO's locate requirement ...; (2) the inclusion of certain threshold and hard-to-
> borrow securities on the Firm's easy-to-borrow list ...; (3) the Firm permitting
> certain clients to bypass the locate requirement when entering short sales ...; and (4)
> the Firm failing to reasonably supervise that locates were obtained and/or
> documented for short sales entered through the Firm's Order Entry Systems. Id., at
> 3.

> As a result of these failures, the Firm improperly entered **millions of proprietary**
> **and customer short sale orders** at various times during the Relevant Period without
> having reasonable grounds to believe that the securities could be borrowed and
> available for delivery. A significant number of these short sale orders were in hard-
> to-borrow securities. Extrapolating from the quantified violations indicates that
> during the Relevant Period, **the Firm likely entered tens of millions of proprietary**
> **and customer short sale orders** without having reasonable grounds to believe that
> the securities could be borrowed and available for delivery. The duration, scope and
> volume of the trading created a potential for harm to the integrity of the market. Id.,
> at 3. (Emphasis added).

> Additionally, the Firm mismarked millions of sale orders in its trading systems at
> various times during the relevant Period. Extrapolating from the quantified violations
> indicates the Firm likely mismarked **tens of millions of sale orders** during the
> Relevant Period. (Emphasis added). Many of these mismarked orders were short
> sales that were mismarked as "long" resulting in additional significant violations of
> Reg SHO's locate requirement. Id.

> Moreover, the Firm also had significant reporting and record keeping violations
> resulting from the foregoing. UBS's mismarked sale orders flowed through to the

Firm's blue sheet submissions, causing it to make inaccurate submissions of trading data to FINRA. ... Id.

Enforcement tested short sales entered through more than a dozen of the Firm's Order Entry Systems (OES's) during the three month period June 1, 2006 to August 31, 2006 (the "Sample Period"). Enforcement's investigation uncovered approximately 700,000 short sales that were effectuated without locates during the Sample Period based upon improper applications of the exceptions to the locate requirement as described above. Given that the Firm improperly applied these exceptions in some cases for several years, extrapolating from the number of violations quantified during the Sample Period indicates that the Firm likely effected more than **ten million short sales in improper reliance** on an exception to Reg SHO's locate requirement. Id., at 5. (Emphasis added).

The Firm incorrectly programmed a trading system so that two proprietary trading strategies treated all short sale orders in Exchange Traded Funds ("ETFs") as if they were exceptions to Reg SHO's locate requirement. ... During the Sample Period, the Firm effected approximately 680,000 proprietary short sale orders in ETF's without locates using these two trading systems. ... [E]xtrapolating from the number of violations quantified during the Sample Period indicates that the Firm likely effected more than 7.4 million short sales in ETFs without valid locates." *Id.* "During the period beginning January 3, 2005 until approximately April 3, 2008, the Firm also improperly treated certain equity hedge transactions ... as exceptions to Reg SHO's locate requirements. ..." Id., at 6.

[T]he Firm created and distributed ETB (easy-to-borrow) lists that improperly included threshold and HTB (hard-to-borrow) securities to UBS's proprietary traders and clients, resulting in more than 900,000 short sale orders that were released for execution without valid locates." *Id.* "The Firm's DES platform was normally designed to block short sale orders that did not contain an entry indicating that a located had first been obtained. However, the Firm altered the programming for these 270 DES Clients to bypass this standard DES platform check. As a result, the clients configured to bypass the locate check had the ability to route short sale directly to the market for execution without locates ... Id., at 8.

See Exhibit B, annexed hereto. As a result of the FINRA Letter, UBS consented to a $12,000,000.00 sanction.

86.     Despite the existence of regulatory prohibitions barring the practice of naked short selling of stock, Defendants' unlawful manipulation of the value of Escala shares was not an isolated incident but a regular course of dealing that resulted in the creation and circulation of

millions of unauthorized and/or counterfeit Escala shares, thereby diluting and artificially depressing

the value of the authorized shares of Escala owned by Plaintiffs during the Relevant Period(s).

87.    By unlawfully flooding the market with unauthorized, fictitious and/or counterfeit

Escala shares, Plaintiff's interests as share holders of Escala to a fixed percentage ownership of the

company stock and associated voting rights were diluted, to their substantial detriment. Moreover,

Defendants' unlawful conduct created uncertainty in the market regarding the integrity of Escala and

its management, which caused further depression in the value of the Escala stock..

<div align="center">

**COUNT ONE**
**N.J.S.A. 2C:41-2c.**

</div>

88.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-87

of the Complaint, as if incorporated by reference herein.

89.    Plaintiffs are "persons" within the meaning of N.J.S.A. 2C:41-1b.

90.    Each of the Defendants is a "person" within the meaning of N.J.S.A. 2C:41-1b.

91.    Defendants Merrill Lynch, Knight Capital Americas, L.P., formerly known as Knight

Equity Markets L.P., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial

Services, L.L.C., Citadel Derivatives, L.L.C. and ABC Companies 1-10 (names being fictitious)

acting independently and/or by and through its subsidiaries, affiliates, related entities, agents,

servants or employees or collectively each constituted a separate "enterprise" engaged in or the

activities of which affected trade or commerce in New Jersey within the meaning of N.J.S.A. 2C:41-

1c.

92.    Defendants John Does 1-10 (names being fictitious) are "persons" within the meaning

of N.J.S.A. 2C:41-1b. each employed by or associated with these enterprise(s), who conducted,

managed, operated or participated, directly or indirectly in the conduct of each separate enterprise's

<div align="center">31</div>

affairs through a pattern of predicate acts or crimes as defined by N.J.S.A. 41-1a. and by multiple, repeated and continuous acts knowingly and willfully committed violations of the New Jersey Racketeering Influenced and Corrupt Organization Act, N.J.S.A. 2C:41-1 et seq., including but not limited to N.J.S.A. 2C:41-2c., and inter alia, the predicate criminal acts set forth in N.J.S.A. 2C:41-1a.(n), "theft and all crimes defined in Chapter 20 of Title 2C of the New Jersey Statutes" and (p) "fraud in the offering, sale or purchase of securities".

93.     In engaging in at least two incidents of predicate acts in the past ten years, as set forth herein, Defendants, in their capacity as enterprises, participated in racketeering activity embracing criminal conduct involving Escala that was not isolated and had either the same or similar purpose, results, participants or victims or methods of commission that are otherwise interrelated by distinguishing characteristics.

94.     The pattern of predicate acts committed by Defendants, in their capacity as enterprises, is continuing, is substantial in nature and poses a threat of continuing in the future because they amount to a regular course of doing business.

95.     Plaintiffs were injured in their business or property as a result of Defendants' predicate criminal acts committed in violation of N.J.S.A. 41-1a. [e.g., theft pursuant to subsection (n) and fraud in the offering, sale or purchase of securities pursuant to subsection (p)] committed by Defendants with the knowledge and intent that they were acting in furtherance of a pattern of racketeering activity.

**A.     Violations of New Jersey Uniform Securities Law, N.J.S.A. 49:3-49 et seq.**

96.     Defendants' conduct constituting criminal predicate acts of racketeering activity as defined by N.J.S.A. 2C:41-1a. (p) include but are not limited to, the following:

32

a)   Willfully employing a device, scheme, or artifice to defraud in connection with an offer to sell, sale or purchase any security;

b)   Willfully engaging in an act, practice, or course of business that operates or would operate as a fraud or deceit upon a person;

c)   Willfully effecting a transaction in a security which involves no change in the beneficial ownership of the security for the purpose of creating a false or misleading appearance of active trading in a security or with respect to the market for a security;

d)   Willfully misappropriating, converting or improperly withholding funds or other property;

e)   Willfully selling or offering for sale unregistered, unauthorized, fictitious and/or counterfeit Escala shares; and/or

f)   Wilfully employing a deceptive or fraudulent device, scheme or to manipulate the market in the security.

97.   As the market for Escala stock was intended to operate in an efficient and honest manner, Plaintiffs relied upon the assumption that the market for Escala stock was free from manipulation.

98.   Defendants, by each knowingly and intentionally engaging in the conduct described herein, (e.g., selling Escala stock short at times when Defendants neither possessed nor intended to obtain Escala stock to deliver by the Settlement Date and by creating and trading in unauthorized, fictitious, and/or counterfeit Escala shares) Defendants willfully violated, attempted to violate, aided and abetted, and solicited another to willfully violate the New Jersey Uniform Securities Law, N.J.S.A. 49:3-47 et seq., which prohibits "generally; any course of conduct or business which is calculated or put forward with intent to deceive the public or the purchaser of any security or investment advisory services as to the nature of any transaction or the value of such security".

99.   Defendants, by making phantom loans of counterfeit Escala stock to facilitate naked

33

short sale transactions, engaged inter alia, in the employment of an "artifice, agreement, device or scheme to obtain money, profit or property by any of the means herein set forth or otherwise prohibited by [the New Jersey Uniform Securities Law, N.J.S.A. 49:3-47 et seq.]"

100. The SEC has expressly noted that naked short selling involves the omission of a material fact. Defendants, by each knowingly and intentionally engaging in the conduct as described herein, (e.g., selling Escala stock short at times when they neither possessed nor intended on obtaining Escala stock to deliver by the Settlement Date and by creating and trading in unauthorized, fictitious, and/or counterfeit Escala shares), made untrue statements of a material fact or omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made not misleading, in violation of the New Jersey Uniform Securities Law, N.J.S.A. 49:3-47 et seq.

101. Further, upon information and belief, Defendants, in violation of the New Jersey Uniform Securities Law, N.J.S.A. 49:3-47 et seq.:

    a)  Knowingly and intentionally charged clients, customers, banks or others, fees, commissions and/or interest for "loaning" shares of stock that the Defendants never loaned;

    b)  Knowingly and intentionally permitted a pattern of allowing failure to deliver or receive positions from the same counter-party or for the same customers/clients;

    c)  Knowingly and intentionally failed to conduct or request buy-ins from clients or counterparties;

    d)  Knowingly and intentionally continued to accept, permit or facilitate short sales or other transactions (e.g., flex options, conversions) for a customer or a prime broker that had failed to deliver on numerous occasions;

    e)  Knowingly and intentionally continued to accept, permit or facilitate short sales of a stock that had repeated net failures to deliver or receive;

34

f) Knowingly and intentionally permitted, facilitated and/or engaged in conversion, reverse conversion, flex option or other transactions that they knew were unlawful;

g) Knowingly and intentionally permitted, facilitated and/or engaged in transactions with customers/clients that it knew intended on violating or circumventing the law;

h) Knowingly and intentionally permitted, facilitated and/or engaged in transactions where they knew that stock would not be borrowed and/or delivered because of a negative rate (e.g., it would cost money to borrow the stock);

**B.    Theft By Taking (N.J.S.A. 2C:20-2)**

102.    Defendants' violations of N.J.S.A. 2C:20-2 et seq., constituted the commission of the offenses of theft, a predicate act of racketeering activity as set forth in N.J.S.A. 2C:41-1(n).

103.    A person commits the offense of theft when he/she unlawfully takes or, being in lawful possession thereof, unlawfully appropriates property of another with the intention of depriving him/her of the property, regardless of the manner in which the property is taken or appropriated.

104.    Plaintiffs held a property interest in their authorized issued shares of Escala stock and all rights appertaining thereto.  Since at any point in time there is a finite amount of authorized and issued Escala stock, when the Defendants created fictitious and/or counterfeit stock through naked short sales, they diminished and/or diluted from each legitimate owner of authorized and issued Escala stock, an amount proportionate to the amount of fictitious and/or counterfeit Escala shares they created.

105.    Each Defendant committed, attempted to commit, aided and abetted, solicited another to commit, or engaged in acts constituting the offense of theft by taking the property of Escala and Escala shareholders, including Plaintiffs.  Upon information and belief, Defendants unlawfully took the property of Plaintiffs, with the intention of depriving them of that property by, inter alia, selling

35

Escala stock short at times when they neither possessed nor intended on obtaining Escala stock to deliver by the Settlement Date and by creating and trading in unauthorized, fictitious, and/or counterfeit Escala shares. By so doing, Defendants took, in whole or in part, shares of Escala stock, which had not been issued or authorized to be issued, for which Escala was never paid, and thereby deprived Escala (and Plaintiffs, as shareholders of the company) of the right to exclusive possession and control over this property and any financial benefit from the introduction of its shares into the marketplace.

106.    Further, Defendants engaged in theft by taking by purporting to loan short sellers Escala stock that the Defendants did not own nor had any intention of obtaining and never did obtain. Upon information and belief, Defendants charged short sellers fees for these sham "loans" of stock. Thus, the creation of fictitious and/or counterfeit shares of Escala through the unlawful naked short sales of counterfeit stock and the fees Defendants charged for these sham loans constituted an unlawful taking of property in violation of N.J.S.A. 2C:20-2.

107.    As stated herein, Defendants engaged in similar unlawful naked short selling of counterfeit securities of other companies for which they earned illicit profits and fees. The illegal naked short selling engaged in by the Defendants were not isolated incidents or parts of the same transaction but rather constituted a regular way or course of conduct of each of the Defendants, acting in their capacity as enterprises, involving a pattern of racketeering activity that spanned several years, by which Defendants derived, directly or indirectly, personal property including money.

**C.    Theft By Deception (N.J.S.A. 2C:20-4)**

108.    Defendants' violations of N.J.S.A. 2C:20-4 et seq., constituted the commission of the offense of theft by deception, a predicate act of racketeering activity as set forth in N.J.S.A. 2C:41-

36

1(n).

109. A person commits the offense of theft by deception when he/she purposely obtains the property of another by deception, which means that the Defendants unlawfully brought about a transfer or an apparent transfer of a legal interest in the property either to the Defendant or to another person. A person deceives another if he/she purposely 1) creates or reinforces a false impression, including false impressions as to law, value, intention, or other state of mind or 2) prevents another from acquiring information which would affect his/her judgment of a transaction.

110. Defendants, by inter alia, engaging in the unlawful naked short sale of counterfeit Escala shares based on promises to borrow Escala stock that it did not borrow and had no intention of borrowing, committed the crime of theft by deception prohibited by N.J.S.A. 2C:20-4.

111. The multiple acts of racketeering committed by the Defendant enterprises in violation of the New Jersey Racketeering Influenced and Corrupt Organization Act N.J.S.A. 2C:41-1 et seq. were interrelated, part of a common and continuous pattern of fraudulent conduct perpetrated for the same or similar purposes, thus constituting a regular way of doing business by each separate Defendant enterprise, that is a pattern of racketeering activity as defined by the N.J.S.A. 2C:41-1d.(1) and (2) by each of the Defendants, acting in their capacity as enterprises.

112. Each of the Defendant enterprises willfully, knowingly, and intentionally participated in these separate but related schemes to defraud Plaintiffs and engaged in a pattern of racketeering activity described herein as a regular way of doing its business with the knowledge and the intention that Plaintiff would be defrauded by their conduct.

113. As a direct and proximate result of each of the Defendants' wrongful acts, Plaintiffs have been injured and sustained substantial damages.

37

WHEREFORE, Plaintiffs demand separate judgments against each Defendant enterprise, that is, Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, L.P., formerly known as Knight Equity Markets L.P., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives, Group L.L.C., John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for statutory trebled damages, attorney's fees, interest and costs of suit.

### COUNT TWO
### N.J.S.A. 2C:41-2a.

114.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-113 of the Complaint, as if incorporated by reference herein.

115.    Plaintiffs are "persons" within the meaning of N.J.S.A. 2C:41-1b.

116.    Each of the Defendants are "persons" within the meaning of N.J.S.A. 2C:41-1b.

117.    Each Defendant enterprise, that is, Merrill Lynch, Knight Capital Americas, L.P., formerly known as Knight Equity Markets L.P., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives, L.L.C. and ABC Companies 1-10 (names being fictitious) acting independently and/or by and through its subsidiaries, affiliates, related entities, agents, servants or employees or collectively constitute a separate "enterprise" within the meaning of N.J.S.A. 2C:41-1c.

118.    Defendants John Does 1-10 (names being fictitious) are "persons" within the meaning of N.J.S.A. 2C:41-1b, separately employed by or associated with each Defendant enterprise who conducted, managed, operated or participated, directly or indirectly in the conduct of each Defendant enterprise's affairs through a pattern of predicate acts or crimes as defined by N.J.S.A. 41-1a. and as such, by a pattern of multiple, repeated and continuous acts, knowingly and willfully committed

38

violations of the New Jersey Racketeering Influenced and Corrupt Organization Act, N.J.S.A. 2C:41-1 et seq., specifically N.J.S.A. 2C:41-2a. that makes it unlawful for any person who has received income derived, directly or indirectly from a pattern of racketeering activity to use or invest, directly or indirectly any part of the income, or the proceeds of the income in acquisition of any interest in, or the establishment or operation of any enterprise engaged in or the activities of which affect trade or commerce through the use of predicate criminal acts defined by N.J.S.A. 2C:41-1a., including but not limited to subsection (n)"theft and all crimes defined in Chapter 20 of Title 2C of the New Jersey Statutes" and (p) "fraud in the offering, sale or purchase of securities".

119.    Each Defendant enterprise, engaging in at least two incidents of unlawful criminal acts as set forth herein, did so as a regular way of doing business that was not isolated, and engaged in unlawful conduct, including but not limited to creating false documentation of their trading, loaning and ownership in shares of Escala and other victims similarly situation and participated in racketeering activity embracing criminal conduct that had either the same or similar purpose, results, participants or victims or methods of commission or which was otherwise interrelated by distinguishing characteristics, in violation of N.J.S.A. 2C:41-2a.

120.    The pattern of predicate acts committed by each Defendant enterprise is continuing, substantial in nature and poses a threat of continuing in the future because these acts amount to a regular way doing business by each of the Defendant enterprises.

121.    Plaintiffs were injured in their business or property as a result of Defendants' committing unlawful criminal acts as defined by N.J.S.A. 41-1a. (e.g., theft pursuant to subsection (n) and fraud in the offering, sale or purchase of securities pursuant to subsection (p), amongst others) with the knowledge and intent that they were acting in furtherance of a pattern of racketeering

39

activity in violation of N.J.S.A. 2C:41-2a.

122.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have been injured and have sustained substantial damages.

WHEREFORE, Plaintiffs demand separate judgments against each Defendant enterprise, that is, Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, L.P., formerly known as Knight Equity Markets L.P., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives, Group L.L.C., John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for statutory treble damages, attorney's fees, interest and costs of suit.

## COUNT THREE
## UNJUST ENRICHMENT

123.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-122 of the Complaint as if incorporated by reference herein.

124.    Each Defendant enterprise, while engaged in naked short selling of counterfeit shares of Escala stock in its business knew or, in the alternative, should have known that their artificial manipulation of Escala's stock value would directly and negatively impact Plaintiff's financial expectations and contractual rights as a shareholder in Escala, while providing Defendants with significant financial gain.

125.    Each Defendant enterprise's unlawful manipulation of the market for Escala stock unjustly enriched themselves at Plaintiffs' expense, such that retention of these benefits would be inequitable.

126.    As a result of each Defendant enterprise's unlawful conduct, Plaintiffs expectations of financial gain under ordinary market conditions was denied, to their substantial detriment.

40

127.     As a direct and proximate result of each Defendant enterprise's actions, Plaintiffs

have suffered damages.

WHEREFORE, Plaintiffs demand separate judgments against each Defendant enterprise, that

is, Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, L.P., formerly known as

Knight Equity Markets L.P.,  UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National

Financial Services, L.L.C., Citadel, Group. L.L.C., John Does 1-10 (names being fictitious) and ABC

Companies 1-10 (names being fictitious) for compensatory damages, attorney's fees, interest and

costs of suit.

### COUNT FOUR
### UNLAWFUL INTERFERENCE WITH PLAINTIFF'S ECONOMIC ADVANTAGE

128.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-127

of the Complaint as if incorporated by reference herein.

129.     Plaintiffs had a reasonable expectation of economic advantage or benefit as a result

of their acquisition of Escala stock.

130.     Each Defendant enterprise knew, or in the alternative, should have known of

Plaintiffs' expectancy of economic advantage by their ownership of Escala stock.

131.     Each Defendant enterprise's conduct in inter alia, engaging in the unlawful naked

short selling of counterfeit Escala Stock was wrongfully undertaken without justification as a result

of which, Plaintiffs' expectation of economic advantage or benefit was impaired to their substantial

detriment.

132.     But for the Defendant enterprise's wrongful conduct, it is reasonably likely that

Plaintiffs would have realized their economic advantage or benefit by their acquisition of Escala

stock.

41

133.    As a direct and proximate result of each Defendant enterprise's unlawful interference with Plaintiffs' economic advantage, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand separate judgments against each Defendant enterprise, that is, Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, L.P., formerly known as Knight Equity Markets L.P., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives Group, L.L.C., John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, attorney's fees, interest and costs of suit.

## COUNT FIVE
## TORTIOUS INTERFERENCE WITH PLAINTIFF'S CONTRACTUAL RELATIONS

134.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1-133 of the Complaint as if incorporated by reference herein.

135.    Plaintiffs' purchase or acquisition of shares of stock in Escala was for investment purposes and undertaken pursuant to a contract.

136.    Each Defendant enterprise knew, or in the alternative, should have known of the existence of that relationship by virtue of Plaintiffs' status as a shareholder in Escala.

137.    Defendants intentionally and maliciously with motive to harm and without justification, interfered with Plaintiffs' contract with Escala by engaging inter alia, in the unlawful naked short selling of counterfeit shares of stock by inducing, procuring or causing a breach or termination of Plaintiffs' contractual relationship.

138.    In the alternative, each Defendant enterprise, if it did not act out of malice, but rather for profit or to enhance its financial position, engaged in conduct affecting Plaintiffs that went far beyond or transgressed generally accepted standards of morality, that is a violation of standards of

42

socially acceptable conduct.

139. But for each Defendant enterprise's conduct, Plaintiffs would have continued to own their shares of Escala stock and would not have suffered losses in the share value of Escala stock.

140. As a direct and proximate result of each Defendant enterprise's actions, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand separate judgments against each Defendant enterprise, that is, Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, L.P., formerly known as Knight Equity Markets L.P., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives Group, L.L.C. John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, attorney's fees, interest and costs of suit.

## COUNT SIX
### UNLAWFUL INTERFERENCE WITH CONTRACTUAL RELATIONS

141. Plaintiffs repeat and realleges each and every allegation set forth in Paragraphs 1-140 of the Complaint as if incorporated by reference herein.

142. Plaintiffs had the right to enjoy the fruits and advantages of their enterprise, industry and skill, free from unjustified and wrongful interference by their investment in Escala stock.

143. Each Defendant enterprise, by inter alia, engaging in the unlawful naked short selling of counterfeit shares of Escala stock, unjustifiably interfered with Plaintiffs contract rights and/or reasonable expectations derived therefrom.

144. But for each of the Defendant enterprise's unlawful activity, Plaintiffs would have realized their economic advantage or benefit.

145. As a direct and proximate result of each Defendant enterprise's actions, Plaintiffs

43

have suffered damages.

WHEREFORE, Plaintiffs demand separate judgments against each Defendant enterprise, that is Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, L.P., formerly known as Knight Equity Markets L.P., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives Group, L.L.C., John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, attorney's fees, interest and costs of suit.

<div align="center">

**COUNT SEVEN**
**THIRD PARTY BENEFICIARY CLAIMS**

</div>

146.     Plaintiffs repeat and realleges each and every allegation set forth in Paragraphs 1-145 of the Complaint as if incorporated by reference herein.

147.     Plaintiffs are the intended third party beneficiaries individually and/or as a class of any and all agreements and/or contracts entered into by each Defendant enterprise in furtherance of their roles as market makes, traders and clearing firms in their transacting short sales of Escala stock.

148.     Upon information and belief, each Defendant enterprise intended that Plaintiffs, individually and as a class were to receive a benefit from these agreements and/or contracts.

149.     As a direct and proximate result of each Defendant enterprise's failure to abide by their agreements and/or contracts, whether by intention, design or otherwise, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand separate judgments against each Defendant enterprise, that is, Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, L.P., formerly known as Knight Equity Markets L.P., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives Group, L.L.C., John Does 1-10 (names being

<div align="center">44</div>

fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, attorney's fees, interest and costs of suit

### COUNT EIGHT
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

150.    Plaintiffs repeat and realleges each and every allegation set forth in Paragraphs 1-149 of the Complaint as if incorporated by reference herein.

151.    In any and all agreements and/or contracts entered into in which Plaintiffs were participants or intended third party beneficiaries individually or as a class, there is an implied covenant of good faith and fair dealing which requires that all parties to same must act in good faith and deal fairly with the other party in performing or enforcing the terms of the agreement and/or contract.

152.    Each Defendant enterprise, by engaging _inter_ alia in the unlawful naked short selling of counterfeit shares of Escala stock acted in bad faith, dishonestly or with improper motive to destroy or injure the right of Plaintiffs individually, or in their capacity as shareholders of Escala, to receive the benefits or reasonable expectation of their agreement or contract as third party beneficiaries.

153.    Each Defendant enterprise, with no legitimate purpose: a) acted with bad motives or intentions;  or b) engaged in deception or evasion in the performance of their agreement and/or contract; and by so doing denied Plaintiffs the benefit of the bargain as originally intended by the parties.

154.    As a direct and proximate result of each Defendant enterprise's conduct, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand separate judgments against each Defendant enterprise, that

45

is, Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, L.P., formerly known as Knight Equity Markets L.P., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives Group, L.L.C., John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, attorney's fees, interest and costs of suit.

## COUNT NINE
### NEGLIGENCE

155.    Plaintiffs repeat and realleges each and every allegation set forth in Paragraphs 1-154 of the Complaint as if incorporated by reference herein.

156.    Each Defendant enterprise owed Plaintiffs a duty of care in their capacity as gatekeepers of the market.

157.    Each Defendant enterprise, in engaging in conduct that fostered or facilitated the naked short sales of Escala stock breached the duty of care that they owed to the Plaintiffs to report suspicious transactions of naked short sales of the Escala stock in May 2006 and December 2006.

158.    As a direct and proximate result of each Defendant enterprise's negligence, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand separate judgments against each Defendant enterprise, that is, Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, L.P., formerly known as Knight Equity Markets L.P., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives Group, L.L.C., John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, attorney's fees, interest and costs of suit.

## COUNT TEN
## PUNITIVE AND EXEMPLARY DAMAGES

159. Plaintiffs repeat and realleges each and every allegation set forth in Paragraphs 1-158 of the Complaint as if incorporated by reference herein.

160. Each Defendant enterprise's actions were undertaken willfully, wantonly and maliciously.

161. As a direct and proximate result of each Defendant enterprise's actions, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand separate judgments against each Defendant enterprise, that is, Merrill Lynch, Pierce, Fenner & Smith, Inc., Knight Capital Americas, L.P., formerly known as Knight Equity Markets L.P., UBS Securities, L.L.C., E* Trade Capital Markets L.L.C., National Financial Services, L.L.C., Citadel Derivatives Group, L.L.C., John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for punitive and exemplary damages, attorney's fees, interest and costs of suit.

NEAL H. FLASTER, L.L.C.
Attorneys for Plaintiffs
Greg Manning, et al

By: _Neal H Flasty_
Neal H. Flaster

Dated: June 5, 2012

47

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Neal H. Flaster

Dated: June 5, 2012

48

# EXHIBIT A

## TABLE OF VIOLATIONS

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|---|---|---|---|---|
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 09/24/2008 | FINRA | $242,500 | Failed to Report to the NMC or FIRA/NASDAQ Trade Reporting facility the correct symbol indicating whether tractions were Buy, Sell , Sell Short, Sell Short Exempt or Cross for Transaction in reportable Securities. Violations of SEC Rules 10B-10, 17A-3, 17A-4, 200(G) of Regulation SHO, NASD Rules 2110, 2320, 3010, 3110, 4632, 4632(A), 6130, 6130(D), 6230(C)(6), 6230(E), 6620, 6620(F), 6955(A), |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 03/23/2006 | NASDAQ | $45,000 | Failed to report to act the correct symbol indicating whether transactions in eligible securities where a buy, sell, sell short, short Exempt or Cross for Transaction in reportable Securities. Violations of SEC Rules 10B-10, 11AC1-5, 17A-3, NASD Rules 2110, 3010, 3110, 4632, 6130(D), 6420(A), 6420(C)(3). |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 08/20/2004 | NASD | $9,000 | NASD Conduct Rule 3370 and NASD Marketplace Rule 6130(D) effectuated short sale transaction in certain securities and failed to make and affirmative determination prior to affecting such transaction. |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 10/27/2004 | NASD | $97,000 | NASD Rules 2110, 2320, 3010, 3370, 4613(E), 4642, 6130, 6420, 6620 and SEC Rule 11AC 1-4 effectuated short sale transaction in certain securities and failed to make and affirmative determination prior to affecting such transaction and executed short sale transactions and failed to report these transactions to Act with a short sale modifier. |

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|---|---|---|---|---|
| Merrill Lynch Professional Clearing Corp. | 05/27/2010 | FINRA | $47,500 | NASD RULES 2110, 3360, 6955(A) NYSE Rule 421.10- submitted inaccurate short interest position reports in NASDQ Securities to NASD and submitted inaccurate short interest position reports in securities listed on the NYSE to the NYSE thereby the OATS system was unable to link the execution reports to the related trade report. |
| Merrill Lynch Professional Clearing Corp. | 06/26/2007 | NASD | $12,500 | Violated SEC Rule 203(B)(3) and NASD Rules 2110 and 3010 by having a fail-to-deliver position in a threshold security for 13 consecutive settlement days and failing to timely allocate and close out its fail-to-deliver position. |
| Merrill Lynch Professional Clearing Corp. | 11/20/2001 | NASD | $20,000 | NASD Rule 3360- the firm failed to report its short interest positions in NASDQ SMALLCAP Securities to the NASD prior to April 199. The firm further submitted its short interest position report to the NASD and failed to report short interest shares of NASDAQ SAMALLCAP Securities. |
| UBS Financial Services Inc. | 02/26/2008 | FINRA | $110,000 | NASD Rules 2110, 2320, 3010, 3110, 3360, 3370, 6130, 6955(A) the firm executed short sale orders and failed to properly mark the order tickets as short for the orders and failed to make a determination that the firm could actually borrow such security on behalf of the customer for delivery. |
| UBS Financial Services Inc. | 10/14/2003 | NASD | $5,000 | NASD Conduct Rule 2110 and 3010 Respondent Member's supervisory system did not provide for supervision reasonably designed to achieve compliance with respect to short sales transaction reported to Act on its behalf. |

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|---|---|---|---|---|
| UBS Securities, LLC | 03/2007 | NASD | $65,000 | Submitted reports to OATS that contained inaccurate, incomplete or improperly formatted data, and erroneously submitted Execution Reports it routed away for handling and/or execution to OATS. |
| UBS Securities, LLC | 10/2004 | NASD | $10,000 | Submitting inaccurate and/or incomplete OATS data. |
| UBS Services USA LLC | 01/20/2010 | FINRA | $60,000 | SEC Rule 605 of Regulation NMS, NASD Rules 2110, 3010, 6130(D), 6955(A)- failed to report to FINRA/NASDA trade reporting facility the correct symbol indicating whether tractions where Buy, Sell, Sell Short or Cross for transactions in reportable securities. |
| UBS Services USA LLC | 01/20/2010 | NASDA Stock Market | $5,000 | NASDAQ 4755, failed to correctly indicate whether orders where a buy, short sale, or long sale. |
| UBS Services USA LLC | 06/26/2008 | FINRA | $116,000 | 17A-3, 17A-4, 604 OF Regulation NMS, NASD Rules 3010, 3110, 3370, 4632(B), 4632(c), 4632(D), 4632(E), 6130, 6130(D)(6),6955, 6955(A)- Accepted customer short sale orders in certain securities and for, each order failed to make an affirmative determination that the firm would receive delivery of the security on behalf of the customer or that the firm could borrow the security on behalf of the customer for delivery by the settlement date. In addition the firm affected short sale orders in certain securities and for itself, and each order failed to make an affirmative determination that the firm would receive delivery of the security or could borrow the security on by the settlement date. |
| UBS Services USA LLC | 07/02/2003 | NASD | $2,000 | NASD Marketplace Rule 6130(D) firm executed short sale transactions and failed to report these transactions with a short sale modifier. Firm also incorrectly labeled and reported long sale transactions as short sales. The firm also failed to report to ACT the |

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|--------|----------------|--------------------|-----------------|-----------|

correct symbol indicating whether the transaction as a buy, sell, sell short, sell short exempt, or cross for several transactions.

# FINANCIAL INDUSTRY REGULATORY AUTHORITY
## LETTER OF ACCEPTANCE, WAIVER AND CONSENT
### NO. 20080144511

TO:    Department of Enforcement ("Enforcement")
       Financial Industry Regulatory Authority ("FINRA")

RE:    UBS Securities LLC, Respondent
       CRD No. 7654

Pursuant to FINRA Rule 9216 of FINRA's Code of Procedure, the Respondent submits this Letter of Acceptance, Waiver and Consent ("AWC") for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against the Respondent alleging violations based on the same factual findings described herein.

## I.

## ACCEPTANCE AND CONSENT

A.    The Respondent hereby accepts and consents, without admitting or denying the findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by FINRA:

## BACKGROUND

UBS Securities LLC ("UBS" or the "Firm"), member NYSE and FINRA, is a registered broker-dealer with its principal office in Stamford, Connecticut and serves as the investment banking and securities arm of UBS AG in the United States. UBS provides investment banking, research, and sales and trading services, primarily to corporate and institutional clients.

## OVERVIEW

On July 28, 2004, the Securities and Exchange Commission (the "SEC") adopted 17 CFR Part 242 ("Reg SHO") under the Securities Exchange Act of 1934 ("Exchange Act"), effective September 7, 2004, with a compliance date of January 3, 2005. Reg SHO was, among other things, established to address potentially abusive naked short selling and other problems associated with failures to deliver while protecting and enhancing the operation, integrity and stability of the markets. As such, Reg SHO: (i) established a uniform "locate" requirement to reduce the number of potential failures to deliver; (ii) created uniform order

marking requirements for sales of equity securities; and (iii) limited the time in which a broker-dealer can permit a failure to deliver to persist for securities on the various self-regulatory organization ("SRO") threshold security lists ("threshold securities").[1]

As set forth below, the Firm failed to comply with certain requirements of Reg SHO, FINRA Rules, NASD Rules and federal securities laws during the period covering, in whole or in part, January 3, 2005 through March 2010, with several violations continuing through December 31, 2010 (the "Relevant Period"). The Firm's violations existed for various periods of time throughout the Relevant Period and are summarized below.

UBS's Reg SHO supervisory and compliance system regarding locates and order marking of short sale orders was significantly flawed and resulted in a systemic supervisory failure that contributed to serious Reg SHO failures across the Firm's equities trading business. The Firm assigned supervisory responsibility for Reg SHO compliance to individual trading desks without providing them with sufficient policies, procedures, or supervisory tools. Further, the Firm failed to establish a reasonable system of oversight to monitor that the trading desks were, in fact, performing their designated supervisory duties. As a result, the Firm's locate and order marking practices on individual trading desks were not reasonably subjected to supervisory review to achieve compliance with Reg SHO. In addition, the Firm failed to detect or prevent the significant Reg SHO-related violations described in this AWC.

In particular, UBS's supervisory and compliance monitoring flaws included a failure to: (1) establish and maintain a supervisory structure that was sufficient to adequately supervise its compliance with Reg SHO, especially in light of the complexity of its equities trading activities; (2) establish, maintain and enforce written supervisory procedures for each of its trading desks that were reasonably designed to achieve compliance with Reg SHO; (3) develop and implement effective supervisory reports to monitor for compliance with Reg SHO; (4) establish adequate information technology implementation and change control procedures relating to Reg SHO; (5) adequately educate and train certain personnel with regard to compliance with Reg SHO; and (6) establish an adequate Reg SHO compliance monitoring program.

The Firm's failure to comply with Reg SHO's locate requirement extended to numerous Firm trading systems, desks, accounts and strategies, and also impacted the Firm's technology, operations, and supervisory systems and procedures. During the Relevant Period, the Firm's extensive locate violations occurred due to: (1) the misapplication of exceptions to Reg SHO's locate requirement by trading desks without adequate consultation and/or approval from any department

---

[1] Threshold securities are equity securities that have an aggregate fail to deliver position for: (i) five consecutive settlement days at a registered clearing agency [e.g., National Securities Clearing Corporation]; (ii) totaling 10,000 shares or more; and (iii) equal to at least 0.5% of the issuer's total shares outstanding.

outside the trading desks; (2) the improper inclusion of certain threshold and hard-to-borrow securities on the Firm's easy-to-borrow list distributed to proprietary traders and clients; (3) the Firm permitting certain clients to bypass the locate requirement when entering short sales through the Firm's Direct Execution Services platform without implementing appropriate controls surrounding that process; and (4) the Firm failing to reasonably supervise that locates were obtained and/or documented for short sales entered through the Firm's Order Entry Systems.

As a result of these failures, the Firm improperly entered millions of proprietary and customer short sale orders at various times during the Relevant Period without having reasonable grounds to believe that the securities could be borrowed and available for delivery. A significant number of these short sale orders were in hard-to-borrow securities. Extrapolating from the quantified violations indicates that during the Relevant Period, the Firm likely entered tens of millions of proprietary and customer short sale orders without having reasonable grounds to believe that the securities could be borrowed and available for delivery. The duration, scope and volume of the trading created a potential for harm to the integrity of the market.

The Firm also failed to maintain the independence of its 21 aggregation units. Further, the Firm failed to maintain accurate written plans of organization for its aggregation units. In addition to inaccuracies in its written plans of organization, in certain instances, the Firm's risk management systems were inaccurate in that traders and accounts were included in either: (1) the wrong aggregation unit; (2) multiple aggregation units at the same time; or (3) in no aggregation unit at all. The Firm's aggregation unit deficiencies also may have resulted in order marking problems, including short sales mismarked as long that also potentially violated Reg SHO's locate requirement.

Additionally, the Firm mismarked millions of sale orders in its trading systems at various times during the Relevant Period. Extrapolating from the quantified violations indicates that the Firm likely mismarked tens of millions of sale orders during the Relevant Period. Many of these mismarked orders were short sales that were mismarked as "long," resulting in additional significant violations of Reg SHO's locate requirement.

Moreover, the Firm also had significant reporting and recordkeeping violations resulting from the foregoing. UBS's mismarked sale orders flowed through to the Firm's blue sheet submissions, causing it to make inaccurate submissions of trading data to FINRA. These same mismarked sale orders caused the Firm to inaccurately report such orders to the Automated Confirmation Transaction service and the Order Audit Trail System. The Firm also failed to create and maintain accurate books and records regarding its easy-to-borrow lists, aggregation units and mismarked orders.

Due to the aforementioned failures with respect to the Firm's Reg SHO supervisory and compliance program, many of the Firm's violations were not detected or corrected until after Enforcement's investigation caused UBS to conduct a substantive review of its systems and monitoring procedures for Reg SHO compliance. It was not until at least 2009 that the Firm's supervisory framework over its equities trading business was reasonably designed to achieve compliance with the requirements of Reg SHO and the other securities laws, rules and regulations described herein.

## FACTS AND VIOLATIVE CONDUCT

### I. The Firm's Extensive Locate Violations Since Reg SHO's Inception Date

*Reg SHO's Locate Requirement*

Rule 203(b)(1) of Reg SHO states that, subject to certain exceptions, a "broker or dealer may not accept a short sale order in an equity security from another person, or effect a short sale in an equity security for its own account, unless the broker or dealer has: (i) Borrowed the security, or entered into a bona-fide arrangement to borrow the security; or (ii) Reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due; and (iii) Documented compliance with this paragraph (b)(1)."

Reg SHO requires a broker-dealer to have reasonable grounds to believe the security can be borrowed so that it can be delivered in time for settlement before effecting a short sale in that security. Identifying a source from which to borrow such security is generally referred to as obtaining a "locate." Reg SHO requires that the "locate" must be obtained and documented prior to effecting the short sale.

*Overview of Firm's Locate Violations*

As described below, the Firm effected or accepted millions of proprietary and customer short sale orders without locates at various times during the Relevant Period. Extrapolating from the quantified violations indicates that during the Relevant Period, the Firm likely entered tens of millions of proprietary and customer short sale orders without valid locates. Furthermore, due to the Firm's failures in certain other areas of Reg SHO compliance, the Firm effected an additional significant but unquantifiable number of short sales without valid locates during the Relevant Period.

## A.    The Firm Misapplied Exceptions to Reg SHO's Locate Requirement

Reg SHO allows for certain categories of short sale orders to be treated as exceptions to the locate requirement.[2] However, the SEC specifically stated that Reg SHO only provided for certain "limited" exceptions to the locate requirement. As described below, the Firm misapplied exceptions to the locate requirement during the Relevant Period by improperly treating short sales in certain types of securities as exceptions to the locate requirement, resulting in significant violations of Reg SHO.

Enforcement tested short sales entered through more than a dozen of the Firm's Order Entry Systems ("OESs") during the three-month period June 1, 2006 to August 31, 2006 (the "Sample Period"). Enforcement's investigation uncovered approximately 700,000 short sales that were effected without locates during the Sample Period based upon improper applications of the exceptions to the locate requirement, as described below. Given that the Firm improperly applied these exceptions in some cases for several years, extrapolating from the number of violations quantified during the Sample Period indicates that the Firm likely effected more than ten million short sales in improper reliance on an exception to Reg SHO's locate requirement.

*The Firm Improperly Treated Short Sales in Exchange Traded Funds as Exceptions to the Locate Requirement*

The Firm incorrectly programmed a trading system so that two proprietary trading strategies treated all short sale orders in Exchange Traded Funds ("ETFs") as if they were exceptions to Reg SHO's locate requirement. As a result, one strategy improperly failed to obtain locates for short sales in two ETFs from January 2005 until on or about June 29, 2007. The other strategy improperly failed to obtain locates for short sales in eleven different ETFs from January 2005 until it ceased trading in all ETFs in the fall of 2007. The Firm also incorrectly programmed another trading system to allow short sale orders in ETFs to proceed without a locate during the period December 20, 2005 to November 11, 2008.

During the Sample Period, the Firm effected approximately 680,000 proprietary short sale orders in ETFs without locates through these two trading systems. Given that the Firm improperly treated ETFs as exceptions to Reg SHO's locate requirement for nearly three years, extrapolating from the number of violations quantified during the Sample Period indicates that the Firm likely effected more than 7.4 million short sales in ETFs without valid locates.

---

[2] Short sales for which the SEC provided an exception to the locate requirement include broker-dealer to broker-dealer introduced short sales transactions, bona-fide market making activities, and certain short sales that are the result of a convertible security, option or warrant being tendered for conversion or exchange but the underlying security is not reasonably expected to be received in time for settlement.

5

*The Firm Improperly Treated Certain Short Sale Equity Hedge Transactions as
Exceptions to the Locate Requirement*

During the period beginning January 3, 2005 until approximately April 3, 2008,
the Firm also improperly treated certain equity hedge transactions effected by its
market making unit as exceptions to Reg SHO's locate requirement.[3]
Specifically, the Firm effected principal short sales in equity securities to hedge
its risk in conjunction with positions it accumulated in connection with its market
making activities. The Firm improperly treated these principal equity hedge short
sales as exceptions to Reg SHO's locate requirement.

As a result, the Firm improperly released for execution a significant but
unquantified number of principal equity hedge short sales without locates over a
period of nearly three and a half years. These additional short sales were not
quantified given the difficulty in identifying the exact nature and scope of the
Firm's equity hedge short sales.

**B.     The Firm Improperly Included Threshold and Hard-to-Borrow
Securities on Its Easy-to-Borrow List**

Reg SHO allows broker-dealers to satisfy the locate requirement for short sales in
certain securities by creating a daily list of equity securities which it deems "easy-
to-borrow" ("ETB List"). The inclusion of a security on a firm's ETB List
reflects the firm's determination, on the trade date for which the ETB List was
created, that it has the ability to easily supply shares of the identified securities,
thereby satisfying the reasonable grounds necessary for a broker-dealer to effect
short sales in the included securities. Short sales entered in reliance upon a firm's
ETB List are therefore considered to be in securities that are "easy-to-borrow"
and do not require that a separate locate be otherwise obtained and/or
documented.

The SROs release lists of threshold securities at approximately midnight each
day. A security that is included on an SRO threshold list is generally not
considered "easy-to-borrow." Stock loan departments at broker-dealers also
typically make determinations concerning which securities are "hard-to-borrow"
("HTB"), thereby requiring that a separate locate determination be made and
documented before releasing such orders for execution.

As described below, the Firm created and distributed ETB Lists that improperly
included threshold and HTB securities to UBS's proprietary traders and clients,
resulting in more than 900,000 short sale orders that were released for execution
without valid locates.

---

[3] In adopting Reg SHO, the SEC did not incorporate an exception from the locate and delivery requirements of Reg
SHO for short sales that result in bona-fide fully hedged or arbitraged positions, citing the difficulty of ascertaining
the "bona-fide" nature of hedging and arbitrage.

*The Firm's Easy-to-Borrow List Creation Process*

On a daily basis, the Firm's securities lending department, called Stock Borrow Loan ("SBL"), created ETB Lists for use by its proprietary trading desks and certain of its clients. The inclusion of a security on the Firm's ETB List was intended to suffice as a locate in that security for that specified trade date only. In order to create the ETB Lists, each morning at approximately 1:00 am, SBL first created a master list of securities included in certain indices and removed from this master list any securities that were on the threshold lists published by various SROs at or around midnight. SBL was then supposed to back out the securities it deemed HTB. Only after the threshold and HTB securities were removed from the master list was the ETB List supposed to be deemed finalized and made available or distributed to the Firm's proprietary desks and clients.

*The Firm Released ETB Lists to Proprietary Desks and Clients that Included HTB Securities*

Although the ETB Lists were only supposed to be released once finalized, the Firm failed to prevent proprietary trading desks from having access to the ETB Lists before HTB securities had been removed. As a result, the ETB Lists utilized by these proprietary desks improperly included HTB securities. These proprietary desks were able to and did release for execution a significant number of short sale orders in HTB securities without a valid locate in misplaced reliance on the securities' appearance on the ETB Lists.

The Firm also provided the unfinished ETB Lists which still included HTB securities to certain clients. These clients were able to and did enter a significant number of short sale orders in HTB securities, to be executed at UBS, without a valid locate in misplaced reliance on the securities' appearance on the ETB Lists. The clients that received the unfinished ETB Lists also had the ability to effect short sales in HTB securities away from the Firm.

*The Firm Released to Proprietary Desks and Clients the Prior Trading Days' ETB Lists*

In or about February 2007, the Firm changed the ETB List creation process so that SBL finalized its ETB List at approximately 4:30 pm daily for use the following trading day. However, some systems continued to use the prior day's ETB List until mid-2008. The proprietary desks and clients that received this stale ETB List had the ability to and did effect at the Firm a significant number of short sale orders in HTB securities without obtaining a locate.

*The Firm Used a Stale Threshold List to Create its ETB List*

From February 2007 until mid-2008, the Firm's ETB List creation process occurred mid-day for trading the next day. Thus, the Firm's process excluded

7

securities added to the SRO threshold lists at approximately midnight each day for the next day's trading session. Proprietary desks and clients that received this stale ETB List had the ability to and may have effected at the Firm short sales in threshold securities added to the SRO threshold lists that night without obtaining a locate. Clients that received this stale ETB List also had the ability to effect short sales in threshold securities at locations away from the Firm.

As a result of these deficiencies in the Firm's ETB Lists, during the period January 2005 to August 2008, the Firm released more than 900,000 short sale orders for execution without locates in violation of Reg SHO. Many of these short sale orders were in HTB securities, and some may have been in threshold securities.

C. **The Firm Permitted Certain Clients to Bypass the Locate Requirement When Entering Short Sales Through the Firm's Direct Execution Services ("DES") Platform**

During the period January 3, 2005 until approximately December 2009, the Firm programmed more than 270 clients ("DES Clients") with the ability to route short sale orders through the Firm's DES platform for execution without first requiring that the DES Clients obtain a locate from the Firm or demonstrate that a locate had been obtained from another recognized lending source.

The Firm's DES platform was normally designed to block short sale orders that did not contain an entry indicating that a locate had first been obtained. However, the Firm altered the programming for these 270 DES Clients to bypass this standard DES platform locate check.[4] As a result, the clients configured to bypass the locate check had the ability to route short sales directly to the market for execution without locates and the Firm did not have adequate controls around that process.

As a result of the aforementioned, during the period January 3, 2005 until in some cases as late as May 2009, 25 DES Clients entered approximately 200,000 short sale orders through the Firm's DES platform without locates. While the majority of these accounts were correctly re-programmed in May 2006, two additional accounts were not corrected until May 2009. Furthermore, as described below, due to the Firm's failure to establish and conduct a meaningful and effective review of its DES Clients' short sales until mid-2009, the Firm failed to detect the majority of these violations. Moreover, the Firm was unable to identify the total number of its DES Clients configured to bypass Reg SHO's locate requirement until in or around December 2009.

---

[4]  The Firm acknowledged that certain of the DES Clients were programmed to bypass the Reg SHO locate requirement, but stated it was unable to determine why those programming changes were made for all of those DES Clients.

8

**D.     The Firm Accepted or Effected Proprietary and Customer Short Sale Orders Without Locates Through its Order Entry Systems**

*The Firm's Locate and Documentation Systems and Procedures*

SBL utilized an automated stock lending system referred to as "ASAP" to provide and document locates and maintain the Firm's stock availability information. ASAP also functioned as a method of documenting locate requests the Firm received from proprietary traders and clients, and any subsequent locate requests SBL approved (including the amount of shares approved and the time of approval) or rejected. Approved locate requests documented in ASAP automatically decremented the Firm's remaining availability in the security. ASAP assigned each approved locate a unique identification code ("ASAP ID") that documented the existence of the locate.

In addition to ASAP, SBL received locate requests via email, telephone and/or instant messaging/chat channels. Emails, instant messages/chats and written logs of telephone conversations with SBL also served as alternate sources of documented evidence for locates.

*The Firm's Front-End Order Entry Systems Did Not Have the Functionality to Prevent Short Sales Without Valid Locates and the Firm Failed to Have an Effective Post-Trade Locate Review System*

During the Relevant Period, the Firm utilized more than a dozen OESs to enter proprietary and client short sales. The Firm's OESs contained a dedicated locate field in the order entry screen into which the user was supposed to enter valid locate information when entering a short sale. The majority of these OESs did not have in place the functionality to automatically "block" or "stop" a short sale order from being released for execution if the locate field was blank or contained an unrecognized or invalid locate source. Several of the Firm's OESs accepted free-form text in the locate field. As a result, the entry of any text, including a space or the entry of a meaningless combination of keystrokes which did not represent a valid locate or locate source would suffice for the OES to release the short sale order for execution.

Other OESs had a locate field with a drop-down menu containing standardized entries for identifying the source of a locate, such as "UBS," "SBL," or "Client." However, in the event the user selected either "UBS" or "SBL," thereby indicating that UBS had provided the locate, the OESs did not verify that the Firm had in fact provided the locate as represented. Similarly, in the event the user selected "Client," the OES did not have the functionality to validate the client-provided locate source. Therefore, the mere selection of one of these pre-programmed entries was sufficient for the OES to release the short sale order for execution.

While a firm's OESs are not required to have an automated "block" or "stop" function or to validate a client-provided locate source, in the absence of such automated functions, a firm must have in place an effective post-trade review of short sales effected through its OESs to determine whether such short sales had valid locates. Despite being aware that its OESs did not have the ability to automatically prevent short sale orders from being released for execution without valid locates, the Firm failed to develop effective post-trade reports or any other review system for all of its customer and proprietary trading to identify short sales entered into its OESs without valid locates as described below.

With respect to customer short selling, the Firm failed to have effective post-trade exception reports for all customer short sales until mid-2006, with the exception of one report that was not put in place until mid-2009. Regarding proprietary short sales, prior to the Fall of 2008, the Firm failed to have effective post-trade exception reports for all of its proprietary short sales except for one report that had been developed for a single system.

Enforcement tested short sales entered through more than a dozen of the Firm's OESs during the Sample Period. Specifically, Enforcement identified numerous instances in which the locate field for proprietary and customer short sale orders was merely left blank or contained invalid locates. The Firm attributed these violations to the following: (1) traders that failed to properly comprehend the locate requirement; (2) a misunderstanding over whether short sales in certain securities such as American Depository Receipts ("ADRs") required locates; and (3) certain traders that wrongly believed a locate could be used over multiple trading days until exhausted.

Also, in numerous instances, a proprietary trader or client indicated that a locate had been obtained from the Firm by entering "UBS" or "SBL" or "ASAP" in the locate field. The purported locate did not exist in ASAP and its existence was not otherwise found in chats, emails or in any other Firm-approved method. Further, in multiple instances, proprietary traders and clients requested a locate from the Firm, the locate request was denied, but the short sale in the subject security was entered without a locate by the requestor. Additionally, in multiple instances, short sales were entered and/or executed for a number of shares in excess of the approved locate amount. Also, on multiple occasions, a short sale order was released for execution before a locate was approved.

In total, Enforcement identified approximately 45,000 short sales without valid locates during the Sample Period alone. Given that most of the OESs reviewed by Enforcement functioned in the same manner for more than four and one-half years (from January 3, 2005 until August 2009), extrapolating from the number of violations uncovered during the Sample Period indicates that the Firm likely accepted or effected approximately 800,000 short sales in violation of Reg SHO's locate requirement.

**E.    The Firm Incorrectly Programmed Certain Accounts and Strategies**

For the three-month Sample Period, Enforcement's investigation also uncovered more than 10,000 short sales that were improperly effected without locates based upon the Firm incorrectly programming accounts or strategies. Extrapolating from the number of violations uncovered during the Sample Period indicates that the Firm likely effected more than 100,000 short sales without locates.

**F.    Summary of Rule 203(b)(1) Violations**

Based upon the foregoing, the Firm violated Rule 203(b)(1) of Reg SHO by effecting tens of millions of short sale orders without locates at the times described herein during the Relevant Period. This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008, both of which require that a firm, in the conduct of its business, observe high standards of commercial honor and just and equitable principles of trade.[5]

**II.    The Firm Failed to Maintain Independent Aggregation Units and to Accurately Document its Aggregation Units**

Rule 200(f) of Reg SHO states that:

> In order to determine its net position, a broker or dealer shall aggregate all of its positions in a security unless it qualifies for independent trading unit aggregation, in which case each independent trading unit shall aggregate all of its positions in a security to determine its net position. Independent trading unit aggregation is available only if: (1) the broker-dealer has a written plan of organization that identifies each aggregation unit, specifies its trading objective(s), and supports its independent identity; (2) each aggregation unit within the firm determines, at the time of each sale, its net position for every security that it trades; (3) all traders in an aggregation unit pursue only the particular trading objective(s) or strategy(s) of that aggregation unit and do not coordinate that strategy with any other aggregation unit; and (4) individual traders are assigned to only one aggregation unit at any time.

Rule 200(f) requires a broker-dealer to maintain independent aggregation units and demonstrate that each aggregation unit is engaged in separate trading strategies without regard to other units, and maintain written plans of organization as a means to demonstrate that each unit is independent.

---

[5] *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules including the change of NASD Rule 2110 to FINRA Rule 2010, effective December 15, 2008.

Further, in order to maintain the independence of the units, Rule 200(f) requires that a trader be assigned to only one aggregation unit at a time, and limits the trader to pursue only the trading strategies or objectives of that particular aggregation unit. Thus, if two or more traders or groups of traders (*i.e.*, desks) within the same firm coordinate their trading activities, those traders or desks must be in the same aggregation unit. Similarly, a trader assigned to one aggregation unit may not have access to information regarding the positions and/or transactions of any other aggregation unit, as such access in itself creates the ability for a trader to coordinate his trading with that of another aggregation unit.

### The Firm Failed to Maintain Independent Aggregation Units

For trading purposes, the Firm's proprietary traders and accounts were assigned to different trading books within the Firm's risk management systems. The different trading books in the Firm's risk management systems were supposed to be in accordance with the Firm's aggregation unit assignments. However, in certain circumstances, the Firm's risk management systems failed to accurately reflect the correct traders and accounts in the appropriate trading books. As a result, the Firm's aggregation units, as they functioned through the Firm's risk management systems in calculating net positions, were deficient and inaccurate. In some cases, net positions resulting from the trading activity of traders and accounts assigned to a certain aggregation unit may have been improperly included in the calculation of the positions for other aggregation units. In other cases, trading activity for certain traders and accounts failed to be included in any position calculations for any aggregation units as these traders and accounts were not assigned to any trading group within the Firm's risk management systems. Further, traders assigned to certain aggregation units may have had access to other aggregation units' positions and transactions, and therefore, could have coordinated strategies. As a result of these problems, the Firm failed to maintain independent aggregation units.

The Firm's aggregation unit failures created the probability that sale orders which should have been marked as "short" were instead mismarked as "long," thereby resulting in unquantified violations of Reg SHO's locate requirement. These violations were not quantified given the difficulty in determining the Firm's proprietary net positions across 21 aggregation units.

### The Firm Failed to Maintain Adequate and Accurate Written Plans of Organization

In addition, from January 2005 through at least the end of 2010, the Firm failed to maintain all required written plans of organization for each of its 21 aggregation units. The few versions of the written plans of organization the Firm did maintain contained inaccuracies in that certain traders and accounts reflected in the Firm's risk management systems were not on the plan, certain accounts were assigned to

12

the incorrect aggregation unit on the written plan, and the plans reflected certain accounts that were not included in the risk management systems.

*Summary of the Firm's Aggregation Unit Failures*

Based upon the foregoing, the Firm violated Rule 200(f) during the period January 3, 2005 through at least the end of 2010 in that it failed to maintain the independence of each of its 21 aggregation units and adequate and accurate written plans of organization for its aggregation units. This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

### III. The Firm's Significant Order Marking Violations

As effected, Rule 200(g) of Reg SHO required that a broker or dealer mark all sale orders of any equity security as "long," "short" or "short exempt." The accurate marking of sale orders is essential for locate, stock borrow, reporting, record-keeping and execution purposes.

From approximately June 2006 until June 2008, a particular Firm proprietary trading strategy was incorrectly programmed to mark all sale orders in certain securities, such as ETFs, as "long." As a result, for the three-month Sample Period, this strategy mismarked nearly 1.6 million short sale orders as "long." Because locates were not obtained for any of these mismarked short sales, the orders also violated Reg SHO's locate requirement. Given that the mismarkings by this strategy persisted for two years, extrapolating from the number of violations uncovered during the Sample Period indicates that the Firm likely released more than 12 million short sale orders without required locates.

Further, for nearly three months in late 2009, another trading strategy consulted stale start of day position data when marking orders. As a result, more than 400,000 orders were mismarked as "long" or "short." Of these orders, more than 275,000 were actual short sales that were mismarked as "long" and the Firm therefore failed to obtain the required locates. In addition, at least one other system was incorrectly programmed to mark all sale orders as "long." However, these mismarkings did not result in locate violations as the orders were either exceptions to the locate requirement or the locates had been obtained by another system. Also, until at least March 2010, the Firm experienced additional issues that caused certain long sales to be mismarked as "short."

*Summary of the Firm's Order Marking Failures*

Based upon the foregoing, the Firm violated Rule 200(g) during the time periods described above in that it mismarked more than ten million sale orders, including short sales mismarked as "long" that also violated Reg SHO's locate requirement.

This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

## IV. The Firm's Reporting Violations

Pursuant to its reporting obligations, the Firm was required to accurately report sale orders through its automated submissions of trading data ("blue sheets") for regulatory purposes. Further, the Firm was required to accurately report sale orders for public dissemination and regulatory purposes to a number of trade reporting, quotation display and collection facilities, including the Automated Confirmation Transaction Service ("ACT") and the Order Audit Trail System ("OATS"), by indicating, among other things, whether each sale order was "long," "short" or "short exempt." However, as the result of the Firm's aforementioned order marking and aggregation unit violations, the Firm inaccurately reported tens of millions of sale orders in violation of its reporting requirements.

*Blue Sheets*

NASD Rules 8211 and 8213 (and later FINRA Rules 8211 and 8213)[6] require that a firm submit transaction data in an automated format to regulators with certain designated information, including the indication of whether a transaction was a purchase, sale, or short sale. These "blue sheet" submissions are generated by firms at the request of regulators in connection with investigations of questionable trading. It is the responsibility of firms to reasonably ensure that the information submitted to regulators via blue sheets is accurate, and a firm's reliance on a third party vendor to assist with the preparation of the firm's blue sheets does not alter the firm's duty to comply.

The Firm mismarked sale orders that flowed through to the Firm's blue sheet submissions and caused the Firm to make inaccurate blue sheet submissions of trading data to FINRA.

Based upon the foregoing, the Firm violated NASD Rules 8211 and 8213 during the period January 3, 2005 to December 14, 2008, and FINRA Rules 8211 and 8213 for the period on or after December 15, 2008, in that it failed to accurately report sale orders in its blue sheets. This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

---

[6] *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules, effective December 15, 2008, including the change of NASD Rules 8211 and 8213 to FINRA Rules 8211 and 8213, respectively.

*Trade Reporting Rules Generally*

The NASD 4000, 5000, 6000 and 7000 Rule Series (and later FINRA 6000 and 7000 Rule Series)[7] require that firms report certain over-the-counter ("OTC") transactions in equity securities to transaction reporting, quotation display and collection facilities for public dissemination and regulatory purposes. Transactions must be reported to a FINRA facility such as a Trade Reporting Facility ("TRF"), the Alternative Display Facility ("ADF"), or the OTC Reporting Facility ("ORF").[8] Firms are required to accurately report these transactions by indicating, among other things, whether a transaction was a "buy," "sell" or "sell short."

*ACT Reporting*

NASD Rule 6130 (and later FINRA Rules 7230A and 7330)[9] requires that firms report transactions to ACT for a number of regulatory purposes, including but not limited to indicating whether a transaction was a "buy," "sell" or "sell short."

The Firm mismarked sale orders that flowed through to the Firm's ACT reports and caused the inaccurate reporting of such sale orders.

Based upon the foregoing, the Firm violated NASD Rule 6130 during the period January 3, 2005 to December 14, 2008, and FINRA Rules 7230A and 7330 during the period on or after December 15, 2008, in that it failed to accurately report sale orders to ACT. This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

*OATS Reporting*

During the Relevant Period, the Firm was a "Reporting Member" within the definition set forth in NASD Rule 6951(n) (and later FINRA Rule 7410(n)). Pursuant to NASD Rule 6955(a) (and later FINRA Rule 7450(a)), the Firm was required to transmit to OATS the order information specified in NASD Rule 6954

---

[7] *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules, effective December 15, 2008, including the transfer of the NASD Marketplace Rules (the NASD Rule 4000 through 7000 Series) to the consolidated FINRA rulebook as the FINRA Rule 6000 through 7000 Series. *See also* FINRA Trade Reporting Frequently Asked Questions (FAQ), available at: http://www.finra.org/Industry/Regulation/Guidance/p038942.

[8] The TRFs are facilities through which firms report transactions in NMS stocks, as defined in SEC Rule 600(b)(47) of Regulation NMS, effected otherwise than on an exchange. FINRA has established the following TRFs (each in conjunction with the pertinent Exchange): the FINRA/NASDAQ TRF and the FINRA/NYSE TRF. The ADF is both a trade reporting and quotation display and collection facility for purposes of transactions in NMS stocks effected otherwise than on an exchange. The ORF is the facility through which members report OTC transactions in OTC Equity Securities and Restricted Equity Securities, as those terms are defined in FINRA Rule 6420.

[9] *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules, including the change of NASD Rule 6130 to FINRA Rules 7230A and 7330, effective December 15, 2008.

(and later FINRA Rule 7440), including, among other things, the designation of an order as a "short sale order."[10]

The Firm mismarked sale orders that flowed through to the Firm's OATS reports and caused the inaccurate transmittal of such sale orders.

Based upon the foregoing, the Firm violated NASD Rules 6954 and 6955(a) during the period January 3, 2005 to December 14, 2008, and FINRA Rules 7440 and 7450(a) during the period on or after December 15, 2008, in that it failed to accurately transmit sale orders to OATS. This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

## V.    The Firm Failed to Create and Maintain Certain Accurate Books and Records

Under Section 17(a) of the Exchange Act and Rule 17a-3 thereunder, firms are required to make and keep current and accurate books and records relating to its business, including, but not limited to, daily records of all sales of securities, and a memorandum of each purchase and sale for every customer and account of the firm. NASD Rule 3110(a) requires that firms make and preserve books, accounts, records, memoranda and correspondence in conformity with applicable laws, rules, regulations and statements of policy promulgated thereunder, and with the Rules of the NASD, and as prescribed by Exchange Act Rule 17a-3.

As previously described, the Firm failed to create and maintain accurate versions of its ETB Lists from January 2005 until August 2008. Further, the Firm failed to maintain accurate versions of its written plans of organization for its aggregation units from January 2005 until at least December 2010. Moreover, the Firm failed to maintain accurately marked sale orders from January 2005 until at least March 2010.

Based upon the foregoing, the Firm violated Section 17(a) of Exchange Act and Rule 17a-3 thereunder and NASD Rule 3110(a) during the period January 3, 2005 to approximately December 2010 in that it failed to maintain accurate books and records. This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

---

[10] *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules, effective December 15, 2008, including the change of NASD Rules 6951(n), 6954 and 6955(a) to FINRA Rules 7410(n), 7440 and 7450(a), respectively.

## VI. Systemic Supervisory Violations: The Firm's Reg SHO Supervisory and Compliance Monitoring Program was Deficient

NASD Rule 3010 requires that firms establish and maintain a supervisory system, including written supervisory procedures related to their business, that is reasonably designed to achieve compliance with the applicable securities laws, regulations and SRO rules.

As described below, it was not until at least 2009 that the Firm's supervisory framework over its equities trading business was reasonably designed to achieve compliance with the requirements of Reg SHO and other securities laws, rules and regulations described herein. The Firm failed to adequately supervise locates and order marking for short sale orders by its equities trading business. In particular, while the Firm designated its equities trading desks' heads ("Desk Heads") with the primary responsibility for Reg SHO supervision, it failed to provide for reasonable oversight to monitor whether and how the Reg SHO supervisory responsibilities were actually carried out. Among other problems, the Firm had substantial deficiencies in its Reg SHO-related: (1) supervisory structure in light of its complex equities trading activities; (2) written supervisory procedures; (3) supervisory reports; (4) supervision over the operation of its OESs; (5) information technology change control protocols; and (6) training for certain employees. Further, the Firm's Reg SHO compliance monitoring program was inadequate.

By designating the Desk Heads as the primary supervisors for compliance with Reg SHO, without providing adequate tools for their supervision or meaningful oversight, the Firm's aforementioned failures persisted for extended periods of time. As a result, the Firm failed to detect or prevent the substantial and persistent locate, aggregation unit, order marking, reporting, and books and records violations described in this AWC.

### A. The Firm Failed to Establish and Maintain a Reasonable Supervisory System for Reg SHO Compliance

*The Firm Failed to Reasonably Supervise for Compliance with Reg SHO*

The Firm designated its Desk Heads with primary Reg SHO supervisory responsibility, including reviewing the activities of the traders on their respective desks. The Desk Heads were supported in their Reg SHO supervisory responsibilities by a Regulatory Control Group ("RCG"). With respect to Reg SHO compliance, RCG was responsible for: (1) creating written supervisory procedures with input from the Compliance Department; (2) working with UBS's Information Technology ("IT") group on various regulatory compliance systems and on developing supervisory reports for the review of trading activity; and (3) conducting reviews of trading activity.

However, not all these responsibilities were fully carried out on every trading desk. On some trading desks, adequate written supervisory procedures were not created, IT changes were made which negatively affected regulatory compliance, and/or supervisory reports were not developed and/or reviewed.

The Desk Heads and RCG were required to utilize a centralized on-line supervisory tool created by the Firm to document that their Reg SHO-related supervisory reviews for each trading desk had occurred. However, this on-line tool did not always provide for a specific report or review for certain trading desks. Further, in some instances, Desk Heads or RCG indicated in the on-line supervisory tool that the supervisory reviews for certain trading desks had taken place when in fact no specific Reg SHO-related reviews had been performed.

*The Firm Failed to Perform Adequate Oversight of its Trading Desks for Reg SHO Supervision*

The Firm failed to develop an adequate system of oversight to monitor the performance of the Reg SHO-related responsibilities assigned to the Desk Heads and RCG. In addition, the Firm failed to establish adequate policies and procedures for the escalation of any potential Reg SHO-related issues or "red flags" to appropriate persons outside of the trading desks.

The Firm's assignment of primary Reg SHO supervisory responsibility to the Desk Heads, and its failure to implement adequate oversight of the trading desks to determine whether each Desk Head was actually carrying out its Reg SHO-related responsibilities, contributed to the Firm's failure to recognize the numerous issues that resulted in the significant violations described above.

**B.  The Firm Failed to Reasonably Supervise and Establish, Maintain and Enforce Written Supervisory Procedures Reasonably Designed to Achieve Compliance with Reg SHO**

The Firm's written supervisory procedures ("WSPs") relating to Reg SHO were defective in several ways. Among other things: (1) the WSPs failed to clearly describe the reviews to be performed with respect to Reg SHO; (2) the WSPs did not adequately explain how supervisors should perform Reg SHO reviews; (3) some WSPs failed to include protocols for escalating issues noted by supervisors in the course of their responsibilities; and (4) the WSPs did not consistently include information on how supervisors were to document their Reg SHO reviews. As an example of these deficiencies, a number of WSPs simply made reference to the "affirmative determination" requirement of Reg SHO without providing further detail about any such review that should be performed to monitor for compliance with Reg SHO's locate requirement.

*The Firm Failed to Prevent the Misapplication of Exceptions to the Locate Requirement*

Until at least the end of 2008, the Firm failed to reasonably supervise and have adequate policies and procedures to supervise the application of exceptions to the locate requirement. As earlier described, certain of the Firm's trading desks misapplied exceptions to the locate requirement, without consultation with or approval from any supervisory department outside of the trading desks. Specifically, from January 3, 2005 through at least the end of 2008, the Firm did not have a formal mechanism in place, including maintaining records or documentation, to determine which trading desks or accounts were actually using exceptions to the locate requirement and whether those exceptions were being properly utilized.

*The Firm Failed to Properly Construct and Distribute ETB Lists*

Until approximately August 2008, the Firm failed to reasonably supervise the compilation and distribution of its ETB Lists. As earlier described, the Firm improperly included certain threshold securities and HTB securities on ETB Lists disseminated to the Firm's proprietary traders and clients. As a result, the Firm and its clients effected a significant number of short sales in HTB securities and may have effected short sales in threshold securities without valid locates.

*The Firm Failed to Prevent Short Sales from Being Entered Without Locates through its OESs and Failed to Perform Adequate Post-trade Reviews*

Until approximately 2009, the Firm failed to reasonably supervise its compliance with Reg SHO's locate requirement. As earlier described, the Firm utilized more than a dozen OESs to enter client and proprietary short sales. Certain of these OESs allowed short sale orders without valid locates to be released for execution. However, the Firm failed to develop an adequate system for the post-trade review of short sales to identify all short sales entered into its OESs without valid locates. As a result, for years the Firm failed to detect that short sales were effected through its OESs without locates.

*The Firm Failed to Maintain Independent Aggregation Units and Adequate Written Plans of Organization*

During the Relevant Period, the Firm failed to reasonably supervise and have adequate policies and procedures to maintain independent aggregation units and adequate written plans of organization for its 21 aggregation units. As earlier described, some of the Firm's aggregation units were not independent in that in certain circumstances, the Firm's risk management systems failed to accurately reflect the correct traders and accounts in the appropriate trading books. Further, the Firm's written plans of organization were inaccurate in that certain traders and accounts reflected in the Firm's risk management systems were not on the plans,

certain accounts were assigned to the incorrect aggregation unit on the written plans, and the plans reflected certain accounts that were not included in the risk management systems. The Firm failed to detect the deficiencies in its aggregation units and written plans of organization, and was, in some instances, unable to accurately determine its proprietary net positions and accurately mark its sale orders.

*The Firm Failed to Properly Mark Sale Orders*

During the Relevant Period, the Firm failed to reasonably supervise and have adequate policies and procedures to properly mark sale orders. As earlier described, the Firm mismarked a significant number of sale orders, including short sales mismarked as "long" that also violated Reg SHO's locate requirement.

*The Firm Failed to Maintain Accurate Books and Records and Submitted Inaccurate Trade Data on its Blue Sheets, ACT and OATS Reports*

During the Relevant Period, the Firm failed to reasonably supervise to maintain accurate books and records and submit accurate trade data on its blue sheets, ACT and OATS reports. As earlier described, the Firm failed to maintain certain accurate books and records and submitted a significant amount of inaccurate trade data on its blue sheets, ACT and OATS reports.

**C.  The Firm Failed to Supervise its Systems and Lacked Adequate IT Change Protocols Affecting Reg SHO Compliance**

During the Relevant Period, the Firm failed to reasonably supervise and have adequate policies and procedures in place to monitor or approve IT-related additions or changes to its systems. The Firm had no formal process in place for trading desks to obtain approval before initiating new trading strategies or making modifications to existing systems. As such, trading desks implemented and made unapproved changes to the Firm's systems without an adequate assessment of the potential regulatory impact of such changes, including changes that impacted the Firm's compliance with the locate and order marking requirements of Reg SHO. Further, because the Firm's IT implementation and change control processes were decentralized across its trading desks, and the Firm failed to keep pace with the growth, complexity and number of electronic trading systems used by UBS to trade equities, the Firm failed to develop established and consistent protocols for all trading desks to follow when making IT changes to the Firm's existing systems.

As a result, the Firm was unaware of certain changes made to its systems by its trading desks, including the implementation and use of a trading strategy or the coding of certain accounts and strategies, and the Firm failed to detect the violations caused by such changes to its systems. Further, certain DES Clients were programmed to bypass Reg SHO's locate requirement in the Firm's OESs.

However, the Firm failed to have a supervisory process in place to monitor those DBS Clients' trading for compliance with the locate requirement.

**D.    The Firm Failed to Adequately Educate and Train its Personnel With Regard to Compliance with Reg SHO**

In response to Enforcement's inquiry regarding the causes of specific violations, the Firm stated that certain employees misunderstood Reg SHO's requirements, including mistaken beliefs that: (i) short sales of certain types of securities, including ADRs and ETFs, did not require locates; (ii) locates could be used over multiple days; and (iii) short sales were exceptions to the locate requirement based on the "tick test" pilot program and subsequent rule change. The Firm failed to adequately educate these personnel with regard to the requirements of Reg SHO.

**E.    The Firm's Reg SHO Compliance Monitoring Program was Inadequate**

In light of the highly decentralized way in which the Firm assigned supervisory responsibility for Reg SHO compliance to the Desk Heads, UBS failed to establish an adequate system to monitor and test whether such supervisory responsibilities were being adequately carried out by the trading desks until at least December 2009. The Firm also failed to review its order entry, order marking and locate protocols to confirm that they were functioning in compliance with Reg SHO. Specifically, until November 2006, the Firm lacked monitoring reports that focused on locates and order marking and did not otherwise reasonably surveil for these Reg SHO requirements.

Further, the Firm did not perform adequate oversight of its equities trading desks to determine whether adequate policies, procedures and systems for Reg SHO compliance had been established and/or reviews were occurring on such desks.

**F.    Summary of Supervisory Violations**

Based upon the foregoing, the Firm violated NASD Rule 3010 in that it failed to establish and maintain a supervisory system, including written supervisory procedures, that was reasonably designed to achieve compliance with the applicable securities laws, regulations and SRO rules. This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

## OTHER FACTORS

*The Firm's Corrective Actions during the Course of FINRA Enforcement's Investigation*

FINRA notes that as the system-related locate and order marking problems, described above were identified during the course of FINRA Enforcement's investigation, the Firm implemented changes to its systems and procedures that were designed to prevent a recurrence of these violations.

*The Firm's Substantial Assistance to FINRA Enforcement's Investigation*

FINRA acknowledges that in 2010, the Firm undertook an internal review of its supervisory policies, procedures and systems relating to Reg SHO. The Firm reported the findings of its internal investigation to FINRA. The sanctions below reflect the credit that UBS has been given for conducting an investigation of these issues and providing the results to FINRA.

B.  The Respondent also consents to the imposition of the following sanctions:

Censure; and

Fine in the amount of $12,000,000.

The Respondent agrees to pay the monetary sanction(s) upon notice that this AWC has been accepted and that such payment(s) are due and payable. The Respondent has submitted an Election of Payment form showing the method by which it proposes to pay the fine imposed.

The Respondent specifically and voluntarily waives any right to claim that it is unable to pay, now or at any time hereafter, the monetary sanction(s) imposed in this matter.

The sanctions imposed herein shall be effective on a date set by FINRA staff.

## II.

## WAIVER OF PROCEDURAL RIGHTS

The Respondent specifically and voluntarily waives the following rights granted under FINRA's Code of Procedure:

A.  To have a Complaint issued specifying the allegations against the Respondent;

22

B. To be notified of the Complaint and have the opportunity to answer the allegations in writing;

C. To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made and to have a written decision issued; and

D. To appeal any such decision to the National Adjudicatory Council ("NAC") and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, the Respondent specifically and voluntarily waives any right to claim bias or prejudgment of the General Counsel, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

The Respondent further specifically and voluntarily waives any right to claim that a person violated the ex parte prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

## III.

## OTHER MATTERS

The Respondent understands that:

A. Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs ("ODA"), pursuant to FINRA Rule 9216;

B. If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against the Respondent; and

C. If accepted:

1. This AWC will become part of the Respondent's permanent disciplinary record and may be considered in any future actions brought by FINRA or any other regulator against the Respondent;

23

2.   This AWC will be made available through FINRA's public disclosure program in response to public inquiries about Respondent's disciplinary record;

3.   FINRA may make a public announcement concerning this agreement and the subject matter thereof in accordance with FINRA Rule 8313; and

4.   The Respondent may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression that the AWC is without factual basis. The Respondent may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC. Nothing in this provision affects the Respondent's right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party.

D.   The Respondent may attach a Corrective Action Statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct. The Respondent understands that it may not deny the charges or make any statement that is inconsistent with the AWC in this Statement. This Statement does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA or its staff.

The undersigned, on behalf of the Firm, certifies that a person duly authorized to act on its behalf has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it; that Respondent has agreed to its provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein and the prospect of avoiding the issuance of a Complaint, has been made to induce the Firm to submit it.

10/14/2011
Date (mm/dd/yyyy)

UBS Securities LLC

By: _____
[Name]   Bryan M. Murtagh
[Title]   Managing Director

By: _____
[Name]   Aby Meistrom
[Title]   Managing Director

24

Reviewed by:

Ben A. Indek, Esq.
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Tel: (212) 309-6109
Fax: (212) 309-6001
bindek@morganlewis.com

25

Accepted by FINRA:

_10 - 24 - 11_
Date

Signed on behalf of the
Director of ODA, by delegated authority

Richard R. Best
Chief Counsel
FINRA Department of Enforcement
14 Wall Street, 14th Floor
New York, New York 10005
Tel: (646) 315-7308
Fax: (202) 689-3424
richard.best@finra.org

26

**NEAL H. FLASTER, LLC**
30 Columbia Turnpike
P.O. Box 21
Florham Park, New Jersey 07932
Tel. No.: (973) 822-7900
Attorneys for Plaintiff
Greg Manning, et al.

Y:\Manning\XXX\Summons 3-9-2012.wpd

| | |
|---|---|
| GREG MANNING; CLAES ARNRUP; POSILJONEN AB; POSILJONEN AS; SVEABORG HANDEL AS; FLYGEXPO AB; and LONDRINA HOLDING, LTD.<br><br>Plaintiffs,<br><br>vs.<br><br>MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; KNIGHT CAPITAL AMERICAS, L.P., formerly known as KNIGHT EQUITY MARKETS L.P.; UBS SECURITIES, L.L.C.; E* TRADE CAPITAL MARKETS L.L.C.; NATIONAL FINANCIAL SERVICES, L.L.C.; CITADEL DERIVATIVES GROUP, L.L.C.; JOHN DOES 1-10 (names being fictitious) and ABC COMPANIES 1-10 (names being fictitious), jointly, severally or in the alternative, individually,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MORRIS COUNTY<br><br>DOCKET NO.:<br><br>*Civil Action*<br><br>**SUMMONS** |

**DULY SERVED**
DATE 6/18/17
John A. Kemler, Sheriff
BY _____ Special Deputy

**The State of New Jersey, to the Above-Named Defendant(s);**

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.**

YOU ARE HEREBY SUMMONED in a Civil Action in the Superior Court of New Jersey instituted by the above-named Plaintiff(s), and required to serve upon the attorney(s) for the plaintiff(s), whose name and office address appears above, an answer to the annexed complaint within 35 days after service of the Summons and Complaint upon you, exclusive of the day of service. If you fail to answer, judgment by default may be rendered against you for the relief demanded in the complaint. You shall promptly file your Answer and proof of services thereof with the Clerk of the Superior Court of New Jersey, Law Division, Morris County,

Morris County Courthouse, Washington & Court Streets, Morristown, NJ 07963, in accordance with the Rules of Civil Practice and procedure. A filing fee payable to the Clerk of the Superior Court and a completed Case Information Statement (available from the Clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion with applicable filing fee and completed Case Information Statement if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford to pay an attorney, call a Legal Services Office. An individual not eligible for free legal assistance may obtain a referral to an attorney by calling a county lawyer referral service. These numbers may be listed in the yellow pages of your phone book or may be obtained by calling the New Jersey State Bar Association Lawyer Referral Service toll free at 1-800-792-8315 (within New Jersey) or 1-609-394-1101 (from out of state). The telephone numbers for the county in which this action is pending are: Lawyer Referral Service: (973) 267-5882, and Legal Services: (973) 285-6911.

JENNIFER M. PEREZ, Clerk of the
Superior Court of New Jersey

Dated:

Name of Defendant to be served:      Merrill Lynch, Pierce, Fenner & Smith, Inc.

Address for Service:                 1300 Merrill Lynch Drive
                                     Pennington, New Jersey

# Directory of Superior Court Deputy Clerk's Offices
# County Lawyer Referral and Legal Services Offices

**ATLANTIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Direct Filing
1201 Bacharach Blvd., First Fl.
Atlantic City, NJ 08401

LAWYER REFERRAL
(609) 345-3444
LEGAL SERVICES
(609) 348-4200

**BERGEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Room 115
Justice Center, 10 Main St.
Hackensack, NJ 07601

LAWYER REFERRAL
(201) 488-0044
LEGAL SERVICES
(201) 487-2166

**BURLINGTON COUNTY:**
Deputy Clerk of the Superior Court
Central Processing Office
Attn: Judicial Intake
First Fl., Courts Facility
49 Rancocas Rd.
Mt. Holly, NJ 08060

LAWYER REFERRAL
(609) 261-4862
LEGAL SERVICES
(800) 496-4570

**CAMDEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Processing Office
Hall of Justice
1st Fl., Suite 150
101 South 5th Street
Camden, NJ 08103

LAWYER REFERRAL
(856) 964-4520
LEGAL SERVICES
(856) 964-2010

**CAPE MAY COUNTY:**
Deputy Clerk of the Superior Court
9 N. Main Street
Cape May Court House, NJ 08210

LAWYER REFERRAL
(609) 463-0313
LEGAL SERVICES
(609) 465-3001

**CUMBERLAND COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
60 West Broad Street
P.O. Box 10
Bridgeton, NJ 08302

LAWYER REFERRAL
(856) 696-5550
LEGAL SERVICES
(856) 691-0494

**ESSEX COUNTY:**
Deputy Clerk of the Superior Court
Civil Customer Service
Hall of Records, Room 201
465 Dr. Martin Luther King Jr. Blvd.
Newark, NJ 07102

LAWYER REFERRAL
(973) 622-6204
LEGAL SERVICES
(973) 624-4500

Revised 11/14/2011, CN 10792-English (Appendix XII-A)
Directory of Superior Court Deputy Clerk's Offices / County Lawyer Referral and Legal Services
Revised 11/2010, CN 10153-English

Page 2 of 4

**GLOUCESTER COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
Attn: Intake
First Fl., Court House
1 North Broad Street
Woodbury, NJ 08096

LAWYER REFERRAL
(856) 848-4589
LEGAL SERVICES
(856) 848-5360

**HUDSON COUNTY:**
Deputy Clerk of the Superior Court
Superior Court, Civil Records Dept.
Brennan Court House--1st Floor
583 Newark Ave.
Jersey City, NJ 07306

LAWYER REFERRAL
(201) 798-2727
LEGAL SERVICES
(201) 792-6363

**HUNTERDON COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
65 Park Avenue
Flemington, NJ 08822

LAWYER REFERRAL
(908) 735-2611
LEGAL SERVICES
(908) 782-7979

**MERCER COUNTY:**
Deputy Clerk of the Superior Court
Local Filing Office, Courthouse
175 S. Broad Street, P.O. Box 8068
Trenton, NJ 08650

LAWYER REFERRAL
(609) 585-6200
LEGAL SERVICES
(609) 695-6249

**MIDDLESEX COUNTY:**
Deputy Clerk of the Superior Court,
Middlesex Vicinage
2nd Floor - Tower
56 Paterson Street, P.O. Box 2633
New Brunswick, NJ 08903-2633

LAWYER REFERRAL
(732) 828-0053
LEGAL SERVICES
(732) 249-7600

**MONMOUTH COUNTY:**
Deputy Clerk of the Superior Court
Court House
P.O. Box 1269
Freehold, NJ 07728-1269

LAWYER REFERRAL
(732) 431-5544
LEGAL SERVICES
(732) 866-0020

**MORRIS COUNTY:**
Morris County Courthouse
Civil Division
Washington and Court Streets
P. O. Box 910
Morristown, NJ 07963-0910

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 285-6911

**OCEAN COUNTY:**
Deputy Clerk of the Superior Court
118 Washington Street,  Room 121
P.O. Box 2191
Toms River, NJ 08754-2191

LAWYER REFERRAL
(732) 240-3666
LEGAL SERVICES
(732) 341-2727

Revised 11/14/2011, CN 10792-English (Appendix XII-A)
Directory of Superior Court Deputy Clerk's Offices / County Lawyer Referral and Legal Services
Revised 11/2010, CN 10153-English

Page 3 of 4

PASSAIC COUNTY:
Deputy Clerk of the Superior Court
Civil Division
Court House
77 Hamilton Street
Paterson, NJ 07505

LAWYER REFERRAL
(973) 278-9223
LEGAL SERVICES
(973) 523-2900

SALEM COUNTY:
Deputy Clerk of the Superior Court
Attn: Civil Case Management Office
92 Market Street
Salem, NJ 08079

LAWYER REFERRAL
(856) 935-5629
LEGAL SERVICES
(856) 451-0003

SOMERSET COUNTY:
Deputy Clerk of the Superior Court
Civil Division
P.O. Box 3000
40 North Bridge Street
Somerville, N.J. 08876

LAWYER REFERRAL
(908) 685-2323
LEGAL SERVICES
(908) 231-0840

SUSSEX COUNTY:
Deputy Clerk of the Superior Court
Sussex County Judicial Center
43-47 High Street
Newton, NJ 07860

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 383-7400

UNION COUNTY:
Deputy Clerk of the Superior Court
1st Fl., Court House
2 Broad Street
Elizabeth, NJ 07207-6073

LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 354-4340

WARREN COUNTY:
Deputy Clerk of the Superior Court
Civil Division Office
Court House
413 Second Street
Belvidere, NJ 07823-1500

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(908) 475-2010

Revised 11/14/2011, CN 10792-English (Appendix XII-A)
Directory of Superior Court Deputy Clerk's Offices / County Lawyer Referral and Legal Services
Revised 11/2010, CN 10153-English

Page 4 of 4

MORRIS COUNTY
SUPERIOR COURT
COURT STREET
MORRISTOWN        NJ 07960

TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (973) 656-4100
COURT HOURS

DATE:    MAY 09, 2012
RE:      MANNING VS MERRILL LYNNCH
DOCKET: MRS L -001173 12

THE ABOVE CASE HAS BEEN ASSIGNED TO: TRACK 4.

DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE
JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST
DEFENDANT, WHICHEVER COMES FIRST.

THE MANAGING JUDGE ASSIGNED IS: HON DAVID B. RAND

IF YOU HAVE ANY QUESTIONS, CONTACT TEAM      001
AT: (973) 656-4103.

IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH R.4:5A-2.
ATTENTION:

NEAL H. FLASTER
30 COLUMBIA TURNPIKE
PO BOX 21
FLORHAM PARK      NJ 07932-2253

JUAMV4

*Copy Rcvd to Atty*

**Appendix XII-B1**



# CIVIL CASE INFORMATION STATEMENT
# (CIS)

Use for initial Law Division
Civil Part pleadings (not motions) under *Rule* 4:5-1
**Pleading will be rejected for filing, under *Rule* 1:5-6(c),
if information above the black bar is not completed
or attorney's signature is not affixed**

| FOR USE BY CLERK'S OFFICE ONLY |
| --- |
| PAYMENT TYPE: ☐ CK ☐ CG ☐ CA |
| CHG/CK NO. |
| AMOUNT: |
| OVERPAYMENT: |
| BATCH NUMBER: |

| ATTORNEY / PRO SE NAME | TELEPHONE NUMBER | COUNTY OF VENUE |
| --- | --- | --- |
| Neal H. Flaster, Esq. | (973) 822-7900 | Morris |

| FIRM NAME (if applicable) | DOCKET NUMBER (when available) |
| --- | --- |
| Law Offices of Neal H. Flaster, L.L.C | MRSL - 1173 - 12 |

| OFFICE ADDRESS | DOCUMENT TYPE |
| --- | --- |
| 30 Columbia Turnpike, Third Floor Florham Park, New Jersey 07932 | COMPLAINT |
| | JURY DEMAND  ■ YES  ☐ No |

| NAME OF PARTY (e.g., John Doe, Plaintiff) | CAPTION |
| --- | --- |
| GREG MANNING, Plaintiff | Greg Manning, Claes Arunup, Postiljonen AB, Postiljonen AS a.k.a Skandia-Postiljonen AS, Flygexpo AB and Londrima Holding Ltd. v Merrill Lynch Pierce, Fenner and Smith, et. al. |

| CASE TYPE NUMBER (See reverse side for listing) | IS THIS A PROFESSIONAL MALPRACTICE CASE?  ☐ YES  ■ NO |
| --- | --- |
| 508 | IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

| RELATED CASES PENDING?  ☐ YES  ■ No | IF YES, LIST DOCKET NUMBERS |
| --- | --- |

| DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)?  ■ YES  ☐ No | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known)  ☐ NONE  ■ UNKNOWN |
| --- | --- |

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP?  ☐ YES  ■ No | IF YES, IS THAT RELATIONSHIP:  ☐ EMPLOYER/EMPLOYEE  ☐ FRIEND/NEIGHBOR  ☐ OTHER (explain)  ☐ FAMILIAL  ☐ BUSINESS |
| --- | --- |

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?  ■ YES  ☐ No |
| --- |

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

| DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS?  ☐ YES  ■ No | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
| --- | --- |
| WILL AN INTERPRETER BE NEEDED?  ☐ YES  ■ No | IF YES, FOR WHAT LANGUAGE? |

**I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).**

ATTORNEY SIGNATURE: *Neal H. Flaster*



**Side 2**

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
Use for initial pleadings (not motions) under *Rule* 4:5-1

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I - 150 days' discovery**
- 151  NAME CHANGE
- 175  FORFEITURE
- 302  TENANCY
- 399  REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
- 502  BOOK ACCOUNT (debt collection matters only)
- 505  OTHER INSURANCE CLAIM (including declaratory judgment actions)
- 506  PIP COVERAGE
- 510  UM or UIM CLAIM (coverage issues only)
- 511  ACTION ON NEGOTIABLE INSTRUMENT
- 512  LEMON LAW
- 801  SUMMARY ACTION
- 802  OPEN PUBLIC RECORDS ACT (summary action)
- 999  OTHER (briefly describe nature of action)

**Track II - 300 days' discovery**
- 305  CONSTRUCTION
- 509  EMPLOYMENT (other than CEPA or LAD)
- 599  CONTRACT/COMMERCIAL TRANSACTION
- 603N AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold)
- 603Y AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold)
- 605  PERSONAL INJURY
- 610  AUTO NEGLIGENCE – PROPERTY DAMAGE
- 621  UM or UIM CLAIM (includes bodily injury)
- 699  TORT – OTHER

**Track III - 450 days' discovery**
- 005  CIVIL RIGHTS
- 301  CONDEMNATION
- 602  ASSAULT AND BATTERY
- 604  MEDICAL MALPRACTICE
- 606  PRODUCT LIABILITY
- 607  PROFESSIONAL MALPRACTICE
- 608  TOXIC TORT
- 609  DEFAMATION
- 616  WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
- 617  INVERSE CONDEMNATION
- 618  LAW AGAINST DISCRIMINATION (LAD) CASES

**Track IV - Active Case Management by Individual Judge / 450 days' discovery**
- 156  ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
- 303  MT. LAUREL
- 508  COMPLEX COMMERCIAL
- 513  COMPLEX CONSTRUCTION
- 514  INSURANCE FRAUD
- 620  FALSE CLAIMS ACT
- 701  ACTIONS IN LIEU OF PREROGATIVE WRITS

**Centrally Managed Litigation (Track IV)**
| | | |
|---|---|---|
| 285  STRYKER TRIDENT HIP IMPLANTS | 291  PELVIC MESH/GYNECARE |
| 288  PRUDENTIAL TORT LITIGATION | 292  PELVIC MESH/BARD |
| 289  REGLAN | 293  DEPUY ASR HIP IMPLANT LITIGATION |
| 290  POMPTON LAKES ENVIRONMENTAL LITIGATION | 295  ALLODERM REGENERATIVE TISSUE MATRIX |
| | 623  PROPECIA |

**Mass Tort (Track IV)**
| | | |
|---|---|---|
| 266  HORMONE REPLACEMENT THERAPY (HRT) | 281  BRISTOL-MYERS SQUIBB ENVIRONMENTAL |
| 271  ACCUTANE/ISOTRETINOIN | 282  FOSAMAX |
| 274  RISPERDAL/SEROQUEL/ZYPREXA | 284  NUVARING |
| 278  ZOMETA/AREDIA | 286  LEVAQUIN |
| 279  GADOLINIUM | 287  YAZ/YASMIN/OCELLA |
| | 601  ASBESTOS |

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1, in the space under "Case Characteristics.

**Please check off each applicable category**  ☐ **Putative Class Action**   ☐ **Title 59**

# NEAL H. FLASTER, LLC

30 Columbia Turnpike
P.O. Box 21
Florham Park, New Jersey 07932
Tel. No.: (973) 822-7900
Attorneys for Plaintiff
Greg Manning, et al.

Y:\Manning\RICO\Summons 5-8-2012.wpd

| | |
|---|---|
| GREG MANNING; CLAES ARNRUP; POSILJONEN AB; POSILJONEN AS; SVEABORG HANDEL AS; FLYGEXPO AB; and LONDRINA HOLDING, LTD. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MORRIS COUNTY |

DOCKET NO.:

Plaintiffs,

*vs.*

*Civil Action*

MERRILL LYNCH, PIERCE, FENNER &
SMITH, INC.; KNIGHT CAPITAL
AMERICAS, L.P., formerly known as
KNIGHT EQUITY MARKETS L.P.; UBS
SECURITIES, L.L.C.; E* TRADE CAPITAL
MARKETS L.L.C.; NATIONAL
FINANCIAL SERVICES, L.L.C.; CITADEL
DERIVATIVES GROUP, L.L.C.; JOHN
DOES 1-10 (names being fictitious) and ABC
COMPANIES 1-10 (names being fictitious),
jointly, severally or in the alternative,
individually,

**SUMMONS**

Defendants.

**The State of New Jersey, to the Above-Named Defendant(s);**

**NATIONAL FINANCIAL SERVICES, L.L.C.**

YOU ARE HEREBY SUMMONED in a Civil Action in the Superior Court of New
Jersey instituted by the above-named Plaintiff(s), and required to serve upon the attorney(s) for
the plaintiff(s), whose name and office address appears above, an answer to the annexed
complaint within 35 days after service of the Summons and Complaint upon you, exclusive of
the day of service. If you fail to answer, judgment by default may be rendered against you for the

relief demanded in the complaint. You shall promptly file your Answer and proof of services thereof with the Clerk of the Superior Court of New Jersey, Law Division, Morris County, Morris County Courthouse, Washington & Court Streets, Morristown, NJ 07963, in accordance with the Rules of Civil Practice and procedure. A filing fee payable to the Clerk of the Superior Court and a completed Case Information Statement (available from the Clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion with applicable filing fee and completed Case Information Statement if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford to pay an attorney, call a Legal Services Office. An individual not eligible for free legal assistance may obtain a referral to an attorney by calling a county lawyer referral service. These numbers may be listed in the yellow pages of your phone book or may be obtained by calling the New Jersey State Bar Association Lawyer Referral Service toll free at 1-800-792-8315 (within New Jersey) or 1-609-394-1101 (from out of state). The telephone numbers for the county in which this action is pending are: Lawyer Referral Service: (973) 267-5882, and Legal Services: (973) 285-6911.

JENNIFER M. PEREZ, Clerk of the
Superior Court of New Jersey

Dated:

Name of Defendant to be served:     National Financial Services, L.L.C.

Address for Service:                        1000 Plaza
                                                      Jersey City, New Jersey

# NEAL H. FLASTER, LLC

30 Columbia Turnpike
P.O. Box 21
Florham Park, New Jersey 07932
Tel. No.: (973) 822-7900
Attorneys for Plaintiff
Greg Manning, et al.

Y:\Manning\EXXX\Summons 5-8-2012.wpd

| | |
|---|---|
| GREG MANNING; CLAES ARNRUP; POSILJONEN AB; POSILJONEN AS; SVEABORG HANDEL AS; FLYGEXPO AB; and LONDRINA HOLDING, LTD. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MORRIS COUNTY |
| | DOCKET NO.: |
| Plaintiffs, | |
| | |
| vs. | *Civil Action* |
| | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; KNIGHT CAPITAL AMERICAS, L.P., formerly known as KNIGHT EQUITY MARKETS L.P.; UBS SECURITIES, L.L.C.; E* TRADE CAPITAL MARKETS L.L.C.; NATIONAL FINANCIAL SERVICES, L.L.C.; CITADEL DERIVATIVES GROUP, L.L.C.; JOHN DOES 1-10 (names being fictitious) and ABC COMPANIES 1-10 (names being fictitious), jointly, severally or in the alternative, individually, | **SUMMONS** |
| | |
| Defendants. | |

**The State of New Jersey, to the Above-Named Defendant(s);**

### E* TRADE CAPITAL MARKETS, L.L.C.

YOU ARE HEREBY SUMMONED in a Civil Action in the Superior Court of New Jersey instituted by the above-named Plaintiff(s), and required to serve upon the attorney(s) for the plaintiff(s), whose name and office address appears above, an answer to the annexed complaint within 35 days after service of the Summons and Complaint upon you, exclusive of the day of service. If you fail to answer, judgment by default may be rendered against you for the relief demanded in the complaint. You shall promptly file your Answer and proof of services

thereof with the Clerk of the Superior Court of New Jersey, Law Division, Morris County, Morris County Courthouse, Washington & Court Streets, Morristown, NJ 07963, in accordance with the Rules of Civil Practice and procedure. A filing fee payable to the Clerk of the Superior Court and a completed Case Information Statement (available from the Clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion with applicable filing fee and completed Case Information Statement if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford to pay an attorney, call a Legal Services Office. An individual not eligible for free legal assistance may obtain a referral to an attorney by calling a county lawyer referral service. These numbers may be listed in the yellow pages of your phone book or may be obtained by calling the New Jersey State Bar Association Lawyer Referral Service toll free at 1-800-792-8315 (within New Jersey) or 1-609-394-1101 (from out of state). The telephone numbers for the county in which this action is pending are: Lawyer Referral Service: (973) 267-5882, and Legal Services: (973) 285-6911.

JENNIFER M. PEREZ, Clerk of the
Superior Court of New Jersey

Dated:

Name of Defendant to be served:      E* Trade Capital Markets, L.L.C.

Address for Service:                 Harborside Financial Center
                                     501 Plaza 2
                                     34 Exchange Place
                                     Jersey City, New Jersey

# NEAL H. FLASTER, LLC

30 Columbia Turnpike
P.O. Box 21
Florham Park, New Jersey 07932
Tel. No.: (973) 822-7900
Attorneys for Plaintiff
Greg Manning, et al.

<small>V:\Manning\REO\Summons 1-0 2612.wpd</small>

| | |
|---|---|
| GREG MANNING; CLAES ARNRUP; POSILJONEN AB; POSILJONEN AS; SVEABORG HANDEL AS; FLYGEXPO AB; and LONDRINA HOLDING, LTD.<br><br><div align="right">Plaintiffs,</div><br><br><div align="center">*vs.*</div><br>MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; KNIGHT CAPITAL AMERICAS, L.P., formerly known as KNIGHT EQUITY MARKETS L.P.; UBS SECURITIES, L.L.C.; E* TRADE CAPITAL MARKETS L.L.C.; NATIONAL FINANCIAL SERVICES, L.L.C.; CITADEL DERIVATIVES GROUP, L.L.C.; JOHN DOES 1-10 (names being fictitious) and ABC COMPANIES 1-10 (names being fictitious), jointly, severally or in the alternative, individually,<br><br><div align="right">Defendants.</div> | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MORRIS COUNTY<br><br>DOCKET NO.:<br><br><br>*Civil Action*<br><br><br><br><br><br>**SUMMONS** |

**The State of New Jersey, to the Above-Named Defendant(s);**

      **UBS SECURITIES, L.L.C.**

      YOU ARE HEREBY SUMMONED in a Civil Action in the Superior Court of New Jersey instituted by the above-named Plaintiff(s), and required to serve upon the attorney(s) for the plaintiff(s), whose name and office address appears above, an answer to the annexed complaint within 35 days after service of the Summons and Complaint upon you, exclusive of

the day of service. If you fail to answer, judgment by default may be rendered against you for the relief demanded in the complaint. You shall promptly file your Answer and proof of services thereof with the Clerk of the Superior Court of New Jersey, Law Division, Morris County, Morris County Courthouse, Washington & Court Streets, Morristown, NJ 07963, in accordance with the Rules of Civil Practice and procedure. A filing fee payable to the Clerk of the Superior Court and a completed Case Information Statement (available from the Clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion with applicable filing fee and completed Case Information Statement if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford to pay an attorney, call a Legal Services Office. An individual not eligible for free legal assistance may obtain a referral to an attorney by calling a county lawyer referral service. These numbers may be listed in the yellow pages of your phone book or may be obtained by calling the New Jersey State Bar Association Lawyer Referral Service toll free at 1-800-792-8315 (within New Jersey) or 1-609-394-1101 (from out of state). The telephone numbers for the county in which this action is pending are: Lawyer Referral Service: (973) 267-5882, and Legal Services: (973) 285-6911.

JENNIFER M. PEREZ, Clerk of the
Superior Court of New Jersey

Dated:

Name of Defendant to be served:     UBS Securities, L.L.C.

Address for Service:                480 Washington Boulevard
                                    Jersey City, New Jersey

# NEAL H. FLASTER, LLC

30 Columbia Turnpike
P.O. Box 21
Florham Park, New Jersey 07932
Tel. No.: (973) 822-7900
Attorneys for Plaintiff
Greg Manning, et al.

V_MJenwaySUCUSummons 5-8-2012.wpd

| | |
|---|---|
| GREG MANNING; CLAES ARNRUP; POSILJONEN AB; POSILJONEN AS; SVEABORG HANDEL AS; FLYGEXPO AB; and LONDRINA HOLDING, LTD.<br><br>Plaintiffs,<br><br>vs.<br><br>MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; KNIGHT CAPITAL AMERICAS, L.P., formerly known as KNIGHT EQUITY MARKETS L.P.; UBS SECURITIES, L.L.C.; E* TRADE CAPITAL MARKETS L.L.C.; NATIONAL FINANCIAL SERVICES, L.L.C.; CITADEL DERIVATIVES GROUP, L.L.C.; JOHN DOES 1-10 (names being fictitious) and ABC COMPANIES 1-10 (names being fictitious), jointly, severally or in the alternative, individually,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MORRIS COUNTY<br><br>DOCKET NO.:<br><br>*Civil Action*<br><br>**SUMMONS** |

**The State of New Jersey, to the Above-Named Defendant(s);**

**KNIGHT CAPITAL AMERICAS, L.P.**

YOU ARE HEREBY SUMMONED in a Civil Action in the Superior Court of New Jersey instituted by the above-named Plaintiff(s), and required to serve upon the attorney(s) for the plaintiff(s), whose name and office address appears above, an answer to the annexed complaint within 35 days after service of the Summons and Complaint upon you, exclusive of the day of service. If you fail to answer, judgment by default may be rendered against you for the relief demanded in the complaint. You shall promptly file your Answer and proof of services

thereof with the Clerk of the Superior Court of New Jersey, Law Division, Morris County, Morris County Courthouse, Washington & Court Streets, Morristown, NJ 07963, in accordance with the Rules of Civil Practice and procedure. A filing fee payable to the Clerk of the Superior Court and a completed Case Information Statement (available from the Clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion with applicable filing fee and completed Case Information Statement if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford to pay an attorney, call a Legal Services Office. An individual not eligible for free legal assistance may obtain a referral to an attorney by calling a county lawyer referral service. These numbers may be listed in the yellow pages of your phone book or may be obtained by calling the New Jersey State Bar Association Lawyer Referral Service toll free at 1-800-792-8315 (within New Jersey) or 1-609-394-1101 (from out of state). The telephone numbers for the county in which this action is pending are: Lawyer Referral Service: (973) 267-5882, and Legal Services: (973) 285-6911.

JENNIFER M. PEREZ, Clerk of the
Superior Court of New Jersey

Dated:

Name of Defendant to be served:     Knight Capital Americas, L.P.

Address for Service:                545 Washington Boulevard
                                    Jersey City, New Jersey

# Hudson County Sheriff's Office
# AFFIDAVIT OF SERVICE

|  |  |
|---|---|
| Plaintiff | GREG MANNING; CLAES ARNRUP; POSILJONEN AB; POSILJONEN AS; SVEABORG HANDEL AS; FLYGEXPO AB; |
| Defendant | MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; KNIGHT CAPITAL AMERICAS, L.P., FORMERLY KNOWN AS KNIGHT |

Service # of 4 Services

Docket # MRS-L-1173-12

Sheriff's # **S 148853**

Attorney Firm
NEAL H FLASTER

30 COLUMBIA TURNPIKE P.O. BOX 21

FLORHAM PARK, NJ 07932

SUPERIOR
NEW JERSEY
MORRIS

Papers Served
SUMMONS/COMPLAINT AND JURY DEMAND
TRACK ASSIGNMENT NOTICE
CIVIL CASE INFORMATION STATEMENT

ENTERED ON ACMS

I, FRANK X. SCHILLARI, SHERIFF OF HUDSON COUNTY DO HEREBY DEPUTIZE AND APPOINT M. RANSOM A DULY SWORN OFFICER TO EXECUTE AND RETURN THE DOCUMENTS ACCORDING TO LAW.

RECEIVED & FILED
SUPERIOR COURT
2012 JUL -3 A 10: 51
CIVIL DIVISION

Date of Action 6/19/2012
Time of Action

| ATTEMPTS | DATE | TIME |
|---|---|---|

Person/Corporation Served

KNIGHT CAPITAL AMERICAS, L.P.
545 WASHINGTON BOULEVARD
JERSEY CITY, NJ

Delivered To DANNY MERRITT

Relationship DEPUTY GENERAL COUNSEL

Type of Action SERVED CORPORATION'S MANAGING AGENT AT PLACE OF EMPLOYMENT

SERVED 6/26/12

I, M. RANSOM WAS ABLE TO SERVE THE WITHIN DOCUMENTS AND/OR A TRUE COPY THEREOF.

M. RANSOM          DATED 6/26/12

# Hudson County Sheriff's Office
## AFFIDAVIT OF SERVICE

Plaintiff  GREG MANNING; CLAES ARNRUP; POSILJONEN AB;
POSILJONEN AS; SVEABORG HANDEL AS; FLYGEXPO AB;

Defendant  MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; KNIGHT
CAPITAL AMERICAS, L.P., FORMERLY KNOWN AS KNIGHT

Service #  of 4 Services

Docket #  MRS-L-1173-12

Sheriff's #  **S 148853**

SUPERIOR
NEW JERSEY
MORRIS

NEAL H FLASTER
30 COLUMBIA TURNPIKE P.O. BOX 21
FLORHAM PARK, NJ 07932

Papers Served
SUMMONS/COMPLAINT AND JURY DEMAND

TRACK ASSIGNMENT NOTICE

CIVIL CASE INFORMATION STATEMENT

*ENTERED ON ACMS*

I, FRANK X. SCHILLARI, SHERIFF OF HUDSON COUNTY DO HEREBY DEPUTIZE AND APPOINT
M. RANSOM A DULY SWORN OFFICER TO EXECUTE AND RETURN THE
DOCUMENTS ACCORDING TO LAW.

Date of Action 6/19/2012
Time of Action

Attempts          Date          Time

Person/Corporation to Serve
**NATIONAL FINANCIAL SERVICES, L.L.C.**

1000 PLAZA
JERSEY CITY, NJ

RECEIVED & FILED
SUPERIOR COURT
2012 JUL - 3  A 10: 52
CIVIL DIVISION

Reason for NonService NOT KNOWN AT THIS ADDRESS

NO SUCH ADDRESS
NO SERVICE 6/26/12

I, M. RANSOM WAS NOT ABLE TO SERVE THE WITHIN DOCUMENTS AND/OR A TRUE COPY THEREOF.

Dof. M. Ranson          6/26/12

M. RANSOM          DATED

# Hudson County Sheriff's Office
## AFFIDAVIT OF SERVICE

Service #  of 4 Services

Plaintiff    GREG MANNING; CLAES ARNRUP; POSILJONEN AB; POSILJONEN AS; SVEABORG HANDEL AS; FLYGEXPO AB;

Docket #    MRS-L-1173-12

Sheriff's #    **S 148853**

Defendant   MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; KNIGHT CAPITAL AMERICAS, L.P., FORMERLY KNOWN AS KNIGHT

Attorney Firm
NEAL H FLASTER

30 COLUMBIA TURNPIKE P.O. BOX 21

FLORHAM PARK, NJ 07932

SUPERIOR
NEW JERSEY
MORRIS

Papers Served
SUMMONS/COMPLAINT AND JURY DEMAND
TRACK ASSIGNMENT NOTICE
CIVIL CASE INFORMATION STATEMENT

*ENTERED ON ACMS*

I, FRANK X. SCHILLARI, SHERIFF OF HUDSON COUNTY DO HEREBY DEPUTIZE AND APPOINT M. RANSOM A DULY SWORN OFFICER TO EXECUTE AND RETURN THE DOCUMENTS ACCORDING TO LAW.

CIVIL DIVISION
2012 JUL -3 A 10: 52
RECEIVED & FILED
SUPERIOR COURT

Date of Action 6/19/2012

Time of Action

ATTEMPTS    DATE    TIME

Person/Corporation Served    E* TRADE CAPITAL MARKETS, L.L.C HARBORSIDE FINANCIAL CNTR 501 PLAZA 2 JERSEY CITY, NJ

Delivered To JEREMY BENELIN

Relationship MANAGING AGENT

Type of Action SERVED CORPORATION'S MANAGING AGENT AT PLACE OF EMPLOYMENT

SERVED 6/26/12

I, M. RANSOM WAS ABLE TO SERVE THE WITHIN DOCUMENTS AND/OR A TRUE COPY THEREOF.

_Del. M. Ransom_    6/26/12

M. RANSOM      DATED

# Hudson County Sheriff's Office
## AFFIDAVIT OF SERVICE

Service #   of 4 Services

Docket #     MRS-L-1173-12

Sheriff's #   **S  148853**

Plaintiff    GREG MANNING; CLAES ARNRUP; POSILJONEN AB;
             POSILJONEN AS; SVEABORG HANDEL AS; FLYGEXPO AB;

Defendant  MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; KNIGHT
           CAPITAL AMERICAS, L.P., FORMERLY KNOWN AS KNIGHT

SUPERIOR
NEW JERSEY
MORRIS

NEAL H FLASTER
30 COLUMBIA TURNPIKE P.O. BOX 21
FLORHAM PARK, NJ 07932

Papers Served
SUMMONS/COMPLAINT AND JURY DEMAND

TRACK ASSIGNMENT NOTICE

CIVIL CASE INFORMATION STATEMENT

*ENTERED ON ACMS*

I, FRANK X. SCHILLARI, SHERIFF OF HUDSON COUNTY DO HEREBY DEPUTIZE AND APPOINT
M. RANSOM A DULY SWORN OFFICER TO EXECUTE AND RETURN THE
DOCUMENTS ACCORDING TO LAW.

Date of Action 6/19/2012
Time of Action

Attempts      Date      Time

Person/Corporation to Serve
**UBS SERCURITIES, L.L.C**

480 WASHINGTON BOULEVARD
JERSEY CITY, NJ

2012 JUL - 3  A 10: 52
CIVIL DIVISION
RECEIVED & FILED
SUPERIOR COURT

Reason for NonService OTHER

CORPORATE OFFICE 1000 HARBOR BLVD, WEEHAWKEN NJ
NO SERVICE 6/26/12

I, M. RANSOM WAS NOT ABLE TO SERVE THE WITHIN DOCUMENTS AND/OR A TRUE COPY THEREOF.

Det. M. Ransom      6/26/12

M. RANSOM          DATED

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GREG MANNING; CLAES ARNRUP; POSILJONEN AB; POSILJONEN AS; SVEABORG HANDEL AS; FLYGEXPO AB; AND LONDRINA HOLDING, LTD., <br><br> Plaintiffs, <br><br> v. <br><br> MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED; KNIGHT CAPITAL AMERICAS, LP, formerly known as KNIGHT EQUITY MARKETS L.P.; UBS SECURITIES, L.L.C.; E*TRADE CAPITAL MARKETS L.L.C.; NATIONAL FINANCIAL SERVICES, L.L.C.; CITADEL DERIVATIVES GROUP, L.L.C.; JOHN DOES 1–10 (names being fictitious); and ABC COMPANIES 1–10 (names being fictitious), jointly, severally or in the alternative, individually, <br><br> Defendants. | Case No.: _____ <br><br><br><br><br><br> **DEFENDANT'S CONSENT TO REMOVAL** |

Defendant E*Trade Capital Markets L.L.C., through its undersigned counsel, hereby consents to the removal of this case by Defendant Merrill Lynch, Pierce, Fenner & Smith, Incorporated from the Superior Court of New Jersey, County of Morris, Docket No. L-1173-12, to this Honorable Court, the United States District Court for the District of New Jersey, Newark Division.

NJ 227469087v1 July 17, 2012

Respectfully submitted on this 17th day of July, 2012.

GREENBERG TRAURIG LLP

By: _David E. Sellinger_
    David E. Sellinger

200 Park Avenue
Florham Park, NJ 07932-0677
Tel 973.360.7900
Fax 973.301.8410
sellingerd@gtlaw.com

*Attorneys for Defendant*
*E\*Trade Capital Markets L.L.C.*

IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF NEW JERSEY
NEWARK DIVISION

| | |
|---|---|
| GREG MANNING; CLAES ARNRUP; POSILJONEN AB; POSILJONEN AS; SVEABORG HANDEL AS; FLYGEXPO AB; AND LONDRINA HOLDING, LTD., <br><br> Plaintiffs, <br><br> v. <br><br> MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED; KNIGHT CAPITAL AMERICAS, LP, formerly known as KNIGHT EQUITY MARKETS L.P.; UBS SECURITIES, L.L.C.; E* TRADE CAPITAL MARKETS L.L.C.; NATIONAL FINANCIAL SERVICES, L.L.C.; CITADEL DERIVATIVES GROUP, L.L.C.; JOHN DOES 1–10 (names being fictitious); and ABC COMPANIES 1–10 (names being fictitious), jointly, severally or in the alternative, individually, <br><br> Defendants. | Case No.: _____ <br><br><br> **DEFENDANT KNIGHT CAPITAL AMERICAS, L.P. f/k/a KNIGHT EQUITY MARKETS, L.P.'S CONSENT TO REMOVAL** |

Defendant Knight Capital Americas, L.P. f/k/a Knight Equity Markets, L.P., through the undersigned counsel, hereby consents to the removal of this case by Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated from the Superior Court of New Jersey Law Division, Morris County, Docket No. MRS L-1173-12, to this Honorable Court, in the United States District Court for the District of New Jersey, Newark Division.

Respectfully submitted on this 17th day of July, 2012.

By: _____

Joseph N. Froehlich
LOCKE LORD LLP
Three World Financial Center
New York, NY 10281-2101
Tele: (212) 415-8600
Fax: (212) 303-2754

Of counsel:   Edwin R. DeYoung
              Texas State Bar No. 0567300
            David G. Cabrales
              Texas State Bar No. 00787179
            James H. Bilton
              Texas State Bar No. 24050293
            LOCKE LORD LLP
            2200 Ross Avenue, Suite 2200
            Dallas, Texas 75201
            Tele: (214) 740-8000
            Fax: (214) 740-8800

**ATTORNEYS FOR KNIGHT CAPITAL
AMERICAS, L.P.**

2